**LAW OFFICE OF DAYTON P. HAIGNEY**
Dayton P. Haigney (DH-3455)
233 Broadway, Suite 2348
New York, NY 10279
(212) 557-5590
dphlaw@msn.com


**KNEUPPER & COVEY, PC**
Kevin Kneupper *(pro hac vice application forthcoming)*
(CA SBN 325413; TX SBN 24050885)
17011 Beach Blvd., Suite 900
Huntington Beach, CA 92647
Telephone: (512) 420-8407
kevin@kneuppercovey.com

*Attorneys for Plaintiff Plaintiffs Yonatan Widiantoro,*
*Heather Brown, Colleen Carmichael, Joseph Liotta,*
*Sabrina Lopez, Alissa Stefanacci, Cheryl Tishman,*
*and Jolene Hynes*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YONATAN WIDIANTORO, HEATHER BROWN, COLLEEN CARMICHAEL, JOSEPH LIOTTA, SABRINA LOPEZ, ALISSA STEFANACCI, CHERYL TISHMAN, and JOLENE HYNES,<br><br>          Plaintiffs,<br><br>v.<br><br>CHRISTOPHER MASANTO, ANDREW MASANTO, CEL PRODUCTS LIMITED, AMPLIFY LIMITED, COFOUNDANT LIMITED, COFOUNDANT HOLDINGS LIMITED, BLOOMING INVESTMENTS LIMITED, and PETLAB GROUP LIMITED,<br><br>          Defendants. | Civ. A. No.: 1:21-cv-6941<br><br>**COMPLAINT FOR:**<br><br>(1) Violation of Magnuson-Moss Warranty Act;<br>(2) Breach of Express Warranty;<br>(3) Breach of Implied Warranty of Merchantability;<br>(4) Products Liability;<br>(5) Violation of New York and Washington State Consumer Protection Statutes;<br>(6) Violation of California State Consumer Protection Statutes;<br>(7) Fraud.<br><br>**DEMAND FOR JURY TRIAL** |

i

Plaintiffs Yonatan Widiantoro, Heather Brown, Colleen Carmichael, Joseph Liotta, Sabrina Lopez, Alissa Stefanacci, Cheryl Tishman, and Jolene Hynes ("Plaintiffs") alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this matter because Plaintiffs' Magnusson-Moss Warranty Act ("Magnusson-Moss") claim, 15 U.S.C. §§ 2301, *et. seq.,* arises under federal law. The amount in controversy of Plaintiff's individual claims meet or exceed $25, and the amount in controversy for all claims to be determined by this lawsuit meets or exceeds $50,000. 15 U.S.C. § 2310(d)(1).

2.      This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

3.      This Court has personal jurisdiction over Defendants Andrew Masanto and Defendant Amplify Limited because they reside this District.

4.      Defendants Christopher Masanto, Cel Products Limited, Cofoundant Holdings Limited, Blooming Investments Limited, and PetLab Group Limited, marketed, promoted, distributed, and sold their products in New York and controlled the activities of Amplify Limited in New York, and Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through their promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible. The Defendants purposely directed their activities towards New York. This included the sale to Sabrina Lopez, a resident of New York. Defendant Christopher Masanto is the CEO of Amplify Limited, whose offices are in this District.

5.      Defendants Cofoundant Holdings Limited, Blooming Investments Limited, and PetLab Group Limited are successors-in-interest of Cel Products Limited and its contacts with this district can be imputed to them. All Defendants are further alter egos of one another, and their contacts can be imputed to one another under a personal jurisdiction analysis.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) because Defendants Amplify Limited and Andrew Masanto reside in this District. Defendants Christopher Masanto, Cel Products Limited, Cofoundant Holdings Limited, Blooming Investments Limited, and PetLab Group Limited reside in the United Kingdom and are disregarded under 28 U.S.C. §§ 1391(c)(3).

## THE PARTIES

### Plaintiffs

7.      **Plaintiff Yonatan Widiantoro** is a citizen of California residing in Covina, CA. On August 18, 2019, Mr. Widiantoro purchased Cel MD's Hair Stimulation Shampoo and Conditioner Travel Pack and the Cel MD Microstem Hair Stimulation Formula based on representations in the advertising for Cel MD. On August 18, 2019, he purchased the Hair Stimulation Shampoo and Conditioner and signed up for a subscription for the Cel MD Microstem Hair Stimulation Formula. He was billed $57.95 on August 18, 2019, $57.95 on September 17, 2019, $57.95 on October 20, 2019, and $57.95 on November 20, 2019. In total, he spent $231.80 on the products.

8.      Mr. Widiantoro specifically recalls seeing advertisements claiming that the plant stem cells in the Cel MD products could reverse hair loss. He also saw what he believed to be legitimate reviews of people claiming that the product worked. He expected to see significant results as he used the product for five months. Instead Mr. Widiantoro's hair got thinner after using the Cel products. The products did not have the promised effect whatsoever.

2

9.      **Plaintiff Heather Brown** is a citizen of Washington residing in Vancouver, Washington. On September 7, 2019, she purchased the "Cel MD Microstem Deep Conditioning Hair Mask for Dry Damaged Hair" from Amazon.com for $42.95. On September 4, 2019, she purchased the "CEL MD Stem Cell Hair Growth Thickening Shampoo and Conditioner for Women and Men" on Amazon for $63.24. On February 3, 2020, without realizing it was from the same company, she purchased the "Cel Advanced Hair Supplement" after clicking on a promotional offer on Amazon for $29.95. Ms. Brown specifically recalls seeing advertisements claiming that the plant stem cells in the Cel MD product could reverse hair loss. She also saw what she believed to be legitimate reviews of people claiming that the product worked. She relied on these claims and expected to see significant results because of the advertising claims of hair growth. Instead, after using the Cel MD products Ms. Brown began to have an allergic reaction. Her head began to sting severely and she experienced skin peeling from her forehead. Ms. Brown's hair got thinner after using the Cel MD products. The products did not have the promised effect whatsoever. Her problems were so bad that she was forced to seek medical care. She went to a doctor on October 21, 2019, who prescribed a Ketoconazole 2% shampoo. She paid a $35 copay, as well as a $20 copay on the shampoo and another $20 copay for a renewal of the prescription. Ms. Brown's skin problems lasted for months, which caused her severe embarrassment. She was forced to wear a hat constantly to avoid revealing her red, splotchy, peeling skin. She attended at least one travel business trip while enduring her extended reaction and decided to stay in her hotel room without going out to avoid drawing attention to herself. Ms. Brown was severely emotionally distressed by the damage to her head, particularly because, until the skin rash cleared up, she did not know if the issue would be permanent.

10.     **Plaintiff Colleen Carmichael** is a citizen of California residing in Crestline, California. On February 6, 2020, she signed up for a subscription of PetLab Co's Itch Relief Chews for $31.72 per month. She purchased an additional single "upsell" of Itch Relief Chews for $19.03. Her last subscription purchase was on July 7, 2020. She purchased through Defendants' website. She bought the products because her dachshund. Cinnamon had developed itchy skin, with red sores, elephant skin, and hair loss. She relied on Defendants' representations regarding the effectiveness of the Itch Relief Chews. She relied on Defendants' representations that PetLab Co. products were made from natural ingredients, and felt they would benefit the dog since they were supposedly from natural, non-toxic herbal ingredients. She relied on Defendants' representations to that she should continue giving her dogs the Itch Relief Chew product for more than 30 days (a single monthly) purchase for it to be effective, which she relied on when deciding to continue the subscription.

11.     When Ms. Carmichael decided to discontinue her subscription, Defendants made it difficult for her to do so. Despite suspending her subscription after the July 2020 shipment, Defendants continued to wrongfully enroll her in monthly subscriptions. Defendants re-subscribed Ms. Carmichael multiple times without her consent after she canceled her original subscription. This practice continued at least through January 6, 2021, when she received another confirmation for an order she did not affirmatively authorize.

12.     **Plaintiff Joseph Liotta** is a citizen of Florida residing in Hollandale Beach, Florida. Mr. Liotta purchased the PetLab Dental Formula on the PetLab website on January 24, 2020. He was billed under a subscription on March 24, 2020, April 23, 2020, May 27, 2020, June 22, 2020, July 12, 2020, August 21, 2020, and September 20, 2020. He was billed $31.72 per bottle, for a total

of $253.76. Mr. Liotta relied on Defendants' representations that the products were effective in improving dental and oral health in dogs.

13.     Like numerous other victims, Mr. Liotta saw no improvement in the dental health of his two dogs, and in fact, the dogs' oral health conditions worsened. His dogs lost two teeth while using the product.

14.     **Plaintiff Sabrina Lopez** is a citizen of New York residing in Schenectady, New York. Ms. Lopez purchased a subscription for Joint Care Chews on October 28, 2019, which Defendants shipped by UPS. Ms. Lopez's subscription was delivered every three months, and Defendants billed her five time, on October 28, 2019, and for four additional orders on January 28, 2020, April 28, 2020, July 28, 2020, and October 28, 2020. She was billed $357.15 in total. She purchased the chews for her pit bull terrier, Olive, who suffers from joint pain. Like numerous other victims, Ms. Lopez saw no improvement in the health of her dog Olive, who still exhibits joint pain after running. This product failed to deliver on the promises made by Defendants on the PetLab Co. website, in ads, and on product labels promising that their products improve joint issues in dogs, which Ms. Lopez relied on to her detriment.

15.     **Plaintiff Alissa Stefanacci** is a citizen of Florida residing in Naples, Florida. Ms. Stefanacci saw advertisements for Cel MD products claiming that they could cure hair loss and improve nail growth and repair nails, and she relied on those representations. She purchased the following Cel MD products based on Defendants' representations in their advertising: Cel Nail Formula, Microstem Shampoo, and Microstem Conditioner. She first purchased on Amazon, and then began purchasing from the company's website. She purchased the Microstem Shampoo and Microstem Conditioner on Amazon.com on August 27, 2018. She purchased six units of the Microstem Shampoo and six units of the Microstem Conditioner from the Cel MD website

sometime in 2019. She purchased two "four-packs" of the Cel MD Nail Formula on February 21, 2020 from the Cel MD website for $75.95. She purchased another "four-pack" of the Cel MD Nail Formula on February 27, 2020 from the Cel MD website for $18.28.

16.     Instead of experiencing the promised hair and nail regrowth, after using the Cel products Ms. Stefanacci began to develop numerous sores on her head. These sores occurred over a period of time. She was severely emotionally distressed by these sores, particularly given the frightening nature of such injuries.

17.     By the time Ms. Stefanacci purchased the products, Defendants Christopher Masanto, Andrew Masanto, Altitude Ads, and Amplify Limited had been specifically informed by her counsel in another matter that their products contained allergens or contaminants, and had been warned that Amazon users of their Shampoo and Conditioner were reporting hair loss and allergic reactions, including one serious enough to require a trip to the emergency room when a user was sent into anaphylactic shock. Instead of recalling the product or changing it, Defendants sold their existing stock to customers knowing it was dangerous, including to Ms. Stefanacci.

18.     **Plaintiff Cheryl Tishman** is a citizen of Florida residing in Coral Springs, Florida. Ms. Tishman saw and relied on Facebook advertising claiming that Cel MD's products could cause hair regrowth and cure hair loss. She purchased the Cel MD Microstem Shampoo and Microstem Conditioner from its website on January 24, 2020. She was billed under a subscription, but she was unable to cancel despite contacting Defendants, requesting to do so, and informing them that the products were not working. She was billed a total of six times, with the final bill on May 29, 2020. She was billed on January 24, 2020, for $38.23, on February 23, 2020, for $62.17, on February 24, 2020, for $38.23, on March 25, 2020, for $38.23, on April 24, 2020, for $38.23, and on May 29, 2020, for $38.23. She paid a total of $253.32 for the products.

6

19.     Instead of experiencing the promised hair regrowth, after using the Cel MD products Ms. Tishman began to experience severe hair loss. This hair loss has been so severe that she has had to purchase and wear wigs. Ms. Tishman has been severely emotionally distressed by this hair loss, particularly because of the need to wear wigs which she did not have before. At the time of this injury, Defendants Christopher Masanto, Andrew Masanto, Altitude Ads Limited, and Amplify Limited had already been informed by Plaintiff's counsel that the Cel MD products contained dangerous allergens and contaminants, as discussed *supra*, and yet they sold the products to Ms. Tishman anyway.

20.     **Plaintiff Jolene Hynes** is a citizen of Iowa residing in Ames, Iowa. Ms. Hynes purchased three unites of Joint Care Chews for her German Shepard from the PetLab website for a total price of $66.67 on November 12, 2019. After feeding her dog two chews per day, Ms. Hynes saw no improvement in her dog's joint health, and in fact, she thought the dog's condition might be worsening. Speculating that the recommended dose was ineffective due to the dog's large size, Ms. Hynes sought help from PetLab customer service agents, who provided no advice on how to make the Chews effective.

21.     Ms. Hynes asked for a refund of the full purchase price which Defendants granted and processed on February 5, 2020. Though she was refunded the $66.67 purchase price, Defendants forced Ms. Hynes to pay the shipping cost to return the product as required to get her refund. Defendants failed to provide a return shipping label at no charge as per PetLab's policy at the time of her return. Her shipping costs were $4.49.

22.     PetLab's "Shipping & Return" policy, at least through May 25, 2020, stated:

> **OUR RETURNS GUARANTEE FOR CERTAIN PRODUCTS**
> We pride ourselves on ensuring our products are made to the highest standards, but we understand that they do not always have the desired effect for every pet.

That's why we offer a 90-day, 100% Money Back Guarantee. No questions asked.

If you do need to return your product, we provide free return labels via UPS. If you would like a 100% refund, then please return your items to the address below.

The Petlab Co.
ATTN: Receiving
11551 E. 45th Avenue, Unit C
Denver, CO 80239

To expedite the refund process, once you have posted the package you can email us the tracking number, and we will process the full refund immediately.

Alternatively, we can offer you an immediate 30% refund should you wish to keep the product and share it with friends or family.

23.     Defendants failed to comply with their written policy to provide Ms. Hynes with a free shipping return label, despite being within the 90-day window.

24.     Web caches of the PetLab website show this return policy displayed on the homepage. Cached pages from Internet Archive dated May 25, 2020 show this claim on the homepage: "we offer a 90-day, 100% Money Back Guarantee. No questions asked, offering free returns, at no extra expense." Though Defendants have now eliminated the "100% Money Back Guarantee" and reduced the 90-day window to 30 days, the new policy on the PetLab "Help Center" is dated November 3, 2020. On information and belief, the 90-day "100% Money Back Guarantee" policy applies to Ms. Hynes purchase and refund request.

25.     Like numerous other victims, Ms. Hynes saw no improvement in the health of her dog. This product failed to deliver on the promises made by Defendants on the PetLab Co. website, in ads, and on product labels, which Ms. Hynes relied on to her detriment.

26.     Each of these Plaintiffs attempted to arbitrate their claims with the AAA, but due to violations of the AAA rules and non-payment of fees, the AAA closed the cases and sent letters

expressly stating to Plaintiffs that under AAA rules they now had the right to bring their claims in court.

**Defendants**

27.     **Defendant Christopher Masanto** is a citizen of Australia residing in London, United Kingdom, with a registered address of: 32 Prescott Street, London, E1 8AX, United Kingdom. Christopher Masanto is the CEO and Founder of the **Cel MD brand**; the CEO and Founder of the **PetLab Co. brand**; the CEO and Secretary of **Amplify Limited**; the CEO, Founder, and Director of **Altitude Ads Limited**, which is now **Cel Products Limited** where he is the Director; the owner and Director of **Blooming Investments Limited** (formerly Cofoundant Limited); the Founder of **Cofoundant Limited** (formerly Blooming Investments Limited); the owner of **Cofoundant Holdings Limited**; and the owner of **PetLab Group Limited**. According to Christopher Masanto's LinkedIn profile, in his position at Altitude Ads he "leads a talented team of internet marketers who specialise in advertising products and services online at scale." One of those is the Cel MD line of products, which Christopher Masanto states on his LinkedIn profile was created by himself and Altitude Ads in April 2018. He also created PetLab Co. with the assistance of his brother, Andrew.

28.     **Defendant Andrew Masanto** is a citizen of Australia residing in New York, NY, who resides at 146 W. 57th Street, #36D, NY, NY 10019. Andrew Masanto describes himself in his biography as "a serial entrepreneur, having founded Altitude Shoes (sold in 2012), Higher Click SEO Agency (sold in 2013), Altitude Ads (ongoing) and then Co-Founding Hadera Hashgraph in 2017." He has publicly described himself as a "founder" of PetLab and stated in an interview that "I've recently been assisting Chris in the formation of Petlab.com — the now fastest growing

9

company in the United States." Andrew Masanto co-founded Cofoundant Limited with Christopher Masanto.

29.   **Defendant Cel Products Limited (formerly "Altitude Ads Limited")** is a United Kingdom corporation with a registered address of: 31-33 Prescot Street, London E1 8BB, United Kingdom. Defendant Christopher Masanto is listed as the director of Cel Products Limited and a person with significant control in its corporate documents. Christopher Masanto previously stated that "Altitude Ads has created … Cel MD...."  The Cel MD website states that "Amplify is solely owned by Altitude Ads Ltd." The PetLab Co. website states that "Amplify LTD and affiliated companies" own and operate the site, and lists Altitude Ads as the owner of PetLab.

30.   **Defendant Amplify Limited** is a Delaware corporation with a registered address of: 413 West 14th Street, 2nd Floor, New York, NY 10014. Amplify Limited is registered to do business in California under the name "Amplify Products," with an address of 1375 Broadway, 15th Floor, New York, NY. Defendant Christopher Masanto is the Chief Executive Officer and Secretary of Amplify Limited, as reflected in its corporate filings as a foreign corporation doing business in California and Florida. In its Florida filings, Amplify Limited refers to itself as "Amplify Limited Inc.," and is registered to do business in Florida as "Amplify Media Inc." The Cel MD website states that it "is operated by Amplify LTD."  The product packaging for the Cel MD products likewise lists their company name as "Amplify LTD." The PetLab website states that "Amplify LTD and affiliated companies" own and operate the site, and lists Altitude Ads (now "Cel Products Limited") as the owner of PetLab.

31.   **Defendants Cofoundant Limited** and **Cofoundant Holdings Limited** are United Kingdom corporations with a registered address of: 31-33 Prescot Street, London, United Kingdom, E1 8BB. Defendant Christopher Masanto is listed as the owner, operator, or beneficiary

in interest of Cofoundant Limited and Cofoundant Holdings Limited in their corporate documents. The ownership of assets relating to Cel MD and PetLab were transferred into these companies as part of a sham transaction intended to avoid liability in this and other litigation. Cofoundant Limited was previously named Blooming Investments Limited when the entity was formed.

32.      **Defendant Blooming Investments Limited** ("Blooming Investments") is a United Kingdom corporation with a registered address of: c/o Buzzacott LLP, 130 Wood Street, London, United Kingdom, EC2V 6DL. Defendant Christopher Masanto is listed as the owner, operator, or beneficiary in interest of Blooming Investments Limited in its corporate documents. Blooming Investments Limited is listed in the corporate documents of Altitude Ads as owning more than 75% of Altitude Ads and being a "person with significant control." Blooming Investments was previously named Cofoundant Limited when the entity was formed.

33.      **Defendant PetLab Group Limited** is a United Kingdom corporation with a registered address of: 31-33 Prescot Street, London, United Kingdom, E1 8BB. Defendant Christopher Masanto is listed as the owner, operator, or beneficiary in interest of PetLab Group Limited in its corporate documents. The ownership of assets relating to PetLab were transferred into this company as part of a sham transaction intended to avoid liability in this and other litigation.

34.      Together Defendants Christopher Masanto, Andrew Masanto, Amplify Limited, Cel Products Limited, Blooming Investments Limited, Cofoundant Limited, and Cofoundant Holdings Limited ("the Cel MD Defendants") created, own, operate, and control the Cel MD brand, website, and business operations. Together they advertise, market, distribute, and sell Cel MD products to tens of thousands of consumers in New York and hundreds of thousands throughout the United States, and have done so from roughly September 27, 2017, when they launched their Facebook page for Cel MD (as "Stem Cell MD"), continuing through the present.

35.     Together Defendants Christopher Masanto, Andrew Masanto, Amplify Limited, Cel Products Limited, Blooming Investments Limited, Cofoundant Limited, Cofoundant Holdings Limited, and PetLab Group Limited ("the PetLab Defendants") created, own, operate, and control the PetLab Co. brand, website, and business operations. Together they advertise, market, distribute, and sell PetLab products to tens of thousands of consumers in New York and hundreds of thousands throughout the United States, and have done so from roughly December 2018 through the present.

36.     All of the Defendants are alter egos of one another, do not follow corporate formalities, and are liable for one another's actions as alter egos. Christopher Masanto, Andrew Masanto, Amplify Limited, Cel Products Limited, Cofoundant Limited, Cofoundant Holdings Limited, and PetLab Group Limited operated together as a single economic entity, as described below.

37.     Amplify Limited nominally contracted with Plaintiffs, and is the nominal entity selling PetLab Co and Cel MD in the United States. Amplify Limited was a "voided" corporation under Delaware law because its registered agents have resigned, and it has been in this status for almost an entire year without correcting it, despite being aware of this issue. It entered this status intentionally in an effort to evade service of process and liability. On information and belief, based on its publicly available corporate records and court filings, Amplify Limited has no employees of its own, but instead uses employees of Cel Products Limited, Cofoundant Limited, and Cofoundant Holdings Limited to conduct its business. Amplify Limited's listed office address, 1375 Broadway Fl 15, New York, NY 10018-7036, is the office of an accounting firm, Raich Ende Malter & Co. A number of other companies use this address as their corporate address, including Defendant Cel Products Limited. Based on these facts, on information and belief, Amplify Limited does not maintain any physical offices but instead is using a virtual office. On information and belief, and

based on this failure to keep its corporate status active and its lack of any employees or physical assets in the US, Amplify Limited is undercapitalized compared to the volume of product sales attributed to it which is in excess of $100 million per year, and money has been withdrawn to the United Kingdom entities to the point that Amplify cannot meet its potential legal obligations to judgment creditors.

38.    Cel Products Limited (previously called Altitude Ads Limited) is nominally the parent company of Amplify Limited. In roughly July 2020, in the midst of litigation in two separate California lawsuits, Altitude Ads Limited conducted a "de-merger" in which assets relating to Cel MD and PetLab Co. were transferred to Cofoundant Limited, Cofoundant Holdings Limited, and PetLab Group Limited. Employee LinkedIn profiles state that Cofoundant "provides shared services, including Performance Marketing, HR, Operations, and Finance, to Cel and Petlab."[1] Most of Altitude Ads' employees were transferred to Cofoundant Limited and Cofoundant Holdings Limited as part of the "de-merger", and remained employees of these new entities. At present, Cel Products Limited has no public facing website. Altitude Ads maintains its web presence, and it lists Cel MD on its home page under "Our Brands," along with photos of the products and a link to the Cel MD website. Altitude Ads also maintains its hiring portal and conducts hiring across corporate lines for "cel," "CoFoundant," and Petlab Co.[2]

39.    There is an overlap in officers and employees between the companies. Christopher Masanto is the CEO of Amplify Limited. He is the director and owner of more than 75% of the shares of Cel Products Limited, and has previously described himself as its CEO when it was Altitude Ads Limited. He is further the director and owner of more than 75% of the shares of Cofoundant

---

[1] https://www.linkedin.com/in/alanabaguley/?originalSubdomain=uk.
[2] https://altitudeads17.bamboohr.com/jobs/

Holdings Limited, Petlab Group Limited, and Blooming Investments Limited. He was a person with significant control of Cofoundant Limited from June 2018 to January 30, 2021, and remains its director.

40.     As recently as January 15, 2021, the Altitude Ads website included names and photos of key officers and other employees, including Christopher Masanto and Jack Nicoll.[3] On information and belief, based on LinkedIn profiles, many of these employees continue to work for these entities.

41.     Defendants do not follow corporate formalities across their corporate lines. For example, Altitude Ads attempted to register the U.S. trademark rights for Cel MD, and did register ownership of the U.S. trademark rights for "PetLab Co.," even though Amplify Limited purportedly owns the rights to the products and sells them in the United States. Altitude Ads employees, including Jack Nicoll, further hired and worked with attorneys to draft the Terms and Conditions of Use at issue for Amplify Limited. The PetLab Co. Terms and Conditions of Use expressly acknowledge that other companies are involved in Amplify's sales without naming them; the contract states it is "between you and Amplify LTD and affiliated companies (collectively 'Amplify'), which own and operate The PetLab Co. and the website www.thepetlab.com (the "Website")." Both Amplify Limited and Cel Products Limited sell products through the same website, using the same employees, and the same customer service representatives. For example, the PetLab Co. Itch Relief Chews and Clear Eye Chews state on their label that they are distributed by "Altitude Ads," while other products state that they are distributed by "Amplify Ltd." But both companies use the same customer service address,

---

[3] Internet Archive, Jan. 15, 2021,
https://web.archive.org/web/20210115173146/https://www.altitudeads.com/ (last visited June 3, 2021).

help@thepetlabco.com. Both companies use the same third-party white label manufacturer, Synergy Labs. Both companies sell their products from the same Amazon store on Amazon.com without differentiating between them. Both companies sell their products on the same website, thepetlabco.com. On December 26, 2020, Altitude Ads imported a shipment of PetLab Probiotic Sticks, which it sent directly to Amplify Limited's distributor in the United States. On August 13, 2020, Altitude Ads imported a shipment of nail oil for the Cel MD brand to Amplify Limited. Altitude Ads made these shipments despite Amplify Limited being the nominal distributor and purportedly being the one with the distribution relationships in the U.S. When Amplify Limited settled a lawsuit in California state court, the settlement was signed by an employee of Altitude Ads, Jack Nicoll, who listed himself as "CEO" despite the fact that Christopher Masanto is the CEO of Amplify Limited. According to the Cel MD website, Jack Nicoll is the CEO of the Cel Brand, and his position at Altitude Ads is Product Manager.

42.     The entities further commingle their assets and resources without regard for corporate formalities, in that Cel Products Limited operated the websites and created the products and the advertising, and then transferred its employees and the ownership of the products to the Cofoundant entities and PetLab Group Limited to evade liability. The Cofoundant entities and PetLab Group Limited continued to run the websites, create products, and run the advertising for the products at issue. The Facebook page for Cel is registered to Altitude Ads Limited, and according to transparency data for the page, most of the people with access to the page are located in the United Kingdom, Australia, or the Philippines. Similarly, the Facebook page for PetLab Co is registered to Altitude Ads Limited, and according to transparency data for the page, most of the people with access to the page are located in the United Kingdom or the Philippines. This is despite the fact that these Facebook pages are used almost exclusively to sell products in the United States,

nominally by Amplify Limited. The companies all share a common set of employees and a common set of offices in the United Kingdom, and similarly share the use of Amplify Limited's New York offices. Andrew Masanto works for these companies and advises them without having a formal role, and has bragged about doing so in a Forbes article and an article on Medium. He further has described himself as the co-founder of the New York branch of Altitude Ads, and he had access to the Altitude Ads LinkedIn page and conducted hiring through it despite not having a formal role with the company. The job posting made clear that employees of Altitude Ads conducted personal tasks for Andrew Masanto, including doing his laundry and cooking for him. The companies each sell products under the same brand names and share those brand names regardless of formality.

43.     It would be inequitable not to treat these entities/individuals as alter egos of one another because the corporate structure is a sham designed to avoid liability, frustrate creditors, prevent service of process by improperly failing to appoint registered agents, avoid document discovery requests, and avoid jurisdiction in the United States even though the UK-based entities are in fact the ones conducting most of the activities. As described herein, this corporate structure was further designed to perpetrate a fraud and protect its perpetrators from liability. Cel Products Limited (then Altitude Ads Limited) exercised complete domination over Amplify Limited until July 2020, until its assets and employees were transferred to Cofoundant Limited, Cofoundant Holdings Limited, and PetLab Group Limited, at which point they in turn exercised complete domination over Amplify Limited. Andrew and Christopher Masanto similarly exercise complete domination over all of the companies at issue, with Christopher taking a formal CEO and owner role at each, and Andrew playing an informal role as advisor, investor, and founder.

44.     Cofoundant Limited, Cofoundant Holdings Limited, Blooming Investments Limited, and PetLab Group Limited are further liable as successors-in-interest of Amplify Limited and Altitude Ads Limited/Cel Products Limited. There was a consolidation or merger of seller and purchaser, in that Altitude Ads Limited conducted a "de-merger" and transferred assets and ownership of shares to Cofoundant Limited, Cofoundant Holdings Limited, Blooming Investments Limited, and PetLab Group Limited, structured themselves in a parent-subsidiary relationship, and then almost immediately transferred ownership of their shares to Christopher Masanto. There was a continuity of ownership of the entities overall by Christopher Masanto. The management, personnel, physical location, assets, and general business operation all continued without change except for their nominal ownership, and they were a mere continuation of the previous business. These transactions were entered into fraudulently to avoid liabilities from sales of the Cel MD and PetLab Co brands, as evidenced by the timing (which occurred in the middle of lawsuits and a set of mass arbitrations), by the facts articulated herein evidencing the fraud, as well as by the multiple reorganizations of shares and assets which occurred within a short period of time. They are further liable as successors-in-interest for the claims of strict product liability because the product lines and their manufacturing process did not change, and because the duty to warn extends to the new entities.

45.     In 2014-2015, Andrew Masanto created a skin care company called Royal Dermatological Foundations, incorporated as RDF LLC ("RDF"). The RDF website lists two products in development—an "aging serum" designed to be applied to the skin, and an "advanced eye repair cream." Cel MD has created similar products, the Nanotech Stem Cell Face Mask and its Eye Serum.

46.     By 2018, Andrew Masanto was clearly involved in Cel MD. He describes himself in his biography as having "founded" Altitude Ads, the parent company and creator of Cel MD.  He has conducted hiring on behalf of Altitude Ads and had access to the Altitude Ads LinkedIn account, posting an advertisement on LinkedIn for a personal assistant to work for Altitude Ads in New York City.  In the advertisement, Andrew Masanto describes himself as one of "[t]he Founders of the successful advertising companies Jump 450 and Altitude Ads (NYC branch)...." The advertisement was posted in roughly June-July 2018, which coincides with the launch of Cel MD in April 2018 and its subsequent ramp-up. On information and belief, Andrew Masanto operates the New York "branch" of Altitude Ads through the Delaware corporation Amplify Limited.

47.     On information and belief, Andrew Masanto was involved creating and developing the Cel MD and the PetLab Co. brands as well as their marketing materials. This is supported by news interviews in Forbes and Medium, his background and experience, his interest and work in founding a nearly-identical skin care company just a few years before Cel MD, the timing of his hiring activities on behalf of Altitude Ads, the corporate structure of the companies which are based in New York (where Andrew Masanto lives) and London (where Christopher Masanto lives), and his publicly acknowledged role as co-founder of Altitude Ads, founder of PetLab, and his role in operating the New York branch of Altitude Ads, whose only apparent activities in that timeframe involve Cel MD.

48.     Andrew Masanto is also involved with Cofoundant Limited, a "venture incubator" that he co-founded with his brother, Christopher Masanto. Sometime in early 2020, Cofoundant partnered with a PR firm called Impact Partners that repeatedly refers to both Andrew Masanto and Christopher Masanto as "founders" of Cofoundant in their promotional work for the company. On July 24, 2020, Impact Partners accounted on their Twitter account, "We placed a great article in

Forbes for venture client, Cofoundant, and its founders, brothers Chris and Andrew Masanto."

Andrew Masanto's bio on Fast Company lists him as "Cofounder, Cofoundant" on its Impact Council.

49. On information and belief, based on these activities as well as their backgrounds in marketing and public statements in news articles, both Andrew and Christopher Masanto exercise control over the advertising of PetLab and Cel MD products, they control the writing of the advertising copy and the decisions to market the products as cures for various health conditions, and Christopher Masanto frequently appears in advertisements and both directly control their content at a granular level.

50. With respect to the claims and allegations herein as to the Cel MD products herein sold to Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman, the Defendants who were involved were Amplify Limited (which was nominally the seller and owner of the Cel MD website), Cel Products Limited (which, under the name Altitude Ads Limited ran the websites and created the marketing materials during the time period of these sales), Andrew Masanto, and Christopher Masanto. With respect to the claims and allegations herein as to the PetLab products sold to Plaintiffs Carmichael, Liotta, Lopez, and Hynes, the Defendants who were directly involved were Amplify Limited (which was nominally the seller of all products and owner of the PetLab website), Cel Products Limited (which, under the name Altitude Ads Limited ran the websites and created the marketing materials during the time period of these sales, and which sold and distributed the Itch Relief Chews to Plaintiff Carmichael according to the product label), Andrew Masanto, and Christopher Masanto. Defendants Cofoundant Limited, Cofoundant Holdings Limited, Blooming Investments Limited, Cel Products Limited, and PetLab Group Limited are liable to all Plaintiffs under alter ego and successor-in-interest theories. Defendants Andrew Masanto and Christopher Masanto are

liable to all Plaintiffs under alter ego theories. When this Complaint references actions by "Defendants" generally or advertisements run by "Defendants," they are alleged to have acted according to the roles as described in this paragraph.

## FACTUAL ALLEGATIONS

### Deceptive Brand Name and Omissions Regarding the Cel MD Brand Name

51.     Defendants have used the name "Cel MD" as an overall brand for marketing their products. All of the products are sold on the Cel.md website or using the Cel MD name on Amazon.com. Defendants' Facebook advertisements were all labeled as from "Cel MD" until roughly July-August 2019, and the title of their Facebook page was Cel MD. At some point this was changed to "cel," but the Facebook page and its account remain "@celmdbeauty" and the product is still described as Cel MD on the page. Since that time, Defendants have maintained Facebook and other social media advertising accounts with titles such as "Cel MD Offers" or "Cel MD Results," and are presently advertising under those names and using them on social media. On information and belief and given the structure of their websites and sales funnels, every customer of the Cel MD products would have been exposed to and viewed the "Cel MD" brand name, including Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman.

52.     The "MD" portion of this brand name is deceptive or misleading to consumers because it falsely implies to consumers that medical doctors are selling Cel MD products. "MD" is commonly known as an abbreviation used by doctors to signify their educational training and achievement, or as part of the name of a medical practice. Defendants have repeatedly used the "MD" portion of their name to suggest to consumers that they are medical doctors. On information and belief, Defendants chose the "MD" abbreviation to deliberately suggest to consumers that their products were sold by a medical practice.

53.     In the context of Cel MD's website, however, MD is an abbreviation for the country of Moldova. Defendants registered a domain name from the country of Moldova because URL's registered through Moldova utilize a .md country code in their domains instead of the .com code. By registering through Moldova, the website would appear as "cel.md" instead of "cel.com" or some other domain name. Many domain name suffixes are reserved for particular industries (for example, .xxx for pornography, .com and .biz for commercial enterprises, and more than 1,000 others including .dental for dentists and .doctor for doctors). Because of this common and well-known practice, a reasonable consumer would be deceived into thinking that .md was a suffix for medical doctors.

54.     On information and belief, Defendants have no connection to the country of Moldova. The Defendants deceived their customers by omission by failing to disclose the information that "MD" in the URL stands for Moldova and not "Medical Doctor(s)" and for failing to disclose that they are not doctors nor are they a medical practice.

55.     Defendants were under a duty to disclose this information to the Cel MD Plaintiffs because Defendants had exclusive knowledge of material facts not known to them, namely that "MD" stands for Moldova and not "medical doctor(s)" as reasonable consumers would assume.

56.     Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman did not know this, and the information was difficult to discover because it requires expertise in domain names and their operation as well as an investigation into the qualifications of the actual people who are behind Cel MD, who are not disclosed by name on the Cel MD website and who cannot be easily located without searching corporate records (and in some instances cannot be located at all from public information).

57.     Defendants were under a duty to disclose this information to the Cel MD Plaintiffs because Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. Defendants were further under a duty to Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman because they made partial representations—using the term "MD" and describing themselves on their website as "innovators" who are "pioneering scientific methods" when in fact they are an advertising company—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that they are not medical doctors, are not a medical practice, that MD in the URL stands for Moldova, and that they have no connection to Moldova.

58.     Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers. Those omissions could have been corrected by using a different URL to host the Cel MD website and by removing "MD" entirely from its name on Amazon, Facebook, on the Cel MD website, and in any other places it is used. They could accurately identify the scientists and doctors who in fact developed Cel MD products should they exist.

59.     This use of "MD" in the Cel MD name is a violation of the California laws against unauthorized practice of medicine. Defendants are not physicians licensed by California or any other state as medical doctors. Pursuant to Cal. Bus. & Professions Code § 2054, "[a]ny person who uses in any sign, business card, or letterhead, or in an advertisement... the initials 'M.D.,' or any other terms or letters indicating or implying that he or she is a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law... is guilty of a

22

misdemeanor." Defendants' conduct is thus unlawful under the California Unfair Competition Law.

60.    This use of "MD" in the Cel MD name is a violation of New York laws to deceptively use of the term "doctor" in representations for the purpose of or which are likely to induce purchase of any drugs, cosmetics, or other goods intended to treat, mitigate, prevent, or cure any human disease, pain, injury, nutritional deficiency, or physical condition, or which are intended to appear as such. New York's General Business Law § 350-b prohibits any person from using the title doctor unless they conspicuously disclose the profession in which they are licensed and have been conferred a doctoral degree by an institution legally authorized to grant such a degree. Defendants' conduct is thus unlawful under New York's false advertising law.

61.    Defendants' misrepresentations and omissions regarding their brand name were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these misrepresentations and omissions in deciding whether to purchase the Cel MD products because had they known that Cel MD was not a medical practice and was not run by doctors, and that in fact the "innovators" were an advertising agency staffed primarily by digital marketing specialists with no medical degrees, consumers would not have purchased the Cel MD products or would not have paid as much for those products. Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman thus reasonably relied upon these representations in making their purchase decisions.

**Omissions Regarding FDA Approval and Regulatory Compliance**

62.    Defendants failed to disclose to Plaintiffs that their products (both PetLab and Cel MD) are not approved by the Food and Drug Administration as required and cannot be legally sold in the United States. Because the products make claims to affect the structure or function of human or animal bodies, they are both "drugs" and "new drugs," requiring an FDA approval prior to

marketing them. With respect to the Cel MD products, Defendants Amplify Limited and Cel Products Limited falsely claimed that claimed the FDA approved their "Cel MD" products in 2017, receiving "expedited" approval due to their "high quality" stem cell ingredients.[4] They further falsely claim on Amazon that the Cel MD products are "FDA approved."[5] On information and belief, based on a search of databases of approvals, none of the Cel MD or PetLab products are FDA approved. All Plaintiffs purchased products which could not legally be sold and which did not go through required safety testing or obtain required approvals, but were not informed of this.

63.    On Facebook, Defendants claim Cel MD products comply with regulatory standards because their formulas "contain lawful cosmetic ingredients," and that clinical trials prove that asparagus stem cells are effective in regrowing lost hair.[6] Defendants have further claimed as to the PetLab products that that "all the ingredients in our products adhere to strict manufacturing and federal regulatory measures and practices."[7] They have represented that as to PetLab, "[o]ur products would not be on the market if it hadn't undergone all regulatory checks to ensure it is safe for consumption."[8] Defendants repeatedly make similar claims to customers about both PetLab and Cel MD products.

---

[4] Cel MD, *Ingredients & Testing*, https://cel.md/pages/ingredients-testing (last visited Apr. 27, 2021); Cel MD, *Ingredients & Testing*, https://cel.md/pages/ingredients-testing (html cache from Aug. 1, 2019)..

[5] Cel MD, *Customer Questions & Answers - Cel Microstem Natural Hair Thickening Shampoo & Conditioner Set*, Oct. 2, 2018, https://www.amazon.com/ask/questions/asin/B07D7HRVDL/12/ref=ask_ql_psf_ql_hza?isAnswered=true (last visited Apr. 27, 2021).

[6] Cel MD, *Cel VS Hair Transplants*, Facebook.com, May 15, 2019, https://fb.watch/58a-3XPJCa/ (last visited Apr. 27, 2021).

[7] PetLab Co., Sept. 5, 2019, https://www.facebook.com/thepetlabco/posts/372577967003025 (last visited Apr. 27, 2021).

[8] https://www.amazon.com/product-reviews/B07SWY5F9G/ref=cm_cr_arp_d_paging_btm_next_2?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&pageNumber=2#reviews-filter-bar (last visited Oct. 21, 2020).

24

64.     Defendants were under a duty to disclose this information because Defendants had exclusive knowledge of material facts not known to them, namely that their products do not comply with federal regulations and are illegal to sell.

65.     Plaintiffs did not know this, and the information was difficult to discover because it requires expertise in federal regulatory requirements as well as knowledge of how to search for FDA approvals.

66.     Defendants were under a duty to disclose this information to Plaintiffs because Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. Defendants were further under a duty to Plaintiffs because they made partial representations—representing that they had FDA approvals and complied with federal regulations—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that their products are not FDA approved and are illegal to sell because they make structure/function claims about human and animal bodies.

67.     Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers. Those omissions could have been corrected by informing consumers that the products are not approved by the FDA and are illegal to sell under federal law. These omissions damaged Plaintiffs because a product for human or animal consumption that cannot be legally sold and has not complied with safety testing requirements or regulations is worth nothing, and is worth less than a product which has complied such that Plaintiffs paid more for the products than they would have absent the omissions.

## Omissions Regarding Cel MD Product Safety

68.     Plaintiffs Yonatan Widiantoro, Heather Brown, Cheryl Tishman, and Alissa Stefanacci purchased Defendants Cel MD's Microstem Shampoo and Conditioner. Defendants were aware of negative reactions from customers using Cel MD Microstem Shampoo and Conditioner at least as early as January of 2019, and they further represented to multiple customers that these products contained an allergen which could cause negative reactions. Yet they did not disclose these known risks to Plaintiffs and did not disclose that the products could be dangerous.

69.     Defendants acknowledged their awareness of adverse health reactions in these products in a January 3, 2019 reply to a consumer on Amazon. Defendants' advice was to continue using the product less frequently. In response to a consumer question about thinning hair and scalp dryness, Cel MD's seller account posted:

> It is very uncommon, but some people do get adverse reactions. If you want to continue using the product, please cut down the number of times you are using it (once or twice per week also works great) and see if you are still reacting to it! If you still continue to experience dry scalp and thinning hair, I would suggest you stop using the product as you may be having a reaction to one of the ingredients.[9]

70.     Defendants specifically stated in responses to Amazon reviews that they knew one of their ingredients could cause allergic reactions: "Sorry to hear this. It is very uncommon, but some people do get adverse reactions to one of the ingredients."[10]

---

[9] *Has anyone with well water tried this product? Scalp has gotten terribly dry, hair is thinning & weighed down. Looking for a remedy ASAP!*, Jan. 3, 2019, https://www.amazon.com/ask/questions/TxQS8B7648EZZ2/ (last visited Apr. 28, 2021).

[10] Amazon Review of Cel MD Shampoo & Conditioner, https://www.amazon.com/gp/customer-reviews/R1OQ0D30Y22A6B/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07D7HRVDL (last visited June 25, 2019); *see also* https://www.amazon.com/gp/customer-reviews/R2UXQ97ENBGG4Q/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07D7HRVDL (last visited June 25, 2019).

71.     Defendants know that certain ingredients in the formulas for the Microstem Shampoo and Conditioner can cause allergic reactions. They know that adverse reactions can happen quickly. Many consumers were reporting such complaints on Amazon, and employees of the Defendants repeatedly replied to them. One customer suffered serious headaches after one week of use, and when she contacted Defendants about it, they never responded.[11] Another customer with no history of skin sensitivity suffered an allergic reaction after the first use.[12]

72.     Defendants have knowledge of adverse reactions that their warnings do not cover, such as irritation to the eye: "My wife got this in her eye. It burned for hours. What the hell is in this? Don't buy this."[13]

73.     One customer reported suffering a life-threatening illness as a result of using the Cel MD Shampoo: "I used it ONCE. It appears that I may be allergic as I had to go to the emergency room via ambulance. Anaphalactic shock [sic]."[14] One would expect that a company that read a report like this about one's own product would attempt to warn customers or to investigate whether there was in fact an allergen (or something more serious such as a chemical contamination). But the Cel

---

[11] Amazon Customer Review, Reaction, May 19, 2019, https://www.amazon.com/gp/customer-reviews/R1T1XCCX51X9YP/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07N6LKXCL (last visited May 13, 2021).

[12] Amazon Customer Review, I don't know… I'm allergic., May 16, 2019, https://www.amazon.com/gp/customer-reviews/R2UXQ97ENBGG4Q/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07N6LKXCL (last visited May 13, 2021).

[13] Amazon Customer Review, *Garbage*, July 13, 2020, https://www.amazon.com/gp/customer-reviews/RZV0PEKK8VQRX/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07N6LKXCL (last visited May 13, 2021).

[14] Amazon Review of Cel MD Shampoo & Conditioner, July 30, 2019, https://www.amazon.com/gp/customer-reviews/R2KBGQKKFH8QTC/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07D7HRVDL (last visited Apr. 30, 2021).

MD Defendants read this review and responded to it with nothing more than an offer to refund the price of a bottle of shampoo.

74.     One customer who used the Microstem formula experienced severe hair loss, stinging, rash, itching, and sores from using the products.[15] Defendants' reply acknowledges they are aware of adverse reactions: "We are sorry to hear that you experienced irritation on your scalp after using our product. The well being of our customers is at the heart of everything we do and we care deeply about their satisfaction with our products."[16] Defendants claimed that "[r]eactions such as the one you experienced are very rare and we advise customers who have any type of negative reaction to stop using it immediately."

75.     Cel MD's products bear a warning label that states the following: "Warnings: Stop using this product if you experience any symptoms on the area this product was applied, including red spots, swelling, itching, or irritation. If the symptoms worsen, consult a dermatologist immediately. If you experience side effects (burning, hair loss, rashes) please stop using the product immediately."

76.     This warning is only provided to consumers after they have purchased the Cel MD products. The warning fails to disclose that these are known side effects which have occurred with other customers. And it fails to disclose the specific ingredient which the Defendants told certain Amazon customers they knew to cause these allergic reactions. Further, on the front of the bottles, the products prominently claim to be "Hypoallergenic."

---

[15] Platinum Living, Trustpilot Review, Jan. 15, 2020,
https://www.trustpilot.com/review/cel.md?search=US (last visited May 6, 2021).
[16] Cel, Reply to Trustpilot Review by Platinum Living, Jan. 16, 2020,
https://www.trustpilot.com/review/cel.md?search=US (last visited May 6, 2021).

77.     On October 31, 2019, counsel for Plaintiffs, while representing another client who had purchased these two products, sent an e-mail to an attorney representing Amplify Limited, Christopher Masanto, Andrew Masanto, and Cel Products Limited (then Altitude Ads Limited) and specifically informed them that their products may be chemically contaminated. The e-mail attached several of the Amazon reviews reporting health effects and stated: "While we understand the need to get up to speed, we do think there is an urgency given some of the issues here. We've attached a couple of Amazon reviews for you to take a look at so you can see that this is not plaintiff's attorney hyperbole. We want to make sure that the issue of potential chemical contamination is being taken seriously while we talk. We don't think asparagus or ginseng are causing these reactions, and if a serious injury or death occurs we don't have to tell you what the consequences could be."

78.     Plaintiffs Widiantoro and Tishman purchased the products **after** this e-mail was sent. Despite this specific warning Defendants did nothing to ensure the products' safety, did not stop selling them, did not recall the products they had sold, and did not warn any of their prior customers of the adverse reactions (including Plaintiffs Brown and Stefanacci).

79.     On information and belief, the Cel MD Microstem Shampoo and Conditioner contain either an allergen, a contaminant, or an ingredient which causes the various adverse side effects reported by Plaintiffs and by other consumers online.

80.     Defendants made material omissions regarding the side effects caused by their products by omitting material information which they were under a duty to disclose relating to those side effects. Defendants failed to disclose to Plaintiffs that their products were known to cause side effects including allergic reactions to one or more of the ingredients, reactions, anaphylactic shock, swelling, itching, red skin, scabs, burning, stinging pains, headaches, and hair loss. Defendants

further were aware of at least one ingredient in their products that caused allergic reactions, but failed to disclose this knowledge to Plaintiffs and failed to disclose which ingredient it was.

81.     Defendants were under a duty to disclose this information to Plaintiffs because Defendants had exclusive knowledge of material facts not known to them, namely that their products caused these side effects and that there is an ingredient in their products which causes allergic reactions.

82.     Plaintiffs did not know this, and given the nature of the side effects, it was difficult to discover because any mention of these side effects was not on the Cel MD website and, to the extent it was publicly known, was buried in various reviews or Facebook comments on advertisements which would have to be affirmatively searched for or were not available via public links.

83.     Defendants were under a duty to disclose this information to Plaintiffs because Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. Defendants have hidden or deleted comments on their Facebook ads containing negative material information, as described further herein.

84.     On information and belief, based on monitoring comment status on these advertisements over time, Defendants have actively hidden numerous comments on their Facebook advertisements using the "Hide Comment" feature in order to suppress negative information about their products and to prevent potential customers from discovering it. Many specific comments hidden specifically related to accusations that Cel MD products cause hair loss, one of the reported side effects, and Defendants actively concealed that information from customers at least by hiding those customer comments on Facebook.

85.     On information and belief, based on a review of disclosures and customer reviews on the TrustPilot site as well as a public warning by TrustPilot itself about the Defendants' conduct,

Defendants have further engaged in active concealment by hiding, concealing, or gating negative reviews on TrustPilot in order to suppress material negative information about their products and to prevent consumers from discovering it.

86.     Defendants were further under a duty to Plaintiffs because they made partial representations and warranties—that their products were "safe," did not have side effects like competing products, and contained no negative or "nasty" ingredients, and stated prominently on the bottle labels that they were "Hypoallergenic"—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that there were in fact side effects (even if they differed from those in competing products), were not safe for all consumers, and their products did in fact contain ingredients which could be negative or "nasty" in that they caused allergic reactions.

87.     Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs. Those omissions could have been corrected by including the omitted information in a prominent position on the Cel MD website, by including prominent disclaimers in (i) the Cel MD videos, (ii) its Amazon product descriptions, and (iii) in the text or videos on its Facebook advertisements.

88.     These omissions are designed to induce consumers to purchase the Cel MD products. As a result of these omissions, Plaintiffs purchased products they would not have or paid more for them than they otherwise would have. Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman each suffered health injuries and side effects which would have been avoided with a disclosure.

89.     Defendants' omissions regarding side effects were material to consumers. A reasonable consumer would attach importance to these omissions in deciding whether to purchase the Cel MD

products because had they known that the products could cause serious side effects, they would

not have paid as much for them or would not have purchased them in the first place.

**Omissions Regarding Plant Stem Cells in Cel MD Products**

90.     A core selling point across the Cel MD product line—repeated throughout the Cel MD

Defendants' advertising and its website—is that the products contain "plant stem cells" which can

miraculously cure ailments such as hair loss or skin problems. The company name as well as the

product names includes references to plant stem cells, suggesting that Cel MD's products work

using some sort of plant stem cell technology. But Defendants omit a crucial fact from these

statements that they are obliged to disclose: that "stem cells" they utilize are in fact dead plant

stem cells that have been processed and turned into extract, not live stem cells, and thus they cannot

be effective for hair loss or skin care.

91.     Defendants' claims about plant stem cells are pervasive and, on information and belief,

were viewed by every customer of the Cel MD products. This is necessarily true because the

product packaging for Cel MD products prominently makes these misrepresentations. For

example, the bottle label for both the Cel MD Shampoo and Conditioner states: "This specialized

stem cell hair formula contains a blend of hair-strengthening and stimulating ingredients. Our

unique three-stage formula helps repair damaged hair cells and provides the ideal nutrients for

thick, luscious hair." This claim is also made on the exterior of the boxes which the Cel MD

Shampoo and Conditioner are contained in. Other Cel MD products contain representations on the

product packaging that they contain stem cells, including the Nail Formula which describes itself

on the packaging as a "Stem Cell Nail Formula," and the Cel MD Microstem Hair Stimulation

Formula which describes itself on the box as a "specialized stem cell hair formula" which includes

a "patented Stem Cell Growth Formula." Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman each bought products which represented that they contained stem cells on the product labels.

92.    These claims are false. There is no "stem cell formula" in the products, let alone one which can regrow hair, skin, and nail cuticles. The Cel MD products do not contain stem cells—they contain, at best, extracts that have been processed with chemicals. And because of this processing, the products cannot "repair damaged hair cells" or strengthen or stimulate hair, or grow cuticles, or penetrate human skin to rejuvenate it from the inside, as Defendants represent and warrant.

93.    Plaintiffs relied on these representations that the products could cure hair loss or cause hair growth because they contained stem cells in purchasing the products, in not exercising their right to return the products within the return period, and in maintaining their subscriptions.

94.    In the time period that Plaintiff Heather Brown purchased from Amazon, the Cel MD Shampoo and Conditioner page contained the following prominent representation under the image of the products: "STEM CELL TECHNOLOGY ‖: Stimulate Dormant and Damaged Cells, Promoting Scalp and Hair Follicle Health Paired with Enhanced Arginine Extract to Extend the Anagen Phase and Regulating Cell Proliferation." The Amazon page explained how this works as follows: "Our product increases blood flow, reduces DHT, then (using stem cell technology) reignites the growth phase of the hair cell while also delivering the precise nutrients for thick healthy hair."

95.    Defendants' Cel MD website is and has been permeated with representations that their products contain beneficial plant stem cells. For example, Defendants represent that the Microstem Shampoo is made with "Premium grade Ginseng Stem Cells, Biotin and advanced arginine extract

have all been proven to reduce hair fall out and stimulate hair follicles."[17] They claim that ginseng stem cells "penetrate the deepest dermal layers which boosts hair follicle health & strengthen hair [sic]," that arginine extract is "[p]roven to promote hair growth at a cellular level and transports the correct nutrients to the hair root," and that biotin is "[c]linically proven nathural [sic] ingredient that helps boost & thicken hair."

96.     One scientific article Defendants have themselves repeatedly cited in making their "stem cell" claims explains why extract cannot, in fact, be effective, and why it is misleading to omit the fact that any ginseng or asparagus stem cells in the products have been chemically processed into extract: "In fact, almost all cosmetic companies advertising to contain stem cells in their products actually contain stem cell extracts and not the live stem cells. Although research on plant stem cells used in skin care reveals their potential as skin protectives, antiaging and antiwrinkle products, the actual stem cells in cosmetic formulations are already dead. Extracts from stem cells cannot act in the same way as the live stem cells. Claimed benefits of smooth and firm skin are due to antioxidants and active extracts from stem cells. To gain all the authentic benefits from stem cells and to let them work the way they are promised to in skin care applications, they need to be incorporated as live cells and should remain so while in the cosmetic formulation."[18]

97.     The article further makes clear that even these theoretical benefits of live plant stem cells in cosmetics have not yet actually been achieved: "[r]esearch on the use of plant stem cells as skin care is still in its infancy." It states: "Plant stem cell therapy needs to move in the right direction

---

[17] Cel, *TRY THE #1 BEST-SELLING STEM CELL SHAMPOO TODAY!*, https://promos.cel.md/dmxcspsub/index.php?fbclid=IwAR2QhI8tTm5MiL3vlPAcYYefZW-YLdrEdMKv0im1KxAgeibIz5JxPjWvK3M (last visited May 6, 2021).

[18] Sonia Trehan, Bozena Michniak-Kohn, & Kavita Beri, *Plant stem cells in cosmetics: current trends and future directions*, 3 Future Sci. OA (2017), available at https://www.future-science.com/doi/10.4155/fsoa-2017-0026 (last visited June 19, 2019).

to implement its inherent potential in skin care. This might happen in the next 20 years but any cosmetic that is advertised to be antiaging due to plant stem cells at this time is about as effective as all the skin creams without stem cells."

98.     Defendants deceived Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman by omission by failing to disclose the information that the plant stem cells in their products are extract containing dead plant cells, not live stem cells, and that they thus cannot provide the theoretical benefits to skin and hair that some scientists believe living plant stem cells might provide in the future.

99.     Defendants were under a duty to disclose this information to Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman because the Cel MD Defendants had exclusive knowledge of material facts not known to them, namely the methods by which the plant stem cells in their products are processed and the difference between live and dead stem cells.

100.    Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman did not know this, and the information was difficult to discover because it requires scientific expertise, as well as information regarding the Cel MD Defendants' proprietary manufacturing process for the plant stem cells which purportedly takes place in Korea.

101.    Defendants were under a duty to disclose this information to Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman because Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. Defendants have hidden or deleted comments on their Facebook ads containing information material to customers, as described further herein.

102.    In aggregate, there are more than 10,000 comments listed across the Defendants' various Facebook advertisements for Cel MD, which millions of people have been exposed to. On

information and belief, Defendants have actively hidden numerous comments on their Facebook advertisements using the "Hide Comment" feature in order to suppress negative information about their products and to prevent potential customers from discovering it. These hidden comments remain accessible to Defendants, and Plaintiffs expect that during discovery and upon a review of these hidden comments, information material to this matter will be found to have been hidden, concealed, or covered up by Defendants.

103.    Defendants were further under a duty to Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman because they made partial representations—that plant stem cells or live plant stem cells can help improve hair or skin conditions, which some scientists believe will be true in the future— but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that plant stem cells must be living at the time of application to provide these theoretical benefits, and that any plant stem cells contained in the Cel MD products are dead plant material or extract.

104.    Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman. Those omissions could have been corrected by including the omitted information in proximity to the representations on the Cel MD website, by including prominent disclaimers in the Cel MD videos, by including a prominent disclaimer on its Amazon product descriptions, and/or by including prominent disclaimers in the text or videos on its Facebook advertisements.

105.    These omissions are designed to induce consumers to purchase the Cel MD products. As a result of these omissions, Plaintiffs Widiantoro, Brown, Stefanacci, and Tishman purchased products they would not have or pay more for them than they otherwise would have.

106.    Defendants' omissions regarding plant stem cells were material to consumers. A reasonable consumer would attach importance to these omissions in deciding whether to purchase the Cel MD products because they are seeking to purchase the products to obtain the theoretical benefits of plant stem cells, which they cannot actually benefit from since the products at issue do not contain live plant stem cells.

### Warranties Regarding Microstem Shampoo and Conditioner

107.    Plaintiff Yonatan Widiantoro, Heather Brown, Cheryl Tishman, and Alissa Stefanacci purchased Defendants Cel MD's Microstem Shampoo and Conditioner, which prominently warrant on the bottles for both products that: "This specialized stem cell hair formula contains a blend of hair strengthening and stimulating ingredients. Our unique three-stage formula helps repair damaged hair cells and provides the ideal nutrients for thick, luscious hair." This statement is also made on the exterior of the boxes which the Cel MD Shampoo and Conditioner are contained in. The label promises results within 4-6 weeks: "For best results use twice a week for 4-6 weeks."

108.    Defendants warranted on Amazon that the Shampoo and Conditioner grows hair by increasing blood flow, reducing DHT, and restarting cells that grow hair:

> When men and women age, the rate of hair growth slows down and hair naturally thins out. This is due to hair cells not receiving the correct nutrition and the build up of hair growth inhibitors like DHT. Our product increases blood flow, reduces DHT, then (using stem cell technology) reignites the growth phase of the hair cell while also delivering the precise nutrients for thick healthy hair. With a mix of natural ingredients: biotin, nettle leaf, ginseng, keratin and glycerin our Shampoo and Conditioner creates the perfect environment for a healthy scalp which allows hair to grow fuller and stronger.[19]

---

[19] *CEL MD Stem Cell Hair Growth Thickening Shampoo and Conditioner for Women and Men*, https://www.amazon.com/CEL-MD-Thickening-Conditioner-Stimulating/dp/B07D7HRVDL (html cache from June 25, 2019).

Defendants warranted that the Shampoo and Conditioner encourage "high cell turnover to promote growth where hair is thinning" and utilize "unique hair nourishing proteins which help new hair growth."

109.    Defendants warranted on Amazon that Cel MD products are natural and healthy. They claim Cel MD products improve the physical condition of the hair and scalp, contribute positively to physical appearance, and are safe for use.

110.    On their Amazon product page as of August 2019, Defendants did not disclose any disclaimers or limitations on express or implied warranties for their products.

111.    As of June 2019 on Amazon, Defendants' Stem Cell Shampoo and Conditioner made two guarantees. The first is at the top of the page:

- || 100% MONEY BACK GUARANTEE ||: We want you to be 100% satisfied with everything you buy from Cel. And if youre not, well refund your money in full, or exchange the goods. All we ask is that you contact our customer services and well sort it out for you

The second guarantee appears less conspicuously, in the middle of the page: "30 DAY MONEY BACK GUARANTEE: We are so confident that you will LOVE our Stem Cell Hair products that we offer a 30 DAY MONEY BACK GUARANTEE. **If they dont work, then we dont deserve your money**."[20] This page also does not include or link to Defendants' terms and conditions, privacy policy, or shipping and return policy.

112.    Defendants warrant on their website that Cel MD Microstem Shampoo and Conditioner strengthens, protects, and regrows hair; that it prevents hair loss by stopping the body from producing a hormone called DHT (Dihydrotestosterone), which they claim causes hair loss; that it

---

[20] *CEL MD Stem Cell Hair Growth Thickening Shampoo and Conditioner for Women and Men*, https://www.amazon.com/CEL-MD-Thickening-Conditioner-Stimulating/dp/B07D7HRVDL (html cache from June 25, 2019).

moisturizes the scalp and prevents skin irritation; and that it promotes cell growth and repair.[21]

They warrant that the Shampoo and Conditioner "Strengthens Each Hair Strand and Encourages a

High Cell Turnover to Promote Growth Where Hair is Sparse," "Helps To Block The Hormone

Causing Premature Hair Thinning," and that the formula "Utilizes Unique Hair Nourishing

Proteins That Help New Hair Growth."[22] Defendants warrant that the formula "[p]romotes hair

growth by extending the anagen phase and regulating cell proliferation in the hair follicle" and

"helps to slow down the hair loss process by providing each strand with keratin to help strengthen

the hair strand structure." They also warrant the formula's "specially selected" ingredients protect

the scalp by "strengthen[ing] hair follicles at the scalp to decrease the amount of splitting hairs."

113.    Prior to the August 2019 redesign of the website, Defendants made the following guarantee

that Cel MD products would be effective:

> Back in 2016, we found that the high-quality skin care and hair care products on the market **were full of harmful synthetics and ineffective natural products**. It seemed it was a choice between efficacy or ethics; which was **a compromise we weren't willing to make. Nor should you**. So we decided to break the mould and **deliver products with the best possible ingredients to provide the best possible results. No compromise**.[23]

---

[21] Cel MD, *Microstem Shampoo*, https://www.cel.md/shampoo-single.php (html cache of page from Aug. 6, 2019); Cel MD, *Microstem Conditioner*, https://www.cel.md/conditioner-single.php (html cache of page from Aug. 6, 2019).
[22] Cel MD, *Cel Shampoo & Conditioner*, https://www.cel.md/products/cel-shampoo-conditioner (html cache of page from Feb 25, 2019).
[23] Cel.Md, *About*, https://www.cel.md/pages/about-alti (html cache from Feb. 25, 2019).

114.    Defendants represented that Cel MD Microstem Shampoo and Conditioner had a "90 Days Money Back Guarantee" on the Cel MD website.[24] Defendants' website continued to represent that the product had a 90 Days Money Back Guarantee as late as May 2020.[25]

115.    Defendants warranted in their landing pages that Cel MD developed the "clinically proven hair thickening" Microstem Shampoo & Conditioner to "harnesses the power of Ginseng Stem Cells, giving thousands of Americans thicker, stronger hair."[26] They warranted that the products use "only premium grade, clinically proven Ginseng Stem Cells," and they are "specifically formulated to help block DHT, while also giving your hair and scalp the best environment and nutrition to produce healthy, thick hair."

116.    These warranties were part of the basis of the bargain which Plaintiffs Yonatan Widiantoro, Heather Brown, Cheryl Tishman, and Alissa Stefanacci relied upon, in that they purchased the products because of these promises. They did not receive the benefits they were promised, and their hair was not strengthened, thickened, or otherwise improved as warranted. This failure to provide the promised benefits constitutes a breach of the warranties.

**Warranties Regarding Cel MD Nail Formula**

117.    Plaintiff Alissa Stefanacci purchased Defendants Cel MD's Nail Formula, which prominently represents on front of the box label that "This double-strength Stem Cell Nail Formula

---

[24] Cel MD, *Microstem Conditioner*, https://www.cel.md/conditioner-single.php (html cache of page from Aug. 6, 2019); Cel MD, *Microstem Shampoo*, https://www.cel.md/shampoo-single.php (html cache of page from Aug. 6, 2019).
[25] Internet Archive, Stem Cell Shampoo, https://web.archive.org/web/20200527181335/https://www.cel.md/stem-cell-shampoo/ (last visited May 12, 2021).
[26] Cel, https://promos.cel.md/bwxcspsteps/index.php?utm_source=bfx_bwxcsp_6S&utm_medium=BWXCSPBFX_Lsplit1_mb2&utm_campaign=bwx_csp&utm_term=bwx_csp (html cache of page from Aug. 7, 2019).

will hydrate and repair damaged brittle nails, fight nail fungus, and encourage strong, healthy growth."

118.    Defendants warrant the Nail Formula is specifically formulated to "promote healthy nail growth and nourish cuticles."[27] Defendants warrant that the benefits of use are stronger nail growth, rejuvenation of damaged nail beds, and repair and protection from fungus and infections. They warrant it can repair the nail bed, "promote the formation of collagen which increases nail growth."[28] On their landing pages which, on information and belief, Ms. Stefanacci viewed, Defendants promise results within 4-6 weeks, stating: "For Best Results, Use Twice Daily For 4-6 Weeks" and "you should start to see results within 4-6 weeks."[29]

119.    On the Cel MD website, Defendants warrant that the castor oil ingredient is "proven to naturally fight fungal infections," that soybean oil "improves nail condition by making them stronger and healthier," and that vitamin E protects the nail bed and "improves nail health" by "increasing blood flow to the nail bed and cuticle for healthier fingertips."[30]

120.    On landing pages, Defendants warrant that the Nail Formula "utilizes Stem Cells to naturally encourage cell recovery and faster healing."[31] Defendants warrant the product is "the answer to weak, damaged cuticles and nails!" They warrant it is "effective" and "scientifically

---

[27] Cel MD, *Nail & Cuticle Oil*, https://www.cel.md/cuticle-oil.php (html cache saved Aug. 6, 2019).

[28] Cel, https://promos.cel.md/caxccogift/index.php?fbclid=IwAR0wML3mtgpW-fQv6xBd_DKyhJkJrPeh6w0SYMlyJma2aNk9rVynnLFsFQE (last visited Apr. 29, 2021).

[29] https://celmdbeauty.com/cnplnew/index.php?fbclid=IwAR3DoLk9WxXjBBoQgHShkkzF9Khs OPoFOiWi8lEWTP2h1LVHxZAXHnaeNVA&id=mjx_cnp_bff&utm_source=mjx_cnp_bff_list &utm_medium=mjx_cnp_bff&utm_campaign=mjx_cnp_bff&utm_term=mjx_cnp_bff (last visited Jan 31, 2021).

[30] Cel MD, *Nail & Cuticle Oil*, https://www.cel.md/cuticle-oil.php (html cache saved Aug. 6, 2019).

[31] Cel, https://promos.cel.md/caxccogift/index.php?fbclid=IwAR0wML3mtgpW-fQv6xBd_DKyhJkJrPeh6w0SYMlyJma2aNk9rVynnLFsFQE (last visited Apr. 29, 2021).

formulated with powerful essential oils" that "combat nail fungus, strengthen weak nails and soothe dry cuticles."

121.    Defendants warrant that specific ingredients in the Nail Formula repair damaged cuticle skin and promote nail health. They represent that rosehip and castor oil "work to nourish the cuticle, helping to repair damage and keep your cuticles healthy." They claim soybeans "keep nail fungus infections at bay," and their plant stem cells "encourage a high cell turnover, keeping your nails healthy."

122.    On their landing pages, Defendants represent that the Cel MD Nail Formula comes with a "30 DAY "HEALTHIER HANDS & NAILS" GUARANTEE."[32] They expressly warrant to consumers: "30 Day Money-Back Guarantee— It Works Or You Don't Pay. **We want you to be 100% satisfied with everything you buy** from Cel MD. And if you're not **entirely happy** with your purchase **we will refund your money in full,** or exchange the goods."

123.    These warranties that the Nail Formula would repair damaged nails and improve the health of nails were part of the basis of the bargain which Plaintiff Alissa Stefanacci relied upon, in that she purchased the product because of these promises. She did not receive the benefits she was promised, and her nails were not repaired or otherwise improved as warranted. This failure to provide the promised benefits constitutes a breach of the warranties.

**Warranties Regarding Cel MD Hair Stimulation Formula**

124.    Plaintiff Yonatan Widiantoro purchased Cel MD Microstem Hair Stimulation Formula, which warrants in its name that it will stimulate hair. It further prominently warrants on the back of the box that the product is contained in that: "This specialized stem cell hair formula contains a

---

[32] Cel MD, https://promos.cel.md/caxccogift/index.php?fbclid=IwAR0wML3mtgpW-fQv6xBd_DKyhJkJrPeh6w0SYMlyJma2aNk9rVynnLFsFQE (last visited Apr. 29, 2021).

blend of hair-strengthening and stimulating ingredients, including the patented Stem Cell Growth Formula. Our unique formula helps repair damaged hair cells and provides the ideal nutrients that result in thicker and fuller hair." The back of the box further promises these results in 8 weeks: "For best results, apply twice a day for 8 weeks…."

125.    Defendants sell Cel MD Microstem Hair Stimulation Formula through the Cel MD website. As of August 2019, Defendants warranted on their website that the Hair Stimulation Formula was a "concentrated blend of scientifically optimized plant extracts, including Asparagus Stem Cells and Biotin" that "encourages new hair growth and fights hair loss."[33] They warranted that the Hair Stimulation Formula "uses natural components block the hormone DHT, known to advance hair loss," "encourages high cell turnover to promote new hair growth," and "strengthens at the root to prevent breakages."[34]

126.    Defendants warranted that the ingredients in the Cel MD Hair Stimulation Formula have specific health benefits. They claim that asparagus stem cells are "[a]ble to activate damaged hair follicles" and "promote hair growth by lengthening the growth-phase in the cell cycle, as well as blocking the hair-killing hormone, DHT." They claim that biotin "is critical to numerous functions within the body including cell growth, metabolism and cell repair," representing that this can treat dry scalp: "If you suffer from a dry scalp, you develop a layer of dead skin cells which prevents the natural regrowth cycle of your hair." They claim that keratin is a protein that can make your hair "less susceptible to breakage." And they claim the glycerin in the Formula is a "powerful, non-toxic sugar compound" that is a "moisture sponge" that keeps the scalp "hydrated, whilst

---

[33] Cel MD, *Microstem Hair Stimulation Formula*, https://www.cel.md/hair-formula.php (html cache of the page from Aug. 6, 2019).
[34] Cel MD, *Microstem Hair Stimulation Formula*, https://www.cel.md/hair-formula.php (html cache of the page from Aug. 6, 2019).

preventing skin irritation and promoting hair growth."[35] Defendants warranted that the product is suitable for all hair types, that it is "hypoallergenic," and that it contains "no harsh chemicals or skin irritating fragrances." Defendants warranted on the product page for the Hair Stimulation Formula to customers purchasing through the Cel MD website that the product had a "90 Days Money Back Guarantee" as of August 2019.

127.   Defendants warrant that their Hair Stimulation Formula is an "effective solution for hair growth" that is "enriched with the most effective hair stimulating ingredients, but most importantly Asparagus Stem Cells."[36] They claim that "Premium grade Ginseng Stem Cells, Biotin and advanced arginine extract have all been proven to reduce hair fall out and stimulate hair follicles." Defendants warrant at the bottom of the page that "HERE AT CEL WE PROMISE" that all ingredients are "natural and complete harmless to your skin."

128.   These warranties were part of the basis of the bargain which Plaintiff Yonatan Widiantoro relied upon, in that he purchased the product because of these promises. He did not receive the benefits he was promised, and her hair was not strengthened, thickened, or otherwise improved as warranted. The products further were not safe as warranted. This failure to provide the promised benefits constitutes a breach of the warranties.

**Warranties Regarding Cel MD Advanced Hair Supplement**

129.   Plaintiff Heather Brown purchased Defendants' Cel MD Advanced Hair Supplement on Amazon.com, which contains a prominent warranty on the front of the bottle label: "Formulated

---

[35] Cel MD, *Microstem Hair Stimulation Formula*, https://www.cel.md/hair-formula.php (html cache of the page from Aug. 6, 2019).
[36] Cel MD, *TRY THE #1 BEST-SELLING STEM CELL HAIR FORMULA TODAY!*, https://promos.cel.md/mjxchfgiftm/index.php (last visited May 6, 2021) (web archive cache, Aug. 8, 2019).

to promote thicker and healthier looking hair, with enhanced Super Biotin and a unique blend of hair strengthening ingredients."

130.    Defendants sold Cel MD Advanced Hair Supplement on Amazon warranting that its "patented super biotin" formula stimulates hair growth, protects the scalp, strengthens hair.[37] They warranted that the product stimulates "cell regeneration," "strengthen[s] hair follicles," and "increases blood flow to the scalp." They warranted that the supplement reduces DHT and uses stem cell technology that "reignites the growth phase" of hair cells.

131.    Defendants warranted that the key ingredients in the Advanced Hair Supplement include "super biotin" that "helps hair utilize amino acids [sic]," vitamins B and C that "encourages collagen synthesis to aid new hair growth," protein peptides that "can treat alopecia and other diagnosed hair loss conditions" while also "prevent[ing] follicle death and increas[ing] follicle size," and niacin that "rebuilds keratin" and "repairs damaged or dormant hair follicles."[38]

132.    Defendants included the same express warranty for their Advanced Hair Supplement that they made for their other products as of August 2019, which promises results within 90 days: "100% Money Back Guarantee (90-Days): We are so confident that you will love our products that we offer a 90-day money back guarantee. If they don't work, then we don't deserve your money."[39]

133.    These warranties were part of the basis of the bargain which Plaintiff Heather Brown relied upon, in that she purchased the product because of these promises. She did not receive the benefits

---

[37] *CEL MD Advanced Hair Vitamins Women Men*, https://www.amazon.com/Advanced-Vitamins-Supplement-Strengthening-Capsules/dp/B07P65TJ8L (html cache from Aug. 13, 2019).
[38] *CEL MD Advanced Hair Vitamins Women Men*, https://www.amazon.com/Advanced-Vitamins-Supplement-Strengthening-Capsules/dp/B07P65TJ8L (html cache from Aug. 13, 2019).
[39] *Id.*

she was promised, and her hair was not strengthened, thickened, or otherwise improved as warranted. This failure to provide the promised benefits constitutes a breach of the warranties.

### Warranties Regarding Cel MD Microstem Deep Conditioning Hair Mask

134.    Plaintiff Heather Brown purchased the Cel MD Microstem Deep Conditioning Hair Mask from Amazon.com, which was prominently labeled on the bottle as the "Microstem Hair Thickening Mask." This claim to be a "hair thickening" mask constitutes a warranty that the mask would, in fact, thicken hair. Such warranties were made throughout the Amazon page which Ms. Brown purchased from, including that it "Provides a Deep Repair to Strengthen Damaged Hair", that it "Strengthens & Thickens," and that it "Promotes Hair Follicle Regeneration, Creating the Optimal Environment for Hair Growth."

135.    Defendants warranted that Cel MD's Microstem Deep Conditioning Hair Mask for Dry Damaged Hair will "repair split ends as well as improving overall hair and scalp health" on the Amazon product page.[40] They warranted that the product protects the hair and scalp through "[s]pecially selected vitamins and minerals [that] help strengthen hair follicles at the scalp."[41] They warranted that the Mask encourages new hair growth by using "unique hair nourishing proteins which help new hair growth" by "extend[ing] the anagen phase and regulates cell proliferation in the hair follicle." They warranted that ingredients like retinol palmitate "enhances the appearance and feel of hair" while increasing "hair body, strength and shine," and that Cel MD's "natural oil blend" supports "hair's defense against future damage." Defendants further represented and warranted that the Microstem Deep Conditioning Hair Mask will improve the consumers

---

[40] *CEL MD Microstem Deep Conditioning Hair Mask for Dry Damaged Hair*, https://www.amazon.com/Microstem-Conditioning-Intensive-Treatment-Conditioner/dp/B07V2NFJD9 (last accessed Aug. 13, 2019).
[41] *Id.*

appearance. They warranted the Mask "creates the perfect environment for a healthy scalp which allows hair to grow fuller and stronger and leaving hair looking salon fresh!"[42]

136.    On Amazon, Defendants represented that the Hair Mask comes with a "100% Money Back Guarantee (90-Days)," expressly warranting that Defendants "are **so confident** that you will love our products that we offer a 90-day money back guarantee. **If they don't work, then we don't deserve your money**."

137.    These warranties were part of the basis of the bargain which Plaintiff Heather Brown relied upon, in that she purchased the product because of these promises. She did not receive the benefits she was promised, and her hair was not strengthened, thickened, or otherwise improved as warranted. This failure to provide the promised benefits constitutes a breach of the warranties.

### Misrepresentations and Omissions Regarding Reviews and Endorsements

138.    Customer reviews, testimonials, videos, and photographs that purport to come from happy customers pervade the Cel MD Defendants' and PetLab Defendants' marketing materials. In their digital advertisements, Facebook advertisements, on Instagram, on their YouTube pages, on the Cel.md website and the PetLab website, and on Amazon, these endorsements are present. On information and belief, and based on the structure of the Cel.md and PetLab sales funnels and websites, Plaintiffs, and every other customer who purchased a product from Cel.md or PetLab at the least through roughly October 2020, would have seen these reviews and testimonials.

### Misrepresentations and Omissions on the Use of Stock Photos

139.    The Cel MD Defendants' website and the PetLab Defendants' website utilize customer reviews throughout the sites, often associated with photographs of what purport to be real customers who have given gushing reviews of Cel MD or PetLab products. But many of the photos

---

[42] *Id.*

are not in fact real customers. Instead, they are stock photos of models who have no connection whatsoever with the Cel MD Defendants or the PetLab Defendants or their respective products. On information and belief, many "customer photos" used by the Cel MD Defendants and by the PetLab Defendants on their websites and social media are either Altitude Ads employees or friends of those employees who are not actual customers. Nowhere is it disclosed that these photos are of employees or others who have been compensated.

140.    Multiple other "customer photos" have been reused on the Cel MD website with different customer names and different reviews. Many of the other images presented on the Cel MD website as being customers or reviewers who made a "Verified purchase" also appear on hundreds of other third-party websites with no connection to Cel MD. On information and belief, the Cel MD Defendants or their agents purchased these stock photos or obtained them from third party websites, falsely labeled them as actual customers, and wrote many of the "reviews" on their website themselves.

**Hiding Negative Facebook Comments**

141.    The Cel MD Defendants have also hidden or deleted negative comments on their Facebook ads. On information and belief, the Cel MD Defendants have actively hidden comments on their Facebook advertisements in order to suppress negative material information from actual users who would report the same experiences of scalp burns and hair loss as reviewers on Amazon have reported, as well as other material facts the Cel MD Defendants seek to hide from their customers.

142.    As a specific example, a page capture taken on June 27, 2019 at of 6:09 PM Pacific time, one of the Cel MD Defendants' Facebook advertisements featured publicly visible comments by

 **Terry Hopkins** Why have you not answered Dave Klein question? This makes me extremely skeptical especially that we have heard in the past that some of these so called products that makes your hair grow can actually make your hair thin out more. His question was does your product have a chance to make you hair thin even more? I looked for your response in the comments to him but you skipped his question and been answering several questions after his question. 😕

Like · Reply · 40m

two individuals seeking to convey negative information about the Cel MD Defendants to consumers. One, by an individual named Terry Hopkins, questioned whether the Cel MD products could "actually make your hair thin out more" and specifically asked the Cel MD Defendants (who had been actively replying to customers' questions) whether that was a possibility:

143.    Another individual named Sean OReilly responded to a "before and after" photo which the Cel MD Defendants posted saying "Lol... more lies." The same individual posted several other negative comments in the thread, also informing customers that if they stopped using the products, they risked "more hair loss."

144.    By the following morning, on June 28, 2019 as of 11:55 AM PDT, these comments had been hidden or deleted by the Cel MD Defendants and were no longer visible to the public. On information and belief, they were hidden rather than deleted, since the number of comments listed on the advertisement had gone up from 285 to 301 even as fewer comments were publicly visible.

### Manipulated Trustpilot Reviews

145.    The Cel MD Defendants and the PetLab Defendants also utilize a website called "Trustpilot" to display reviews on their websites, in advertisements, on social media, and on landing pages. Both Defendants frequently tout their high Trustpilot scores in advertisements. Trustpilot acknowledged that there is a widespread "black market" for fake reviews on its website.[43]

---

[43] Mike Deri Smith, "Fake Reviews Plague Consumer Websites," *The Guardian* (Jan. 26, 2013), https://www.theguardian.com/money/2013/jan/26/fake-reviews-plague-consumer-websites (last visited June 18, 2019).

146.    As of June 2019, the reviews for Cel MD on Trustpilot were almost universally positive, with 95% of reviewers giving Cel MD a 5-star rating.[44]

147.    By contrast, on Amazon in the same time period, Cel MD's shampoo and conditioner products managed a mediocre 3.7 rating, with a full 20% of reviewers giving the products the lowest possible 1-star rating.[45]

148.    From March 26, 2019, through October 13, 2019, Cel MD continued to have this same disparity in Trustpilot reviews, racking up almost 200 five-star reviews with zero negative reviews. But on October 14 of 2019—after the Cel MD Defendants learned that that they were being investigated for a class action lawsuit—this suddenly changed. A flood of one-star, two-star, and three-star reviews for Cel MD were released onto the Trustpilot website, all dated after October 14, 2019. Cel MD went from a 4.9 rating to a 4.3 rating, with its one-star ratings jumping from 0% to 10% percent.[46]

149.    On information and belief, this vast disparity between Cel MD's Trustpilot rating and their Amazon ratings is due to manipulation or falsification of Trustpilot reviews by Cel MD. Because the Trustpilot reviews automatically populate Cel MD's website, this manipulation makes it appear to visitors of the Cel MD website that Cel MD receives almost universally positive reviews—when in fact, the reviews on Amazon complain of problems ranging from ineffectiveness of the products to scalp burns or hair loss caused by the Cel MD products.

150.    Cel MD has five-star reviews are not legitimate, and Defendants knowingly leave them up despite their ability to flag reviews that are not based on a genuine experience. For example, the

---

[44] TrustPilot, https://uk.trustpilot.com/review/cel.md?page=3 (last visited June 18, 2019).
[45] Amazon.com, https://www.amazon.com/CEL-MD-Thickening-Conditioner-Stimulating/dp/B07D7HRVDL (last visited June 18, 2019).
[46] Trustpilot, https://www.trustpilot.com/review/cel.md (last visited Nov. 18, 2019).

Defendants replied to five-star review about products that are not Cel MD products, thanking the customer for their "review":[47]



151.    Defendants also solicit Trustpilot reviews by invitation, which take two forms; first, reviews that come from a customer responding to an automatically generated email invitation to leave a review, which are marked as "Verified" reviews; second, Defendants can manually invite a customer to write a review, which provides a direct link to review on Trustpilot, which are automatically flagged as "Invited" reviews.[48]

152.    Defendants have an incentive to manually send invitations because these "Invited" reviews procure five-star ratings at a much higher rate than for all review methods, allowing Defendants to manipulate the ratings of their most recent reviews and to influence their overall star rating.

---

[47] Andi H, Trustpilot Review, Jan. 13, 2021,
https://www.trustpilot.com/review/cel.md?b=MTYxMDk5OTYxNDAwMHw2MDA1ZTczZTc1
NWRjMTA2MWNlYzhmYzk (last visited May 6, 2021).
[48] *How do reviews get on Trustpilot?*, https://support.trustpilot.com/hc/en-
us/articles/223402468?utm_campaign=invited_basic_link&utm_content=invited_tooltipl&utm_
medium=referral&utm_source=CPP

Over the last 12 months, when Defendants manually invited customers to leave a review by directly emailing them a Trustpilot link, the number of five-star reviews shot up to nearly to 95%, while one-star reviews fell to below 1%.[49]

153.    In July 2020, Defendants sent solicited 61 Invited reviews, and all 61 reviews were five-star reviews.[50]

154.    Defendants also manipulate ratings by soliciting positive reviews for Trustpilot, but they do not disclose this to potential consumers when they display their Trustpilot star rating on the Cel MD website, on landing pages, in advertisements, on social media, and on Amazon.

155.    Defendants explicitly offer discounts in exchange for reviews. In response to a customer complaining that Defendants cancelled her subscription to force her out of a deep 50% discount, Defendants then offered her a cash discount, as she reported in her Trustpilot review: "I will only purchase this now as a 1 off **along with the £10 discount to write this review**…"[51]

156.    The Cel MD Defendants reply to almost all negative reviews on Trustpilot. Defendants replied to 99% of all negative Trustpilot reviews (one- or two-star reviews) over the twelve-month period from May 2020 to May 2021.[52]

---

[49] Trustpilot, Cel Business Transparency page,
https://www.trustpilot.com/review/cel.md/transparency (last updated May 19, 2021) (last visited May 19, 2021).
[50] Trustpilot, Cel Business Transparency page,
https://www.trustpilot.com/review/cel.md/transparency (last updated May 19, 2021) (last visited May 19, 2021).
[51] Denise Andrews, Trustpilot Review, Apr. 12, 2021,
https://www.trustpilot.com/review/cel.md?search=discount (last visited May 6, 2021).
[52] Trustpilot, Cel Business Transparency page,
https://www.trustpilot.com/review/cel.md/transparency (last updated May 19, 2021) (last visited May 19, 2021).

157.    The PetLab Defendants engage in the same practices as alleged above about the Cel MD Defendants' use of Trustpilot. They manipulate their overall rating by manually inviting reviews, which receive almost entirely five-star reviews and nearly zero one-star reviews.

158.    On information and belief, Defendants have further engaged in active concealment by hiding, concealing, or gating negative reviews on TrustPilot in order to suppress material negative information about their products and to prevent consumers from discovering it.

**Misrepresenting the Total Number of Reviews Per Product**

159.    Defendants falsely represent that Itch Relief Chews have higher star ratings and more customer reviews than they actually do. On the PetLab website, Defendants display customer reviews on each product page by embedding a customizable widget that displays data from Trustpilot. Defendants knowingly set the parameters of Trustpilot's widget to filter reviews to only display four- and five-star reviews, with the filter label "Showing our favorite reviews."[53]

160.    On information and belief, Defendants displayed customer reviews in this manner at the time Plaintiff purchased Itch Chews Chews from the PetLab website. The Reviews section of the product page displayed an "Excellent" Trustpilot rating and displayed an image showing five stars shaded in green, visually representing a 4.5/5 star rating.[54] Defendants did not disclose that the rating counted reviews for all PetLab products, not limited to reviews for the Itch Relief Chews. They knowingly selected only four- and five-star reviews to display as examples in the review feed to make it appear that negative reviews were infrequent.

---

[53] PetLab Co., *Itch Relief for Dogs*, https://thepetlabco.com/products/dog-itching-treatment (html cache of the page from Jan. 20, 2021).
[54] PetLab Co., *Itch Relief for Dogs*, https://thepetlabco.com/products/dog-itching-treatment (html cache of the page from Jan. 20, 2021).

161.    Defendants also misrepresented the number of positive customer reviews for Itch Chews on their social media accounts through sponsored advertisements, their posts and comments, and by linking to deceptive landing pages.

162.    On another landing page, Defendants represent that the Itch Chews have 3,144 five-star reviews.[55]

163.    On information and belief, Defendants falsely represented to consumers and Plaintiff that PetLab Co. Itch Relief Chews have thousands of five-star reviews. As of May 2021, Defendants' own website reveals that the Itch Relief Chews in reality have only 135 total reviews specific to the product, and only 76 of those reviews are five-star reviews.[56]

164.    On information and belief, Defendants reveal the true rating and number of five-star reviews in a single location, while disseminating false claims in hundreds of other instances. Defendants own data shows the true overall rating on Trustpilot is 3.8/5, and they omit reporting or displaying a significant number one-star reviews, 25 out of 135.

165.    Customer reviews on Amazon for the Itch Relief Chews also do not substantiate Defendants claim of having over 3,000 five-star reviews. On Defendants' Amazon product page, the Itch Relief Chews have only 203 five-star global customer reviews out of 695 total customer

---

[55] Petlab Co., https://promos.thepetlabco.com/itchreliefchews/itch25?id=IRC-002-control-v2&utm_campaign=2059666785&utm_medium=googleshopping&utm_source=google&utm_term=control (last visited May 5, 2021).
[56] Petlab Co., *Itch Relief for Dogs*, https://thepetlabco.com/products/dog-itching-treatment (last visited May 5, 2021).

reviews.[57] As of May 2021, the Amazon Itch Chew customer review rating is 3.7 out of 5 stars, and less than half of all reviews are five-star reviews (48%).[58]

166.    Defendants also claim that Dental Formula has "incredible reviews" and "[t]housands of Americans have posted online about how much the mouthwash has changed their dogs's lives (it's rated 4 STAR on Trustpilot)."[59] Defendants use misleading images to suggest that the Dental Formula product itself has over 3,000 five-star reviews:[60]

167.    Dental Formula in fact has approximately less than 500 total reviews on Trustpilot, of which about 300 are five-star reviews.[61]

168.    TrustPilot issued a warning about Defendants on their PetLab page stating: "We've found out that this company's use of the Trustpilot brand is misleading. The company is not displaying the most up-to-date ratings, TrustScore or reviews on their website. We wanted to let you know that this company hasn't been playing by the rules."

**Fake Reviews / Paid Reviews**

---

[57] *Customer Reviews – Petlab Itch Chews for Dogs*, https://www.amazon.com/Petlab-Co-Soothing-Turmeric-Curcumin/product-reviews/B07XB24LJQ/ref=cm_cr_dp_d_show_all_btm?ie=UTF8&reviewerType=all_reviews (last visited May 5, 2021).

[58] *Customer Reviews – Petlab Itch Chews for Dogs*, https://www.amazon.com/Petlab-Co-Soothing-Turmeric-Curcumin/product-reviews/B07XB24LJQ/ref=cm_cr_dp_d_show_all_btm?ie=UTF8&reviewerType=all_reviews (last visited May 5, 2021).

[59] Petlab Co., *"What Will YOU Do With The Money You Save By Switching To This Dental Detox Drink?"*, https://promo.thepetlabco.com/aax/mtw_speech/index-vet.php?fbclid=IwAR3Cfn5CPC5T_-2eXO2O7YQUKZRlKLyKObM9ME9qAQcamgcmFyf8otNJFKM (last visited Oct. 16, 2020).

[60] Petlab Co., *"What Will YOU Do With The Money You Save By Switching To This Dental Detox Drink?"*, https://promo.thepetlabco.com/aax/mtw_speech/index-vet.php?fbclid=IwAR3Cfn5CPC5T_-2eXO2O7YQUKZRlKLyKObM9ME9qAQcamgcmFyf8otNJFKM (last visited Oct. 16, 2020).

[61] PetLab Co., Dog Dental Formula, https://thepetlabco.com/products/dog-dental-formula (last visited May 11, 2021).

169.   On information and belief, some of Cel MD's positive Amazon reviews and some of PetLab Co.'s positive Amazon reviews are fake or were obtained through undisclosed compensation. On information and belief, some of Cel MD's positive reviews or comments on its Facebook ads are fake or were obtained through undisclosed compensation.

170.   On information and belief, some PetLab Co. positive reviews or comments on Facebook ads are fake or were obtained through undisclosed compensation. The PetLab Co. Defendants have also hidden or deleted negative comments on their Facebook ads, as described further herein, and in order to suppress negative material from consumers.

171.   On information and belief, some of the endorsers used in Cel MD's and PetLab Co.'s videos and video advertising were beneficiaries of undisclosed compensation or were paid actors and actresses.

172.   Plaintiffs did not know this, and it was difficult to discover because information about the authorship of reviews or the compensation and identity of the authors is non-public.

173.   The Cel MD Defendants made material omissions regarding their customer reviews and misled consumers by omitting material information which they were under a duty to disclose relating to their reviews. The Cel MD Defendants failed to disclose to consumers who viewed their videos, their Amazon page, their website, or their Facebook advertisements that some of their reviews and endorsements were fake, compensated for without disclosure, featured images of individuals who were not the reviewer, or which were manipulated to make it appear as if the overall reviews were more positive than they actually were. While the Cel MD Defendants made limited disclosures on a separate page on their website that some of their reviews and endorsements were compensated, that disclosure is of no legal relevance because it was made on a separate page and was not made in proximity to the reviews or endorsements, and because the disclosure

contained material omissions (for example, that some reviews were fake or manipulated or that the photos were not of actual customers, as well as the true nature of the actual compensation).

174.     The Cel MD Defendants were soliciting reviews by email at least as of August 2019 in exchange for discounts by offering 20% off to customers who shared their opinion.[62]

175.     On information and belief, the Cel MD Defendants and the PetLab Defendants did not disclose that they provide discounts of value to customers to incentivize them to leave reviews.

**Materiality of Omissions**

176.     As discussed herein, the Defendants made material omissions regarding their customer reviews and misled consumers by omitting material information which they were under a duty to disclose relating to their reviews. These include the omissions that many reviews employed stock photos and were not photos of actual customers, that negative Facebook comments were hidden from view by Defendants, that Defendants manipulated their Trustpilot reviews, that Defendants misrepresented the total number of reviews per product, and that many reviews were either downright fake or made in exchange for compensation.

177.     The Cel MD Defendants were under a duty to disclose this information to the Cel MD Plaintiffs because the Cel MD Defendants had exclusive knowledge of material facts not known to them, namely that they had written the reviews themselves, that the photos were not of actual customers or reviewers, that the reviews or endorsements were compensated for, or that reviews were manipulated to make it appear as if the overall reviews were more positive than they actually were.

---

[62] Facebook Review on Cel MD Page, Aug. 30, 2019, https://www.facebook.com/sarah.golding.1232/posts/10219350931139572 (last visited May 27, 2021).

178.    The PetLab Co. Defendants were under the same duty to disclose this information to the PetLab Plaintiffs because Defendants had exclusive knowledge of material facts not known to them, as described herein.

179.    The Cel MD Defendants were under a duty to disclose this information to Plaintiffs because the Cel MD Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. The Cel MD Defendants have hidden or deleted negative comments on their Facebook ads, as described further herein.

180.    The PetLab Defendants were under a duty to disclose this information to Plaintiffs because the PetLab Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. On information and belief, the PetLab Defendants have hidden or deleted negative comments on their Facebook ads, as described further herein.

181.    On information and belief, the Cel MD Defendants and the PetLab Defendants have further engaged in active concealment by hiding, concealing, or gating negative reviews on Trustpilot in order to suppress material negative information about their products and to prevent consumers from discovering it.

182.    The Cel MD Defendants and the PetLab Defendants were further under a duty to the respective Plaintiffs because they made partial representations—that the reviews reflected the statements of customers or endorsers and their actual appearance—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that the reviews were authored by Cel MD or PetLab Co. employees or were fake, that reviewers or endorsers were compensated, that they featured photos who were not the reviewer, or that they were manipulated to make it appear as if the overall reviews were more positive than they actually were.

58

183.    The Cel MD Defendants and the PetLab Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs. Those omissions could have been corrected by including the omitted information in proximity to the reviews on the Cel MD and PetLab websites, by including prominent disclaimers in the Cel MD and PetLab videos, by including a prominent disclaimer on its Amazon product descriptions, and/or by including prominent disclaimers in the text or videos on its Facebook advertisements.

184.    These omissions are designed to induce consumers to purchase the Cel MD and PetLab Co. products based on the positive and enthusiastic endorsements of the fake or paid reviewers. As a result of these omissions, Plaintiffs purchased products they would not have or paid more for them than they otherwise would have.

185.    The Cel MD Defendants' omissions regarding their customer reviews were material to all consumers, including the Cel MD Plaintiffs. A reasonable consumer would attach importance to these omissions in deciding whether to purchase the Cel MD products because the experience of other consumers and the ratings other consumers give to products are important in a reasonable consumer's purchasing decision. A product with highly positive reviews is reasonably considered by consumers to be more valuable than a product with bad reviews. Whether or not consumer reviews are fake, involved compensation, were manipulated, or use pictures of stock models would be important to a reasonable consumer.

186.    The PetLab Co. Defendants' omissions regarding their customer reviews were material to all consumers, including the PetLab Co. Plaintiffs for the same reasons as stated herein.

**Deceptive and Unlawful Disclosures of Warranties and Guarantees—Cel MD and PetLab Co. Products**

187.    The Cel MD Defendants made express warranties to consumers in ads and on landing pages. For example, they represented that by claiming a special offer, "you are virtually guaranteeing your hair will grow thicker, longer & healthier. Our research indicates that each successive month you use our stem cell thickening shampoo & conditioner, the results continually improve too."[63]

188.    The Cel MD Defendants provided deceptive disclosures of warranties and guarantees for consumers making purchases through promo.cel.md links.

189.    On promotional sales funnel pages, Defendants include shopping portals where consumers can complete their entire purchase without leaving pages with root URLs of promo.cel.md.

190.    The Cel MD Defendants post sales funnel pages that direct consumers to pages with URLs that begin with promo.cel.md. In March of 2019, Defendants posted a link to sales funnel page on Facebook for the Microstem Shampoo and Conditioner that contain deceptive warranties and guarantees.[64] In the main Facebook post, Defendants posted a link to a sales page that represented that the Microstem Shampoo and Conditioner had a 30-day money-back guarantee.[65]

---

[63] Cel, *Special New Customer Offer*, https://www.celmdbeauty.com/cspl/upsell.php?product=1a&analytic (last visited Nov. 26, 2019).
[64] Cel Reply on Apr. 10, 2019, *available at* https://www.facebook.com/celmdbeauty/photos/a.534741676868884/854803284862720/ (last visited May 25, 2021).
[65] Cel MD, *CEL SHAMPOO & CONDITIONER 1x*, https://cel.md/products/cel-shampoo-conditioner (last visited May 25, 2021).

191.     On the sales funnel page however, Defendants represented that the products had a 90-day money-back guarantee.[66] Defendants include the 90-day image and the 90-day claim in writing at least three times each before a consumer scrolls to the bottom of the page. This express warranty claim directly contradicted the 30-day express warranty Defendants made in other places.

192.     The Cel MD Defendants also made deceptive and fraudulent warranties through their provision of substantially different and inaccurate terms of service to consumers who made purchases using promo.cel.md links.

193.     Consumers who purchased Cel MD products by adding items to their "shopping cart" on promo.cel.md pages, the Cel MD Defendants provided terms of service that do not contain any of the warranty terms that are contained in their "Terms of Use and Conditions of Sale" that exists at present on the Cel MD Website. Defendants linked to different terms, "Terms of Service," for purchased made by consumers completing transactions using a promo.cel.md shopping cart.[67]

**Deceptive Brand Name and Omissions Regarding the PetLab Co. Brand Name**

194.     The PetLab Defendants have used the names "The Pet Lab" and "PetLab Co." to marketing their products since they launched the brand in late 2019. Defendants' "The Pet Lab" Facebook page was created by Altitude Ads Limited on October 24, 2018. Altitude Ads changed the name of the page to "Petlab Co." on September 29, 2020. Altitude Ads also hosts a page named "Petlab Co. – Dogs," which it created on October 31, 2019. Both the Petlab Co. and Petlab Co. – Dogs pages run advertisements on Facebook using those names.

---

[66] Cel MD,
https://promos.cel.md/dmxcspsub/index.php?fbclid=IwAR0HzE9unWQRofRgROvgmbBN2txX
zyOqJYatZWCREPyKO_q29XdPRJwtqDY (last visited May 25, 2021).
[67] Cel MD, *Terms of Service*, https://cel.md/pages/terms-of-service (last visited May 25, 2021).

195.    The PetLab Defendants' Instagram page is titled "thepetlabco," featured prominently as the name at the top of the page.  The PetLab Defendants' YouTube page is titled "Petlab Co."  On information and belief, and given the structure of their websites and sales funnels, every customer of PetLab Co. products would have been exposed to and viewed the "The Pet Lab" or PetLab Co. brand name on the PetLab website and on the product packaging and labelling.

196.    The "lab" portion of the brand name is deceptive and misleading to consumers because it implies that the Petlab Defendants make their products in a laboratory when, in fact, they buy them from a manufacturer of private label products to sell as distributors.

197.    The PetLab Defendants make these representations on their website, claiming "[e]very day we continuously learn and research high-quality ingredients."[68] On their About Us page, Defendants claim that PetLab has a "dedicated team" whose "research is extensive and never-ending."[69] A reasonable consumer could find the PetLab Defendants' brand name misleading and deceptive in light of Defendants' statements that suggest they operate the lab that develops their products themselves.

198.    Defendants make similar claims on their website's product pages, on social media, on promotional pages, and in advertisements. These representations are pervasive throughout the PetLab Defendants' branded content.

**199.**    Recently, the U.S. Patent and Trademark Office (PTO) denied Amplify Limited's application to trademark "PetLab" based on this reasoning—the word "lab" implies a "laboratory"

---

[68] Petlab Co., https://thepetlabco.com/ (last visited May 26, 2021).
[69] Petlab Co., *About Us*, https://thepetlabco.com/pages/about-us-1 (last visited May 11, 2021).

that manufactures products, and when combined with "pet," the name purports to describe features of the goods.[70]

200.    On information and belief, the PetLab Co. Defendants chose the word "lab" in their brand to mislead consumers into thinking that their product formulas were developed by veterinarians in a lab.

## Omissions Regarding PetLab Product Safety

201.    Defendants represented and warranted to their customers, including Plaintiffs, that PetLab products are safe. But the products are not, in fact safe, as evidenced by numerous reports of serious side effects in dogs and cats who have ingested the products.

202.    Contrary to Defendants' claims that PetLab Co. Itch Relief Chews are safe, natural, and effective, customers report that the product does not work and makes dogs sick:

   a. "This product has nothing in it that vets recognize as being an anti-itch or allergy relief ingredient. There's nothing proprietary in it; it's just a hodge-podge of various ingredients that do nothing to help with itching. If you think it's working, then you are delusional & sadly mistaken;"[71]
   b. "This product made our dog really sick. He had horrible vomiting and diarrhea for 48 hours after 2 days of these chews;"[72]
   c. "These tabs made my dog seriously ill. They didn't dissolve in her belly and formed a plug in her intestines. Emergency vet clinic, hundreds of dollars and a week later she finally pooped it out. Dangerous product;"[73]

---

[70] Final Refusal on Apr. 15, 2021, U.S. Trademark Application Serial No. 79288641 (filed May 4, 2020).

[71] Amazon Customer Review, *No reason it would work, and it doesn't*, May 27, 2020, https://www.amazon.com/gp/customer-reviews/RNNHVOUHTDR89/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07XB24LJQ (last visited May 11, 2021).

[72] Amazon Customer Review, *Made our dog so sick*, Nov. 6, 2020, https://www.amazon.com/gp/customer-reviews/R1M53D4HIL4492/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07XB24LJQ (last visited May 11, 2021).

[73] Amazon Customer Review, *These nearly killed my dog*, Aug. 14, 2020, https://www.amazon.com/gp/customer-reviews/R9RKLQPZM18VZ/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07XB24LJQ (last visited May 11, 2021).

     d. "25 days in to this product, not only was he still itching, he had chewed his tail raw - off to the vet and back on prescription meds! . . . this product was a big fail!;"[74]

     e. "This was the second product i bought from amazon with the highest reviews and best comments on how it cures hot spots and frequent itching . . . . It didn't help at all in fact it might have made my dogs itching worse . . . ."[75]

203.    The PetLab Defendants specifically represent that PetLab Co.'s Dental Formula is safe for dogs because the product compliance with regulations: "Our products would not be on the market if it hadn't undergone all regulatory checks to ensure it is safe for consumption."[76]

204.    On the PetLab Co. website, the PetLab Defendants make explicit affirmations of fact that Dental Formula prevents, mitigates, and treats dental disease and its harmful effects, including "tooth loss, kidney and liver problems, and heart disease."[77] Defendants' website claims that the product formula "directly targets the build-up of plaque and tartar" to give your pet "the health benefits of optimum dental care."

205.    Contrary to Defendants' representations, customers report their dogs suffering serious side effects like vomiting, diarrhea, and seizures after using PetLab Co. products. Customer reviews on Amazon report these effects after giving the Dental Formula product to their dogs:

     a. "My dog had the most severe diarrhea with blood;"[78]

---

[74] Amazon Customer Review, Disappointed, Oct. 25, 2020, https://www.amazon.com/gp/customer-reviews/R1LJQ0C3M4XFKM/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07XB24LJQ (last visited May 11, 2021).

[75] Amazon Customer Review, *Deff didn't help the itching maybe made it worse*, Oct. 21, 2020, https://www.amazon.com/gp/customer-reviews/R9UIMLQ1H0UOU/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07XB24LJQ (last visited May 11, 2021).

[76] PetLab Co., Comment from Sept. 15, 2019, on post dated Aug. 27, 2019, https://www.facebook.com/thepetlabco/posts/367109470883208 (last visited May 11, 2021).

[77] PetLab Co., *Dog Dental Formula*, https://thepetlabco.com/products/dog-dental-formula (last visited May 11, 2021).

[78] Amazon Customer Review, *Don't buy!*, Oct. 18, 2019, https://www.amazon.com/gp/customer-reviews/R3VCFXWPVQN4QT/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07SWY5F9G (last visited May 11, 2021).

b. "My dog had to have a tumor removed from his tongue after using this stuff. Waiting results to see if it's cancerous or not;"[79]

c. "My dog began having seizures after starting this product. She has never had a seizure before and she has not suffered a single seizure since I stopped adding this;"[80]

d. "puppy threw up every day within 10 minutes of drinking and lost an adult palm sized patch of top coat from his scruff. Originally, we did not associate the hair loss or vomiting with Pet Lab until the bottle was gone and his vomiting stopped and the hair began growing back."[81]

206.    With knowledge that customers report these side effects and complain that PetLab Co.

products are ineffective, PetLab Defendants' Facebook account claims the product is "absolutely

safe"[82] for dogs and "won't cause any gastrointestinal upset."[83] Defendants represent:

> We would like to assure you that we would never, ever use ingredients that cause cancer! ❤️ We always choose our ingredients and additives based on those that are considered safe and after undergoing complex safety reviews across a spectrum of recipients and species. Everything we add adheres to the official control guidelines. It is also a requirement for all dietary supplements to be evaluated and monitored for safety after they are put on the market and we have not reported any contraindications at our recommended dosage guidelines.[84]

207.    Customers report that Defendants' Joint Chews do not work and caused their dogs to suffer

from seizures, vomiting, organ failure, and even death. Defendants had actual knowledge of these

---

[79] Amazon Customer Review, *CAUTION!*, July 9, 2019, https://www.amazon.com/gp/customer-reviews/R3JMII63Z0EXM6/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07SWY5F9G (last visited May 11, 2021).

[80] Amazon Customer Review, *Do not take the chance with your dogs health!*, Feb. 21, 2020, https://www.amazon.com/gp/customer-reviews/R2FDJ4NSDC9DXI/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07SWY5F9G (last visited May 11, 2021).

[81] Amazon Customer Review, *TOXIC!!! DO NOT USE!!!*, Aug. 9, 2020, https://www.amazon.com/gp/customer-reviews/R1ANNFJDUMJDG/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07SWY5F9G (last visited May 11, 2021).

[82] Petlab Co., Comment from Sept. 16, 2020, on post dated Aug. 15, 2020, https://www.facebook.com/thepetlabco/posts/644182726509213 (last visited May 11, 2021).

[83] Petlab Co., Comment from June 25, 2019, on Facebook post dated June 24, 2019, https://www.facebook.com/thepetlabco/posts/327301878197301 (last visited May 11, 2021).

[84] Petlab Co., Comment from Oct. 20, 2020, on Facebook post dated Aug. 13, 2020, https://www.facebook.com/thepetlabco/posts/642197140041105 (last visited May 11, 2021).

adverse events from customers posting Amazon reviews that recount gruesome side effects after feeding their dogs this "miracle" product:

    a. "this didn't work for my dog. He was immediately projectile vomiting after consuming;"[85]

    b. "[my yorkie] had a seizure and I rushed her to the animal hospital. . . . after 3 days she went into cardiac arrest and didnt respond from resuscitation . . . she took 4 days worth and this is the only thing different in her diet. It cost me 3000 to try to get her back and she never recovered;"[86]

    c. "Movement seemed to improve so I ordered a second container but he seemed to become confused . . . We took him to the veterinarian and they put him down very sad. Don't know what to say;"[87]

    d. "My 15 year old female King Charles, DIED yesterday from ACUTE KIDNEY FAILURE. . . . The only thing new in her diet were these Petlab 1/2 a glucosamine chewable tablet . . . The vet believes strongly that glucosamine made her kidneys swell and eventually fail. . . . the vet said it's toxic to some dogs."[88]

208.    The PetLab Defendants received notice that a sample of its Dental Wash was contaminated with a chemical known as MGK-264. MGK-264 is a man-made chemical that acts as a synergist in pesticides including flea poison, and is not an actual ingredient in the Dental Wash. This contamination was confirmed by an independent third-party lab, and the report is attached as Exhibit A. The same company which makes the PetLab products, Synergy Labs, also manufactures

---

[85] Amazon Customer Review, *dog was projectile vomiting after consuming*, July 8, 2020, https://www.amazon.com/gp/customer-reviews/R2CTR67R1R9251/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07LDF9Z9K (last visited May 10, 2021).

[86] Amazon Customer Review, *THIS KILLED MY YORKIE*, Mar. 8, 2020, https://www.amazon.com/gp/customer-reviews/RM5G5WW6VGY1Z/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07LDF9Z9K (last visited May 10, 2021).

[87] Amazon Customer Review, *Don't know if good or bad*, Aug. 24, 2019, https://www.amazon.com/gp/customer-reviews/R4D7ST3DUM83J/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07LDF9Z9K (last visited May 10, 2021).

[88] Amazon Customer Review, *This product killed my dog*, Dec. 23, 2019, https://www.amazon.com/gp/customer-reviews/RV01HVNZ1DR5W/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B07LDF9Z9K (last visited May 10, 2021).

flea poison, and it uses MGK-264 as an ingredient in its flea poison products. Ingredients in flea poison, including permethrins, are widely acknowledged to cause the exact same symptoms that consumers are reporting across the PetLab line of products, including in particular brain seizures. On information and belief, the PetLab products are being contaminated with MGK-264 and other ingredients from flea poison, and are not in fact safe.

209.   The PetLab Defendants are directly responsible for this. On information and belief, they do not:

      a.   perform regular product safety analysis, lab tests, or other checks on their products;

      b.   have a system for cataloging adverse health effects reported by consumers of their products;

      c.   have a system or method for reporting to their manufacturer any adverse health effects reported by consumers of their products;

      d.   have a system or method for reporting to their manufacturer any contaminants in their products; nor do they

      e.   report any adverse health effects or findings of contamination to the FDA as required by law.

210.   These reports of serious side effects in pets, as well as the failure of the PetLab defendants to perform any such analysis, cataloging, or reporting of those reports of side effects, would have been material to the Plaintiffs who purchased PetLab products and would be material to any reasonable consumer in deciding whether to purchase these products.

211.   The PetLab Defendants were under a duty to disclose this information because they had exclusive knowledge of material facts not known to them, namely that they had received multiple reports of contamination and adverse health effects from the use of the PetLab products.

212.    Plaintiffs did not know this, and the information was difficult to discover because it requires digging through hundreds of reviews on different websites.

213.    The PetLab Defendants were under a duty to disclose this information to Plaintiffs because the PetLab Defendants engaged in active concealment of these facts by hiding negative reviews to cover up this matter.

214.    Defendants were further under a duty to Plaintiffs because they made partial representations—representing that their products were safe for pet consumption—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that many consumers reported adverse reactions and that PetLab had received notice of contamination of flea poison in at least one of its products that was intended for pets to consume.

215.    Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers. Those omissions could have been corrected by informing consumers that the products may be dangerous, they do not conduct regular product testing, that numerous consumers have reported adverse effects from the use of the products including many reports of brain seizures after consumption, that Defendants do not systematically catalog adverse reactions to using their products, and that Defendants do not report adverse reactions or reports of contamination to the FDA.

216.    These omissions damaged Plaintiffs because products that may be unsafe for animal consumption is worth less than a product which is safe and for which all such cataloging, testing, and reporting has occurred.  Unsafe products have no value.

**Warranties Regarding PetLab Co. Itch Relief Chews**

217.    Plaintiff Colleen Carmichael purchased the PetLab Itch Relief Chews, which prominently warrant on the front of the bottle that the product "Soothes Irritated Skin & Coat." On the PetLab Co. website, the PetLab Defendants warrant the Itch Relief Chews "reduce inflammation," "soothe irritated or inflamed skin," "nourish areas of dry skin," and provide "fast-acting itch relief."[89] An infographic on the product page lists "Key Benefits" for dogs, warranting that the chew "maintains a normal inflammatory response" and "moisturizes & promotes healthy skin."

218.    Defendants' promotional landing pages warrant that specific ingredients in the Itch Chews have specific properties that can treat or prevent a range of health problems.[90] They warrant the Itch Chews have "Omega 3 & 6 to help prevent discomfort commonly caused by skin conditions and allergies."[91] Defendants warrant that turmeric curcumin is a "'magical' natural antihistamine" that is "packed with antiviral, antibacterial, antioxidant, and anti-inflammatory properties," which Defendants claim "[i]mproves immune system response by increasing the ability to combat infection and disease" and "[e]ffectively fights external and internal irritants that can cause skin & coat problems." They warrant that Vitamin E is an "essential" antioxidant, "supporting [your pet's] muscle and circulation health" and "playing a huge role in protecting your pet against free radicals that can damage their skin and coat."

---

[89] PetLab Co., *Itch Relief for Dogs*, https://thepetlabco.com/products/dog-itching-treatment (last visited May 5, 2021).
[90] Petlab Co., https://promos.thepetlabco.com/itchreliefchews/itch25?id=IRC-002-control-v2&utm_campaign=2059666785&utm_medium=googleshopping&utm_source=google&utm_term=control (last visited May 5, 2021).
[91] Petlab Co., https://promos.thepetlabco.com/itchreliefchews/itch25?id=IRC-002-control-v2&utm_campaign=2059666785&utm_medium=googleshopping&utm_source=google&utm_term=control (last visited May 5, 2021).

219.    PetLab Defendants warrant that the Chews affect a dog's body by strengthening the "skin barrier," mitigating the risk of yeast and bacterial infections. Defendants warrant this prevents recurring infections.[92]

220.    The PetLab Defendants represent on Facebook that Itch Review Chews perform at specific levels over specified periods of time, claiming "[t]he Itch Relief Chews is proven to show effectiveness after 4 weeks provided the correct dosage is followed. Some dog owners reported seeing results after 6 weeks."[93] The landing pages for their products further contain purported reviews from customers claiming to have seen results within "days" of using the product.

221.    Defendants expressly warrant on Facebook that their 90-day money back guarantee allows customers to continue using the product if they do not see results. Responding to a customer inquiring whether the Itch Chews might make a dog's itching worse before it gets better, Defendants claim, "We hope you see improvements in the coming weeks. It's worth noting that you'll still be able to return the product for a full refund due to the 90-day guarantee."[94]

222.    These warranties were part of the basis of the bargain which Plaintiff Colleen Carmichael relied upon, in that she purchased the product because of these promises. Her dachshund. Cinnamon had developed itchy skin, and she bought the product based on these warranties that it would soothe or relieve the itching. She did not receive the benefits she was promised, as Cinnamon did not experience any improvement in skin condition. This failure to provide the promised benefits constitutes a breach of the warranties.

---

[92] PetLab Co., March 13, 2020, https://www.facebook.com/thepetlabco/posts/527947108132776 (last visited May 5, 2021).
[93] Petlab Co., Comment from Nov. 23, 2020, on Facebook post dated Aug. 13, 2020, https://www.facebook.com/thepetlabco/posts/642197140041105 (last visited May 11, 2021).
[94] Petlab Co – Dogs, Comment from Aug. 8, 2020, on Facebook post dated July 29, 2020, https://www.facebook.com/PetlabCoDogs/posts/298106971623442 (last visited May 11, 2021).

**Warranties Regarding PetLab Co. Dental Formula**

223.    Plaintiff Joseph Liotta purchased the PetLab Dental Formula product, which prominently warrants on the front of the label that it is "For Fresh Oral Hygiene," that it "Reduces Plaque," and that it "Kills Germs." The label on the back of the bottle says, "6 Benefits In One," with an icon or image placed next to each, alleging the product "Reduces Plaque," "Restores Enamel," "Prevents Gingivitis," "Prevents Cavities," "Freshens Breath," and "Reduces Germs." Below this text, the label further warrants that: "Adding Dental Formula to your pet's water bowl each day will ensure their teeth and gums stay clean, healthy, and strong. The clinically proven ingredients within our formula activates only when bacteria is present, eliminating germs in the mouth and harmful plaque that forms on your dog's teeth." The label references a daily period of use: "For best results use daily." In their use instructions to consumers, Defendants state: "Daily usage results in fresher smelling breath and healthier teeth and gums."[95]

224.    Defendants warrant on the Petlab website that Dental Formula contains "antimicrobial and antibacterial ingredients."[96] They warrant that sodium benzoate "can can help to combat bacteria build-up, as well as toxic and potentially harmful plaque build-up."

225.    On PetLab Co.'s Facebook account, Defendants warrant that Dental Formula ingredients "have all been studied and prove to decrease the numbers of bacteria in the mouth, reduce plaque and bacterial biofilm, thereby decreasing the risk of cavities . . . these ingredients, formulated in the perfect mixture, are absolutely essential to reducing gingivitis, periodontitis, and decreasing bad breath . . . ."[97]

---

[95] https://offer.thepetlabco.com/dentalformula/dental.
[96] PetLab Co., *Dog Dental Formula*, https://thepetlabco.com/products/dog-dental-formula (last visited May 11, 2021).
[97] Petlab Co. Comment from Nov. 15, 2020, on Facebook post dated June 24, 2019, https://www.facebook.com/thepetlabco/posts/327301878197301 (last visited May 11, 2021).

226.    Defendants warrant that ingredients in Dental Formula strengthen dogs' teeth, like potassium sorbate, representing that "it is proven to improve the bone mineral density in your dog's teeth. It also has a positive effect on the overall strength of gums, improving oral health."[98] Defendants also make these warranties on landing pages for the product.[99]

227.    The PetLab Defendants make written promises that the Dental Formula will meet specific levels of performance over specified periods of time. On the product's FAQ page, Defendants state that if "[u]sed daily," dogs will experience "healthier gums, and less risk of developing periodontal disease."[100] Defendants' specific affirmations of fact that go beyond opinion:

> **In just the first week**, you'll notice your dogs breath is fresher (a plus for anyone who gets licked in the face by their ppooch. [sic]
> **Week 2** and the results of the dental wash will start to show as your dogs teeth start to look a little whiter and the gums look less dark.
> **By week 3** and beyond you'll see healthy pink gums and teeth that look so clean you'll think they're shining.[101]

228.    These warranties were part of the basis of the bargain which Plaintiff Joseph Liotta relied upon, in that he purchased the product because of these promises. His dogs had dental problems, and he bought the product based on these warranties that it would eliminate them. He did not receive the benefits he was promised, as his dog's dental health worsened. This failure to provide the promised benefits constitutes a breach of the warranties.

---

[98] PetLab Co., *Dog Dental Formula*, https://thepetlabco.com/products/dog-dental-formula (last visited May 11, 2021).
[99] PetLab Co., *Bestseller – Dog Dental Formula*, https://promos.thepetlabco.com/dentalformula/dental25?fbclid=IwAR3G7fmXvICuTKmrEid0QJBH4u1EZvZPeWQioR5daBj3O0GKdxcKdU-Ct1U (last visited May 11, 2021).
[100] "Damian" - PetLab Co., *What Is Petlab Co. Dental Formula*?, Oct. 10, 2019, https://petlab.zendesk.com/hc/en-us/articles/360034654692-What-is-the-dog-dental-formula- (last visited May 11, 2021).
[101] Petlab Co., *"What Will YOU Do With The Money You Save By Switching To This Dental Detox Drink?"*, https://promo.thepetlabco.com/aax/mtw_speech/index-vet.php?fbclid=IwAR3Cfn5CPC5T_-2eXO2O7YQUKZRlKLyKObM9ME9qAQcamgcmFyf8otNJFKM (last visited May 11, 2021).

## Warranties Regarding PetLab Co. Joint Care Chews

229.    Plaintiffs Sabrina Lopez and Jolene Hynes purchased the PetLab Joint Care Chews, which prominently warrant on the front of the bottle label that they are "For Strong, Flexible Joints." The PetLab Defendants' ads warrant to consumers that PetLab Co. products effectively prevent and treat joint pain. PetLab Co. warrants that its Joint Care Chews "give your dog's joint health a powerful punch like no other" through use of a formula that "provides joint health-boosting properties.[102]

230.    Defendants' landing pages for Joint Care Chews warrant that their "unique blend of powerful ingredients, including Green Lipped Mussels, Glusamisme [sic], and Salmon Oil" can treat joint pain and inflammation and promote cartilage production.[103] Defendants warrant that Green Lipped Mussels are "'miracle' crustacea" that "contain a rare but more effective form of Omega 3," which "prevent[s] the production of cyclooxygenase, an enzyme that causes inflammation."[104]

231.    Defendants warrant that the "trick" to success are their Joint Care Chews, which are "designed to maximize joint health in dogs which as prior mentioned, could mean they stay around

---

[102] PetLab Co., *Joint Care Chews*, https://promos.thepetlabco.com/jointcarechews_pg/joint_pg?id=mcx_jhc_innerpuppy_krystal_og_list&utm_source=mcx_jhc_innerpuppy_krystal_og_list&utm_medium=mcx_jhc_innerpuppy_krystal_og_list&utm_campaign=mcx_jhc_innerpuppy_krystal_og_list&utm_term=mcx_jhc_innerpuppy_krystal_og_list (last visited Feb. 4, 2021).
[103] PetLab Co., *Joint Care Chews*, https://promos.thepetlabco.com/jointcarechews_pg/joint_pg?id=mcx_jhc_innerpuppy_krystal_og_list&utm_source=mcx_jhc_innerpuppy_krystal_og_list&utm_medium=mcx_jhc_innerpuppy_krystal_og_list&utm_campaign=mcx_jhc_innerpuppy_krystal_og_list&utm_term=mcx_jhc_innerpuppy_krystal_og_list (last visited Feb. 4, 2021).
[104] PetLab Co., *Joint Care Chews*, https://promos.thepetlabco.com/jointcarechews_pg/joint_pg?id=mcx_jhc_innerpuppy_krystal_og_list&utm_source=mcx_jhc_innerpuppy_krystal_og_list&utm_medium=mcx_jhc_innerpuppy_krystal_og_list&utm_campaign=mcx_jhc_innerpuppy_krystal_og_list&utm_term=mcx_jhc_innerpuppy_krystal_og_list (last visited Feb. 4, 2021).

that little bit longer with us."[105] Defendants warrant that the Chews "contain some of the strongest joint care ingredients available today and are designed to be both corrective AND preventative - meaning they are good for younger dogs too."

232.    Defendants use these landing page to make specific representations that the product will perform over time.[106] Defendants also represent on Facebook that "for best results," customers should use Joint Care Chews "consistently for at least 4-6 weeks."[107] The landing pages further include reviews from purported customers claiming to have seen results within "days" of using the product.

233.    Defendants also warranted that the Joint Care Chews had a money back guarantee on landing pages, as one example states: "Right now you can give the Joint Care Chews a try 100% risk free with Petlab Co's 90-Day Money Back Guarantee."[108]

234.    These warranties were part of the basis of the bargain which Plaintiffs Sabrina Lopez and Jolene Hynes relied upon, in that they purchased the product because of these promises. Both of their dogs had joint problems, and both of them bought the product based on these warranties that

---

[105] PetLab, "This One Simple Treat Could Save You Thousands Of Dollars...And The Heartbreak Of Losing A Beloved Pet,"
https://promo.thepetlabco.com/adv/mcx_jhc_innerpuppy_vet/?fbclid=IwAR1708-ffCvLFWlr966PwMUGlqKGo9sZUr4JkK0YsCSfo__XfsMusd1WvF4 (last visited Oct. 16, 2020)
[106] PetLab, "This One Simple Treat Could Save You Thousands Of Dollars...And The Heartbreak Of Losing A Beloved Pet,"
https://promo.thepetlabco.com/adv/mcx_jhc_innerpuppy_vet/?fbclid=IwAR1708-ffCvLFWlr966PwMUGlqKGo9sZUr4JkK0YsCSfo__XfsMusd1WvF4 (last visited Oct. 16, 2020).
[107] Petlab Co – Dogs, Comment from Jan. 5, 2021, on Facebook post dated July 29, 2020,
https://www.facebook.com/PetlabCoDogs/posts/298106971623442 (last visited May 11, 2021).
[108] Lab, "This One Simple Treat Could Save You Thousands Of Dollars...And The Heartbreak Of Losing A Beloved Pet,"
https://promo.thepetlabco.com/adv/mcx_jhc_innerpuppy_vet/?fbclid=IwAR1708-ffCvLFWlr966PwMUGlqKGo9sZUr4JkK0YsCSfo__XfsMusd1WvF4 (last visited Oct. 16, 2020).

it would eliminate them. They did not receive the benefits they were promised, as their dogs continued to have joint problems. This failure to provide the promised benefits constitutes a breach of the warranties.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of Magnuson-Moss Warranty Act

### 15 U.S.C. §§ 2301, *et. seq.*

235.    Plaintiffs incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

236.    The amount in controversy of Plaintiffs' individual claims meets or exceeds $25, and the amount in controversy for all claims to be determined by this lawsuit meets or exceeds $50,000. 15 U.S.C. § 2310(d)(1).

237.    The Magnuson-Moss Warranty Act provides a cause of action for any consumer who is damaged by the failure of a supplier or warrantor to comply with a written warranty, an implied warranty, or obligations under the Act. 15 U.S.C. § 2310(d)(1).

238.    Plaintiffs are each a "consumer" under the act as buyers of any consumer product. 15 U.S.C. § 2301(3).

239.    Defendants are each "warrantor[s]" as "any supplier or other person who gives or offers to give a written warranty" and who is "obligated under an implied warranty." Defendants are suppliers "engaged in the business of making a consumer product directly or indirectly available to consumers." 15 U.S.C. § 2301(4)–(5).

240.    Defendants' Microstem Hair Stimulation Formula, Microstem Shampoo and Conditioner, Advanced Hair Supplement, and Nail Formula are each a "consumer product" as "tangible

personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1). Defendants' Itch Relief Chews, Joint Care Chews, and Dental Formula are also each a "consumer product" under this definition. *Id.* All of these products were used either on humans or on their pets.

241.    Plaintiffs are entitled to damages and other equitable relief, and costs and expenses including reasonable attorneys' fees pursuant to 15 U.S.C. § 2310(d)(2).

## **Breach of Express Warranty**

242.    Defendants' representations are written warranties that relate to nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time.

243.    Defendants' claims and representations as described *supra* were made in writing to Plaintiffs in connection with the sale of Cel MD consumer products and PetLab consumer products on Defendants' product packaging and labelling, on their website, on their social media, in advertisements, on Amazon, on customer review websites including Trustpilot, and in emails and other electronic communications.

244.    Defendants represented that Cel MD products have FDA approval in writing on the Cel MD website, on Amazon, on landing pages, on social media, and in advertisements. Defendants made these affirmations of fact in connection with the sale of Cel MD products by placing this information under the FAQ section of the Cel MD website, by posting it on Amazon in response to questions from potential customers, and by including it on landing pages where customers made direct purchases.

245.    Defendants breached this express warranty because the Cel MD products they sold to the Cel MD Plaintiffs do not have FDA approval and do not comply with federal regulations.

246.    Defendants expressly warranted to customers with thinning hair and/or hair loss that their Cel haircare Products, "encourage new hair growth," "fight hair loss," "strengthen hair," "promote new hair growth," "use natural components [to] block the hormone DHT, known to advance hair loss," and "encourage high cell turnover to promote new hair growth," and various other representations described *supra* which generally amount to promises to regrow hair or stop hair loss.

247.    Defendants made written affirmations expressly warranting to customers Cel MD hair care Products contain scientifically proven, clinically tested asparagus stem cells, ginseng stem cells, and super biotin as discussed in the sections discussing "Misrepresentations and Omissions Regarding Plant Stem Cells."

248.    Defendants breached express warranties to Plaintiffs because the Cel MD products they sold to the Plaintiffs do not contain live stem cells that are effective at preventing hair loss or stimulating growth.

249.    Defendants affirmed that the Microstem Shampoo and Conditioner products were defect free by making broad claims that their products are safe for all hair and skin types, that they contain no harsh chemicals, and stating on the bottle labels that they were hypoallergenic. Defendants expressly warranted these affirmations in writing on the Cel MD website, on Amazon, on landing pages, on social media, and in advertisements.

250.    Defendants breached this warranty because the shampoo and conditioner products they sold to Plaintiffs are not safe or defect free and they contain irritating and dangerous chemicals or allergens as described *supra*.

251.    Defendants claim that the Microstem Shampoo and Conditioner are hypoallergenic, affirming that the materials are defect free as products that are safe for use by consumers with

allergies. Defendants expressly warrant these affirmations in writing on the products' packaging and bottle labels, the Cel MD website, on Amazon, on landing pages, on social media, and in advertisements.

252.   Defendants breached this warranty as to Plaintiffs Brown, Stefanacci, and Tishman because, on information and belief, the Microstem Shampoo and Conditioner contain allergens, contaminants, unlisted or unidentified ingredients, and listed ingredients that caused adverse reactions when used by Plaintiffs.

253.   The Cel MD Defendants warranted as effective and defect free the materials in the Microstem Shampoo & Conditioner on the Cel MD website as detailed in the sections "Misrepresentations and Omissions Regarding Microstem Shampoo & Conditioner on the Cel MD Website."*supra*. Defendants made these representations to the Plaintiffs Stefanacci, Tishman, and Widiantoro in connection with sale of these products on the Cel MD website and on the bottle labels.

254.   Defendants breached this warranty as to Plaintiffs Stefanacci, Tishman, and Widiantoro because using the Shampoo and Conditioner as directed did not produce the hair loss benefits that Defendants warranted to Plaintiffs.

255.   Defendants warranted as effective and defect free the materials in the Microstem Shampoo & Conditioner on Amazon, as detailed in the section "Misrepresentations and Omissions Regarding Microstem Shampoo & Conditioner on Amazon."*supra*. Defendants made these representations to Plaintiff Brown in connection with sale of the products in writing on the products' packaging and bottle labels, on Amazon, on social media, and in advertisements.

256.     Defendants breached this warranty as to Plaintiff Brown because using the Shampoo and Conditioner as directed did not produce the hair loss benefits that Defendants warranted to Plaintiff.

257.     Defendants warranted that the Cel MD Hair Stimulation Formula would grow new hair and prevent hair loss as detailed in the section "Misrepresentations and Omissions Regarding Microstem Hair Stimulation Formula."*supra*. Defendants made these representations to Plaintiff Widiantoro in connection with sale of the products in writing on the products' packaging, the Cel MD website, on landing pages, on social media, and in advertisements.

258.     Defendants breached this warranty as to Plaintiff Widiantoro because the Hair Stimulation Formula did not regrow hair or prevent hair loss as Defendants warranted.

259.     The Cel MD Defendants warranted that the Nail Formula is proven to fight fungal infections, strengthen nails, protect the nail bed, and improve nail health, as detailed in the section "Misrepresentations and Omissions Regarding Nail Formula."*supra*.

260.     Defendants made these representations to Plaintiff Stefanacci in connection with sale of the products in writing on the products' packaging, the Cel MD website, on landing pages, on social media, and in advertisements.

261.     Defendants breached this warranty as to Plaintiff Stefanacci because Nail Formula does not improve nail growth, stimulate cuticles, or prevent infections as Defendants warranted.

262.     The Cel MD Defendants warranted that the Cel MD Hair Thickening Mask would thicken hair and improve hair and scalp health, as detailed in the section "Misrepresentations and Omissions Regarding Microstem Hair Thickening Mask on Amazon."*supra*. Defendants made these representations to Plaintiff Brown in connection with sale of the products in writing on the

products' packaging and bottle labels, on Amazon, on landing pages, on social media, and in advertisements.

263.    Defendants breached this warranty as to Plaintiff Brown because the Hair Thickening Mask does not make hair thicker or protect scalp health as Defendants warranted.

264.    The Cel MD Defendants warranted that the Cel MD Advanced Hair Supplement treated hair loss and promoted cell regeneration, strengthens hair follicles, and increases blood flow to the scalp to encourage new hair growth and regrow and prevent follicle death, as detailed in the section "Misrepresentations and Omissions Regarding Advanced Hair Supplement."*supra*.

265.    Defendants made these representations to Plaintiff Brown in connection with sale of the products in writing on the products' packaging and bottle labels, on Amazon, on landing pages, on social media, and in advertisements.

266.    Defendants breached this warranty as to Plaintiff Brown because the Advanced Hair Supplement does not have the hair loss and scalp regeneration benefits that Defendants warranted.

267.    Defendants warranted that the Microstem Shampoo and Conditioner will meet specified levels of performance over a specified period of time, promising that by using the products, customers are "virtually guaranteeing" their hair will grow thicker and healthier, and that "each successive month" of use results in continual improvement. They promised results in 4-6 weeks on the labels for the products.

268.    Defendants made these representations in writing on landing pages and in advertisements in connection to the sale of Microstem Shampoo and Conditioner to all Cel MD Plaintiffs. On information and belief, based on a review of the contemporaneous websites to the purchases, all Plaintiffs saw this or a substantially similar warranty when Defendants funneled Plaintiffs to

landing pages from social media and advertisements. The labels and packaging for the products further contained warranties of hair growth within 4-6 weeks.

269.    Defendants warranted that Microstem Hair Stimulation Formula will meet performance levels over a specific period of time, as detailed in the section "Misrepresentations and Omissions Regarding Microstem Hair Stimulation Formula." Defendants claim their "clinical trials" showed that Hair Stimulation Formula results in "a 7.5% increase in hair volume and hair continues to grow when used continuously for 2 months," and they make these claims in writing in ads, on landing pages, and in their clinical trial "one-pager." The back of the box further promises these results in 8 weeks

270.    Defendants made these representations in connection to the sale of Microstem Hair Stimulation Formula to Plaintiff Widiantoro. On information and belief, based on a review of contemporaneous web pages, Plaintiff saw this or a substantially similar warranty on social media posts or advertisements and/or on landing pages funneled from those places.

271.    Defendants breached this warranty as to Plaintiff Widiantoro because he used the product for five months and did not see the product return the described performance when used over specified periods of time.

272.    Defendants warranted that the Nail Formula will meet specified levels of performance over a specified period of time, representing that they promise with a "30 DAY "HEALTHIER HANDS & NAILS" GUARANTEE." They expressly warranted to consumers: "30 Day Money-Back Guarantee— It Works Or You Don't Pay."

273.    Defendants made these representations in writing on landing pages and in advertisements in connection to the sale of Nail Formula to Plaintiff Stefanacci. On information and belief, based

on a review of contemporaneous webpages, Plaintiff saw this or a substantially similar warranty on social media posts or advertisements and/or on landing pages funneled from those places.

274.    Defendants breached this warranty as to Plaintiff Stefanacci because she used the product as directed and did not see the product return the described performance when used over specified periods of time.

275.    Defendants expressly affirmed that all Cel MD products are safe and defect free by offering "no questions asked" money-back guarantees.

276.    Plaintiff Widiantoro purchased the Microstem Shampoo and Conditioner in August 2019 on Defendants' website, which came with a "90-day 100% satisfaction guarantee." "If you're not happy, then we're not happy. It's that **simple**. In the **incredibly unlikely event you're not 100% satisfied** with your order," Defendants warrant that customers can receive a 100% refund.

277.    Plaintiff Widiantoro purchased the Hair Stimulation Formula on the Cel MD website in August 2019, and Defendants expressly warranted that the product had a "90 Days Money Back Guarantee."

278.    Plaintiff Brown purchased the Cel Hair Thickening Mask from Defendants on Amazon, which they represented came with a "100% Money Back Guarantee (90-Days)," expressly warranting they "so confident" customers will "love" their products that they promise: "If they don't work, then we don't deserve your money."

279.    Plaintiff Stefanacci purchased Microstem Shampoo & Conditioner first on Amazon in late-2018, and Defendants expressly warranted that the products came with a 100% Money Back guaruntee, promising that "we want you to be 100% satisfied" with the product, and "if youre not, well refund your money in full [sic]." Plaintiff then purchased the Shampoo & Conditioner several times from Defendants' website during 2019. Defendants represented that Cel MD Microstem

Shampoo and Conditioner had a "90 Days Money Back Guarantee" on the Cel MD website prior to the redesign in late 2019. Plaintiff saw advertisements for the product, and Defendants posted links to landing pages with the 90 Days Money Back Guarantee on Facebook, where Plaintiff first saw ads for Cel MD products.

280.   Plaintiff Stefanacci purchased Nail Formula on the Cel MD website in early 2020, and on information and belief, Defendants offered a "90 Days Money Back Guarantee" for their Nail Formula. Plaintiff saw advertisements for the product, which usually contain some form of guarantee. Even when Defendants periodically change their guarantees from 90 days to 30 days, they still expressly warrant that it is a "30 Day Money-Back Guarantee." Defendants warrants: "It Works Or You Don't Pay. **We want you to be 100% satisfied with everything you buy** from Cel MD. And if you're not **entirely happy** with your purchase **we will refund your money in full,** or exchange the goods." Because this general policy concerning consumer satisfaction is subject to a limitation of duration, it is an express warranty under the Act.

281.   Plaintiff Tishman saw Facebook ads for the Microstem Shampoo and Conditioner before buying it on Defendants' website in late January 2020. Defendants posted on Facebook promoting the products in mid-January 2020, and Defendants' agents represented that they still offered the 90-day Money Back Guarantee. A cache of Defendants' webpage for the Microstem Shampoo shows they still represented the product had a 90-day guarantee as recently as May 2020.

282.   Defendants breached these money-back guarantee warranties as to all Cel MD Plaintiffs as described herein.

283.   Defendants' claims and representations were made to the PetLab Plaintiffs, in connection with the sale of PetLab Co. consumer products, in writing on Defendants' product packaging and

labelling, on their website, on their social media, in advertisements, on Amazon, on customer review websites including Trustpilot, and in emails and other electronic communications.

284.    Defendants warranted that all PetLab products are safe and effective for use, as described *supra*. Defendants warranted that PetLab Co. products are defect-free by claiming they comply with all applicable standards for pet foods, including all applicable federal regulations. They warranted that PetLab products undergo complex safety reviews, and that Defendants monitor after-market adverse reactions and that all of their products are safe based on their safety "records," which they represented is a requirement for dietary supplements. Defendants warranted that none of their products contain ingredients that are defective, representing that all of their ingredients are safe and do not cause any adverse reactions.

285.    Defendants breached the above warranties to the PetLab Plaintiffs because PetLab's Itch Relief Chews, Joint Care Chews, and Dental Formula were not defect-free and did not perform as described.

286.    Defendants warranted that the Itch Relief Chews are specially formulated with all-natural ingredients whose effectiveness is allegedly highly researched. Defendants warrant that the Chews strengthen a dog's skin barrier to prevent recurring yeast and bacterial infections. They claim that customers should see the benefits of Itch Chews in as few as four to six weeks.

287.    Plaintiff Carmichael purchased Itch Relief Chews from Defendants' website as a subscription from January to July 2020. Defendants represented on Facebook as recently as July 29, 2020, that the Itch Relief Chews came with a 90-day guarantee. One of Defendants' agents posted that customers could return the product if they saw no improvement, even if they continued using the product.

288.    Defendants breached these express warranties for their Itch Relief Chews as to Plaintiff Carmichael because the Itch Chews did not perform as warranted.

289.    Defendants warranted that PetLab Dental Formula prevents, mitigates, and treats dental disease and its harmful effects, including "tooth loss, kidney and liver problems, and heart disease, by directly targeting plaque and tartar build up. They represented that customers should notice their dog has fresher breathe after just one week, and by week three, customers should see healthy gums and clean teeth.

290.    Plaintiff Liotta purchased Dental Formula from Defendants' website beginning in January 2020, continuing his subscription through September 2020. At least as of May 31, 2020, Defendants warranted that all of their products were defect free, and they backed their promise that their products are of the "highest standard" by offering a 90-day, 100% Money Back Guarantee. Defendants warranted a "100% risk free" 90-day guarantee on landing pages as late as October 2020.

291.    Defendants breached these express warranties for their Itch Relief Chews as to Plaintiff Liotta because the Dental Formula did not perform as warranted.

292.    Defendants warranted that PetLab Joint Care Chews treat joint pain and inflammation and promote cartilage production with "miracle" ingredients, such as green lipped mussels, glucosamine, salmon oil, and other oils. They warranted that Omega 3 acid prevents the production of enzymes that cause inflammation.

293.    Defendants warranted that Joint Chews were effective by offering a 90-day money back guarantee "to prove" they "are offering nothing less." Defendants expressly warranted this to customers on Facebook, landing pages, and in advertisements, affirming that customers should see the product performing within a few weeks to a few months.

294.    Defendants breached these express warranties for their Joint Care Chews as to Plaintiffs Lopez and Hynes because the Joint Chews did not perform as warranted.

## Violation of Pre-Sale Availability of Written Warranty Terms—Cel MD Defendants

295.    For products costing more than $15.00, sellers must make "the terms of any written warranty on a consumer product available to the consumer prior to sale." 16 C.F.R. § 702.2.

296.    For online sales, sellers that make written warranties must provide a written copy of the warranty materials must "provide the warranty terms in an accessible digital format on the warrantor's Internet Web site." 16 C.F.R. § 702.3(b)(2).  If the warrantor elects this option, the warrantor must do all of the following to comply with § 702.3(b)(2):

(i) Provide information to the consumer that will inform the consumer how to obtain warranty terms by indicating, in a clear and conspicuous manner, in the product manual or on the product or product packaging:
    (A) The Internet Web site of the warrantor where such warranty terms can be reviewed, and
    (B) The phone number, the postal mailing address of the warrantor, or other reasonable non-Internet based means for the consumer to request a copy of the warranty terms;
(ii) Provide a hard copy of the warranty terms promptly and free of charge upon request by a consumer or seller made pursuant to paragraph (b)(2)(i)(B) of this section;
(iii) Ensure that warranty terms are posted in a clear and conspicuous manner and remain accessible to the consumer on the Internet Web site of the warrantor; and
(iv) Provide information with the consumer product or on the Internet Web site of the warrantor sufficient to allow the consumer to readily identify on such Internet Web sites the warranty terms that apply to the specific warranted product.

297.    The Cel MD Defendants violated this provision as to any Cel MD Plaintiffs who completed a purchase using a shopping cart on Defendants' website for URLs that begin with promos.cel.md, as described in the section "Deceptive Disclosures of Terms and Conditions."

298.    The Cel MD Defendants did not ensure that the terms covering promo.cel.md purchases were posted in a clear and conspicuous manner and remained accessible as required by § 702.3(b)(2)(iii). These terms were not posted in a clear and conspicuous manner because they were

not linked on the main Cel MD website under the "Terms of Use" link at the bottom of cel.md webpages. These terms did not remain accessible because they are not linked on the main Cel MD website under the "Terms of Use" link at the bottom of cel.md webpages.

299.    The Cel MD Defendants did not make any of their terms related to disclaimers of warranties available in writing prior to sale as required by § 702.3(b)(2), including but not limited to the following terms or conditions: statements purporting to disclaim express warranties, that products are sold on an "as is" and "as available" basis, statements limited implied warranties of merchantability or fitness for a particular purpose, statements disclaiming warranties as to results that may be obtained from, and statements disclaiming warranties related to use of the Cel MD website.

300.    The Cel MD Defendants did not make any of their terms related to limitation of liabilities available in writing prior to sale as required by § 702.3(b)(2), including but not limited to the following terms or conditions: liquidated damage provisions; limitation of liability for injury or loss, whether the claim arises in tort or contract; or limitation of liability for Amplify directors, officers, employees, affiliates, agents, or contractors.

301.    The Cel MD Defendants did not provide information sufficient to allow Plaintiffs to readily identify the terms that apply to the specific warranted product, either with the product or on the Cel MD website for warranty terms covering promo.cel.md purchases, as required by § 702.3(b)(2)(iv).

302.    The Cel MD Defendants' terms do not apply to the extent they reserve the right to require Plaintiffs to agree to separate agreements other than what are presented at prior to sale as mandated by § 702.3(b)(2).

**Violation of Minimum Standards for Written Warranties—Cel MD Defendants**

303.    For products costing more than $15.00, the Act establishes federal minimum standards for written warranties: (1) requiring the warrantor to remedy products that fail to conform to warranties within a reasonable time; (2) prohibiting durational limits on any implied warranty unless it is "consciable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty" as required by 15 U.S.C. § 2308(b); (3) prohibiting exclusion or limitation of consequential damages unless the limit appears on the face of the warranty; and (4) for defects in the product, allowing the customer to elect either a refund or replacement product at no charge after a reasonable number of attempts by the warrantor to remedy the breach. 15 U.S.C. § 2304(a).

304.    All products purchased by the Cel MD Plaintiffs cost more than $15.00.

305.    Defendants violate these minimum standards as to the warranties made to Plaintiff Brown for her purchases on Amazon.com. Defendants did not present their Terms or their Shipping & Return Policy as they appear on the Cel MD website to Plaintiff when she purchased on Amazon.

306.    Defendants' Terms and Shipping & Return Policy for purchases made on the Cel MD website do not comply with federal minimum standards for written warranties. The Terms unlawfully prohibit customers from electing a refund or replacement for defective products by refusing returns and refunds for products that lack a money-back guarantee, are opened, or were purchased more than 30 days prior to the request in violation of § 2304(a)(2), (4).

307.    As the warrantor, Defendants have not remedied the Cel MD products that failed to conform to the express warranties for Plaintiffs Widiantoro, Brown, Stefanacci, or Tishman within a reasonable time. Defendants have not remedied the lack of FDA approval for Cel MD products, nor have they offered Plaintiffs any replacement products that perform as expressly warranted.

308.    As to Plaintiffs Widiantoro, Stefanacci, and Tishman who purchased on the Cel MD website, the Terms' provision stating that no Cel MD product has any implied warranty of any kind is in violation of the Act in violation of § 2308(a) because Defendants made written warranties to Plaintiffs with respect to the products. It is further in violation because Defendants' disclaimer of the implied warranty is not prominently displayed on the face of the warranty— which for warranties on a website or displayed electronically means disclosure "in close proximity to the location where the warranty text begins." 16 C.F.R. § 701.1(j)(3).

309.    Defendants' Terms on the Cel MD website also violate § 2304(a)(3) because the Terms' provision limiting consequential damages is also not "disclosed on the face of the warranty" as required by 16 C.F.R. § 701.3(a)(7). Nor is the 30-day limit on refunds in Defendants' Terms and Return policy.

310.    Defendants' Terms and Shipping & Return Policy prohibit customers from making returns or receiving refunds unless the product is returned to Defendants unused, sealed, and unopened, in violation of the § 2304(a)(1) requirement that Defendants must allow Plaintiffs to receive a replacement or refund at no charge for products that fail to conform to written warranties.

311.    Defendants did not replace or refund the products in breach purchased by Plaintiffs Stefanacci and Widiantoro.

312.    Defendants did not replace or refund the products in breach purchased by Plaintiff Tishman on the Cel MD website, even though she reported to Defendants that the products did not work. They did not refund or replace the products, nor did they comply with her requests to cancel her subscription.

313.    Plaintiffs Widiantoro, Stefanacci, and Tishman are entitled to personal injury damages under the Act for the violations of § 2304(a)(2), § 2304(a)(3), and § 2308. These violations

damages Plaintiffs in the full amount of the claims they improperly disclaimed, because they improperly disclaim implied warranty claims that the products are fit for ordinary purposes, including being fit for consumption and application to the human body.

### Violation of Minimum Standards for Written Warranties—PetLab

314.    All products purchased by the PetLab Co. Plaintiffs cost more than $15.00.

315.    The PetLab Co. Terms and Shipping & Return Policy unlawfully prohibited Plaintiffs from receiving refunds unless the product is returned to Defendants unused, sealed, and unopened, in violation of the § 2304(a)(1) remedy requirement for products that fail to conform to written warranties.

316.    Defendants unlawfully prohibited Plaintiffs from electing a refund or replacement for defective products by refusing returns and refunds for products that lack a money-back guarantee, are opened, or were purchased more than 30 days prior to the request, in violation of § 2304(a)(2), (4).

317.    As the warrantor, the Defendants did not, and have not, remedied the PetLab Co. products that failed to conform to the express warranties for Plaintiffs Carmichael, Lopez, and Liotta within a reasonable time. Defendants have not remedied the lack of FDA approval for PetLab products that are require approval as new animal drugs, nor have they offered Plaintiffs replacement products that prevent itchy skin, treat joint pain, or promote dental health in dogs as they expressly warranted.

318.    Defendants' disclaimer of the implied warranty is not prominently displayed on the face of the warranty. To the extent that the PetLab Terms are enforceable and valid as to purchased made by Plaintiffs Carmichael, Hynes, Lopez, and Liotta on the PetLab website, the Terms' provision stating that no PetLab Co. product has an implied warranty of any kind is prohibited under the Act.

319.   To the extent that the PetLab Terms are enforceable and valid as to Plaintiffs Carmichael, Hynes, Lopez, and Liotta, the Terms' provision limiting consequential damages is also not "disclosed on the face of the warranty" as required by 16 C.F.R. § 701.3(a)(7).

320.   Defendants violated the 16 C.F.R. § 701.3(a) "single document rule" by failing to include all required information in one document, whether in their Terms, Shipping & Return policy, or FAQ page. None of these documents are incorporated by reference in the warranty information found in Defendants' ads, on their website, or on their social media.

321.   The 30-day limit on refunds in the PetLab Co. Terms and Return policy are not "disclosed on the face of the warranty" in close proximity to the warranty text as required by § 701.3(a)(7).

322.    Defendants violated the § 701.3(a)(2) requirement for clear identification of products that are covered by warranties and those that are excluded by failing to clearly indicate which products are sold with the "money-back guarantee" referenced in their Shipping Policy.

323.    Defendants did not replace or refund the products in breach purchased by Plaintiff Carmichael, the Itch Relief Chews, even though she attempted to cancel her subscription. Defendants continued to bill her instead of issuing refunds.

324.   Defendants did not replace or refund the products in breach purchased by Plaintiff Lopez, the Joint Care Chews.

325.   Defendants did not replace or refund the products in breach purchased by Plaintiff Liotta, the Dental Formula.

326.   Defendants did not refund the products in breach purchased by Plaintiff Hynes at no charge to her as required by § 2304(a)(4) because they did not provide her a free shipping label as required by the Act requires and Defendants' own Shipping & Returns Policy.

### Magnuson-Moss Warranty Act

327.    Plaintiffs seek actual damages as follows under the Act: Widiantoro ($231.80); Brown ($211.14); Carmichael ($50.75); Liotta ($253.76); Lopez ($357.15); Stefanacci (not less than $94.23, plus the cost of purchases where the amount paid is currently unknown); Tischman ($253.32); and Hynes ($4.49).

328.    Plaintiffs seek punitive damages as follows under the Act:  Lopez ($3,214.35), Hynes ($15,000).

329.    Plaintiffs seek personal injury damages as follows under the Act for the violations of § 2304(a)(2), § 2304(a)(3), and § 2308: Widiantoro ($10,000 in emotional distress damages, $40,000 in punitive damages); Stefanacci (($100,000 in emotional distress damages, $50,000 in medical monitoring damages; $1,350,000 in punitive damages based on these personal injuries); Tishman ($100,000 in emotional distress damages, $50,000 in medical monitoring damages; $1,350,000 in punitive damages based on these personal injuries).

### SECOND CAUSE OF ACTION

### Breach of Express Warranty

### Violations of State Uniform Commercial Codes (All Defendants)

330.    Plaintiffs incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

331.    Plaintiffs are "buyers" under the Uniform Commercial Code ("UCC") because they are persons who bought goods or contracted to buy goods. Cal. U. Com. Code § 2103(1)(a); N.Y. U.C.C. Law § 2-103(1)(a); Wash. Rev. Code Ann. § 62A.2-103(1)(a).

332.    Defendants are "sellers" as persons who sell or contract to sell goods. Cal. U. Com. Code § 2103(1)(d); N.Y. U.C.C. Law § 2-103(1)(d); Wash. Rev. Code Ann. § 62A.2-103(1)(d).

333.    Defendants are "merchants" as persons who deal in the goods of the kind or by holding themselves out as having knowledge or skill specific to the goods involved in the transaction. N.Y. U.C.C. Law § 2-104(1); Cal. U. Com. Code § 2104(1); Wash. Rev. Code Ann. § 62A.2-104(1).

334.    "Person" means an individual, corporation, trust, partnership, limited liability company, association, joint venture, or "any other legal or commercial entity." Cal. U. Com. Code § 1201; N.Y. U.C.C. Law § 1-201(27); Wash. Rev. Code Ann. § 62A.1-201(27).

335.    Cel MD and PetLab Co. products are "goods" because they are things which are moveable and identifiable at the time of the contract for sale. Cal. U. Com. Code § 2105(1); N.Y. U.C.C. Law § 2-105(1); Wash. Rev. Code Ann. § 62A.2-105(1).

336.    Express warranties by sellers are created by: (1) any "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise;" (2) any "description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description"; and (3) any "sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." Cal. U. Com. Code § 2312(1); N.Y. U.C.C. Law § 2-313(1); Wash. Rev. Code Ann. § 62A.2-313(1).

337.    No formal words are required to create an express warranty, nor does the seller have to have a specific intention to make an express warranty. Cal. U. Com. Code § 2312(2); N.Y. U.C.C. Law § 2-313(2); Wash. Rev. Code Ann. § 62A.2-313(2).

338.    Defendants made express warranties and breached them as to the Cel MD Plaintiffs as described in Plaintiffs' First Causes of Action and in the warranty sections herein.

339.    Defendants made express warranties and breached them as to the PetLab Plaintiffs as described in Plaintiffs' First Causes of Action and in the warranty sections herein.

340.    Contractual provisions that purport to limit damages or liquidate damages are invalid if they fail the essential purpose of remedying breach, in which case Article 2 of the UCC provides for remedies against the party in breach. Cal. U. Com. Code § 2719(1)–(2); N.Y. U.C.C. Law § 2-719(1)–(2); Wash. Rev. Stat. Ann. § 62A.2-719(1)–(2).

341.    Defendants' requirements, in their respective Terms and Shipping & Returns Policies for PetLab and Cel MD, are unenforceable and invalid limitations of remedy because they fail their essential purpose by limiting returns and refunds of any product to 30 days from the date of purchase. The Return Policies require the products to be unopened, which fails to remedy breach of the above express warranties related to product performance.

342.    A provision liquidating "consequential damages for injury to the person in the case of consumer goods is invalid unless it is proved that the limitation is not unconscionable," Cal. U. Com. Code § 2719. Washington's provision is nearly identical. Wash. Rev. Stat. Ann. § 62A.2-719(2)–(3) ("in the case of goods purchased primarily for personal, family or household use"). In New York, liquidating consequential damages "for injury to the person in the case of consumer goods is prima facie unconscionable." N.Y. U.C.C. Law § 2-719(3).

343.    Limitations on consequential damages are unenforceable if unconscionable under California law as to Plaintiffs Widiantoro and Carmichael, and under Washington law as to Plaintiff Brown. The limitation on consequential damages in the Cel MD Terms for injury to the person are prima facie unconscionable in New York as to Plaintiffs Stefanacci and Tishman.

344.    Defendants' Terms are unconscionable and unenforceable against the Cel MD Plaintiffs because they exclude and limit personal injury damages, and they liquidate damages to "(I) USD

$500.00, or (II) the total amount of money you paid to Amplify in the one (1) month period immediately preceding the incident on which your alleged claim is based."

345.    The PetLab Terms are unconscionable and unenforceable against the PetLab Plaintiffs because they exclude and limit personal injury damages, and they liquidate damages to "(I) USD $500.00, or (II) the total amount of money you paid to Amplify in the one (1) month period immediately preceding the incident on which your alleged claim is based."

346.    The Cel MD and the PetLab liquidated damages provisions, above, violate the UCC because the liquidated amount is not "reasonable" in light of anticipated or actual harm caused by breach, the difficulty of proving loss is low, and there is inconvenience or impracticability to fully remedy Plaintiffs' losses due to Defendants' breaches.

347.    Defendants breached provisions related to limitation of remedies for goods as follows:

> a.  Limitation of remedy to "repair or replacement of defective parts or non-conforming goods is invalid in sales of goods" primarily for personal or household use unless the seller maintains or provides within the State of Washington facilities "adequate to provide reasonable and expeditious performance of repair or replacement obligations." Wash. Rev. Stat. Ann. § 62A.2-719(3). The Cel MD Defendants breached this as to Plaintiff Brown.

> b.  Pursuant to Cal. U. Com. Code § 2801, if a seller "issues a written warranty or guarantee as to the condition or quality of all or part of the goods which requires the buyer to complete and return any form to the manufacturer or seller as proof of the purchase of the goods, such warranty or guarantee shall not be unenforceable solely because the buyer fails to complete or return the form. . . . The buyer must agree in writing to any waiver of this section for the waiver to

be valid. Any waiver by the buyer of the provisions of this section which is not in writing is contrary to public policy and shall be unenforceable and void." The Defendants breached this as to Plaintiff Widiantoro. Defendants breached this as to Plaintiff Carmichael.

348.    Plaintiffs are entitled to damages for breach of warranty for the value of the goods should they have performed as warranted, incidental damages, and consequential damages, which include "Injury to person or property proximately resulting from any breach of warranty." Cal. U. Com. Code §§ 2714(2)–(3), 2715; N.Y. U.C.C. Law §§ 2-714(2)–(3), 2-715(2); Wash. Rev. Stat. Ann. §§ 62A.2-714, 62A.2-715.

### THIRD CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### Violations of State Uniform Commercial Codes (All Defendants)

349.    Plaintiffs incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

350.    When the seller is a merchant, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. U. Com. Code § 2314(1); N.Y. U.C.C. Law § 2-314(1); Wash. Rev. Code Ann. § 62A.2-314(1).

351.    The implied warranty of merchantability establishes minimum standards: "Goods to be merchantable must be at least such as (a) Pass without objection in the trade under the contract description; and (b) In the case of fungible goods, are of fair average quality within the description; and (c) Are fit for the ordinary purposes for which such goods are used; and (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) Are adequately contained, packaged, and labeled as the

agreement may require; and (f) Conform to the promises or affirmations of fact made on the container or label if any." Cal. U. Com. Code § 2314(2); Wash. Rev. Code Ann. § 62A.2-314(2). New York's minimum standards are substantially similar. N.Y. U.C.C. Law §2-314(2).

352.    Defendants are "merchants" as persons who deal in the goods of the kind or by holding themselves out as having knowledge or skill specific to the goods involved in the transaction. N.Y. U.C.C. Law § 2-104(1); Cal. U. Com. Code § 2104(1); Wash. Rev. Code Ann. § 62A.2-104(1).

353.    Defendants breached the implied warranty of merchantability as to the Cel MD Plaintiffs because their products are unfit for their alleged ordinary purpose, are inadequately labeled, are unsafe and not fit for human consumption or application to the human body, and fail to conform to the promises of fact made on Defendants' labels as described in Plaintiffs' First and Second Causes of Action and in as described *supra* in the fact sections.

354.    Defendants breached the implied warranty of merchantability as to the PetLab Co. Plaintiffs because their products are unfit for their alleged ordinary purpose, are inadequately labeled, and fail to conform to the promises of fact made on Defendants' labels as described in Plaintiffs' First and Second Causes of Action and in as described in the fact sections *supra*.

355.    Defendants' Terms are unenforceable as to any limitation of remedies or liquidation of damages to the same extent as for breach of an express warranty, as described in Plaintiffs' Second Cause of Action.

356.    Plaintiffs are entitled to actual damages, incidental damages, and consequential damages for breach of implied warranty. Cal. U. Com. Code §§ 2714–2715; N.Y. U.C.C. §§ 2-714 to 2-715; Wash. Rev. Code Ann. §§ 62A.2-714 to 62A.2-715.

**FOURTH CAUSE OF ACTION**

**Strict Products Liability for**

**Manufacture Defect, Design Defect, and Warning Defect (as to Cel MD Defendants)**

357.     Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

358.     The elements of a products liability claim are: (1) the product had a manufacturing, design, or warning defect when it left the defendant's control; (2) plaintiff used the defendant's product in a reasonably foreseeable manner; and (3) the defect in the product proximately caused the plaintiffs injuries.

359.     Defendants' Microstem Shampoo and Conditioner were defective in manufacture, at the time the products left their control, for reasons including but not limited to:

  a.  The Microstem Shampoo and Conditioner had defects due to units that deviated from the manufacturer's intended result, or that differed from other units of the same product; and

  b.  Defendants' placement on the market and sale of defective Microstem Shampoo and Conditioner are substantial factors in causing Plaintiffs' injuries.

360.     Defendants' Microstem Shampoo and Conditioner were defective in design at the time the products left their control, for reasons including but not limited to:

  a.  The products were defectively designed because they caused injury while being used in a reasonably foreseeable way;

  b.  The products failed to perform safely as an ordinary consumer would expect when used as intended and in a reasonably foreseeable manner, or in the alternative, the risk of dangers inherent to the design of the Microstem Shampoo

98

and Conditioner outweigh the utility of the design and a reasonable alternative design existed at the time of sale; and

c.   Defendants' placement on the market and sale of defective Microstem Shampoo and Conditioner products are substantial factors in causing Plaintiffs' injuries.

361.   Defendants' Microstem Shampoo and Conditioner Products were defective in directions for use and warnings of risks at the time the products left their control, for reasons including but not limited to:

a.   The Microstem Shampoo and Conditioner Products had dangers of which Defendants knew or should have known and that required warning to ensure safe use;

b.   The Microstem Shampoo and Conditioner Products had dangers that Plaintiffs as ordinary consumers would not have recognized;

c.   The Microstem Shampoo and Conditioner Products had known or reasonably knowable risks or dangers in light of generally recognized scientific or medical knowledge available at the time of sale and Defendants did not adequately warn of those risks;

d.   Defendants did not adequately warn Plaintiffs of the risks from using the Microstem Shampoo and Conditioner Products; and

e.   Defendants' failure to warn of the dangers proximately caused Plaintiff's injuries because the defective warnings were a substantial factor in producing said injuries.

362.   All persons and legal entities that cause a defective product to enter the stream of commerce or chain of distribution are strictly liable for injuries caused by it, including product sellers,

wholesale sellers, and upstream entities engaged in the formulation, manufacturing, designing, labelling, branding, and distribution of the defective product. Defendants are strictly liable for their claims, representations, misrepresentations, or omissions that were a substantial factor in causing the Microstem Shampoo and Conditioner to be defective in warnings.

363.   Defendants are product sellers for products purchased on the Cel MD website.

364.   Defendants are product sellers for products purchased on Amazon as direct sellers or as the seller pursuant to the Fulfilled by Amazon terms and conditions, and as they represent and hold out as to consumers on Cel MD Amazon product pages, on Amazon orders, and on Amazon receipts for Cel MD products.

365.   Defendants are distributors according to the packaging on all Cel MD products.

366.   The Microstem Shampoo and Conditioner products were defective in manufacture, design, and in warnings at the time they left Defendants' control as described herein.

367.   Defendants' distribution and sale of defective Microstem Shampoo and Conditioner products are substantial factors in causing Plaintiffs' injuries.

368.   The Microstem Shampoo and Conditioner used by Plaintiffs are substantial factors in causing their injuries.

369.   The Cel MD Plaintiffs in fact suffered physical injuries and emotional distress as a result of using defective Cel MD Products.

370.   Cel MD Microstem Shampoo and Conditioner contained manufacturing defects at the time the products left the Cel MD Defendants control.

371.   On information and belief, Cel MD Microstem Shampoo contained either contaminants, allergens, or an unidentified ingredient known by the Defendants to cause adverse health effects.

372.    The Cel MD Plaintiffs all used Defendants' defective products in a reasonably foreseeable manner and according to Defendants' instructions for use as described *infra*.

373.    The risks posed by the designs of Cel MD Microstem Shampoo and Conditioner outweigh their utility. Under the risk-benefit test, a design is defective based on factors that include the degree and probability of the risks posed by the product design, the utility of the current design to Plaintiffs and to the public as a whole, the feasibility of a reasonable alternative design, the relative costs of making a safer design, and the possible reduction in utility of an alternative design.

374.    The risk inherent to the design of Cel MD Shampoo and Conditioner is high, as evidenced by the harms alleged by Plaintiffs herein and by other consumers.

375.    The existing designs of Cel MD Microstem Shampoo and Conditioner have little to no utility to the public because the products do not work—the existing formula does not regrow hair or stimulate hair follicles to prevent hair loss or protect the scalp as Defendants allege, as described herein.

376.    Plaintiffs experienced no benefits from using Cel MD's Shampoo and Conditioner as currently designed, nor have numerous other customers who report the products do not work as Defendants claim.

377.    A reasonable alternative design for the Cel MD Microstem Shampoo and Conditioner exists—Defendants could omit from the product formulas any ingredients that risk adverse or allergic reactions, cause hair loss, or damage skin. Defendants could reformulate the products with ingredients that are actually FDA-approved to treat hair loss, skin irritation, nail fungus, and any other alleged benefit, and go through the FDA required safety testing processes. To the extent there is no reasonable alternative design, the design of Cel MD Shampoo and Conditioner is manifestly unreasonable.

378.   Cel MD's products contained manufacturing defects at the time they left Defendants' control, because the defect is in what was included in the product.

379.   At the time Plaintiffs suffered their injuries, Defendants had actual knowledge of manufacturing defects in Cel MD products because they had been specifically informed the products contained allergens or contaminants by Plaintiff's counsel in another matter.

380.   Defendants also knew or should have known of the manufacturing defects in Cel MD's Microstem Shampoo and Conditioner from purchasers reporting hair loss and allergic reactions in reviews on Amazon. At least one review reported that the user suffered serious anaphylactic shock that required emergency medical care. Instead of recalling the product or changing it, Defendants sold their existing stock to customers knowing it was dangerous, including to Plaintiffs.

381.   Defendants sold Plaintiffs products knowing their Cel MD Microstem Shampoo and Conditioner could cause hair loss and other injuries even when used as designed.

382.   Plaintiffs used the Cel MD Shampoo and Conditioner in a reasonably foreseeable way and by applying it their hair as directed by Defendants.

383.   Plaintiffs expected Defendants' Cel MD Shampoo and Conditioner to perform safely when used as Defendants directed and in a reasonable manner. Defendants claimed that use as directed would strengthen hair to prevent hair loss and would encourage new hair growth. Plaintiffs did not expect that using Cel MD Microstem Shampoo and Conditioner as directed would cause them to lose hair or suffer other side effects.

384.   In the alternative, Cel MD Shampoo and Conditioner are defective because the risks from the design of the products outweigh the benefits and their utility as described above. Plaintiffs suffered injury as a result of the products' defective design, she saw none of the benefits to her hair as Defendants represented.

102

385.    Cel MD's Microstem Shampoo and Conditioner were defective in warnings when Plaintiffs used them because Defendants knew or reasonably should have known of the products' risks, specifically the risk of hair loss, from having actual knowledge of due to customer reviews, products returned by customers, and information provided to Defendants by Plaintiff's counsel in another matter.

386.    Defendants should have known of the risk of hair loss from use of Microstem Shampoo and Conditioner based on generally recognized scientific and medical knowledge available at the time about the products' ingredients, possible contaminants, and possible adverse reactions from use.

387.    Defendants in fact failed to warn Plaintiffs of the risks from use generally at the time they purchased.

388.    Defendants' warning on the label was inadequate at the time of purchase because the Cel MD website and Amazon did not include any images of the label, did not provide a general warning that side effects are possible, did not warn specifically of the risk of hair loss, and did not provide the full list of ingredients.

389.    Defendants failed to warn of the risk of hair loss on the packaging of the products. The label on Cel MD's Microstem Shampoo and Conditioner that Plaintiff received warns of "red spots, swelling, itching or irritation" as possible symptoms, omitting the risk of hair loss as a possible reaction.

390.    As to Plaitniff Brown, the Washington Product Liability Act (WPLA) provides Plaintiff a cause of action for a product liability claim, which "includes any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage

or labeling of the relevant product." Wash. Rev. Code Ann. § 7.72.010(4). Product liability claims include those based on "Strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; [or] misrepresentation, concealment, or nondisclosure, whether negligent or innocent . . . ." *Id.*

391.    A "claimant" under the WPLA is as any person "asserting a product liability claim" who "suffers harm." Wash. Rev. Code Ann. § 7.72.010(5). Plaintiff can bring this claim "even though the claimant did not buy the product from, or enter into any contractual relationship with, the product seller." *Id.*

392.    "Harm" includes "any damages recognized by the courts of this state . . . ." Wash. Rev. Code Ann. § 7.72.010(6). Plaintiff can recover emotional distress damages under the Act.

393.    Cel MD products are "products" under the WPLA as "object[s] possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce." Wash. Rev. Code Ann. § 7.72.010(3).

394.    Defendants are "product sellers," defined as "any person or entity that is engaged in the business of selling products" for "use or consumption," and the "term includes a manufacturer, wholesaler, distributor, or retailer of the relevant product." Wash. Rev. Code Ann. § 7.72.010(1).

395.    Product sellers are liable to Plaintiff for harm proximately caused to her by (a) "negligence of such product seller," (b) "[b]reach of an express warranty made by such product seller," or (c) "[t]he intentional misrepresentation of facts about the product by such product seller or the intentional concealment of information about the product by such product seller." Wash. Rev. Code Ann. § 7.72.040(1).

396.   Product sellers "shall have the liability of a manufacturer" to Plaintiff when the "product was marketed under a trade name or brand name of the product seller." Wash. Rev. Code Ann. § 7.72.040(2)(e).

397.   Defendants are also "manufacturers" under the WPLA because the term includes any "product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer." Wash. Rev. Code Ann. § 7.72.010(2).

398.   Plaintiff Brown is a Claimant under the WPLA because she asserts a claim based on strict liability, negligence, breach of warranty, breach of a duty to warn, misrepresentation, concealment, and nondisclosure related to Defendants' manufacture, design, formula, preparation, testing, warnings, instructions, marketing, packaging, and labeling of Cel MD's Advanced Hair Supplement, Microstem Shampoo, and Microstem Conditioner.

399.   Cel MD's Advanced Hair Supplement, Microstem Shampoo, and Microstem Conditioner are products under the WPLA because they are objects with intrinsic value produced for sale in commerce. Plaintiff Brown purchased Cel MD products for value in interstate commerce.

400.   Defendants are product sellers because they are engaged in the business of selling Cel MD products as distributors and retailers to consumers for use and consumption of those products.

401.   Defendants are liable to Plaintiff Brown as product sellers for though she purchased the Cel MD products on Amazon; there is no requirement that she directly bought the products from Defendants or contracted with them.

402.   Defendants are also statutorily vicariously liable to Plaintiff Brown as manufacturers of Cel MD products because they sold said products using their trade name "Cel MD."

403.   Defendants are directly liable as product sellers to Plaintiff Brown for harm caused by breach of an expressed warranty as alleged in the First and Second Causes of Action, and by

intentionally misrepresenting facts and concealing information about Cel MD's Advanced Hair Supplement, Microstem Shampoo, Microstem Conditioner, and Microstem Deep Conditioning Hair Mask products as alleged in the Fifth Cause of Action.

404.   Defendants are liable to Plaintiff Brown for harm caused by their negligence in selling Cel MD Microstem Shampoo and Conditioner containing manufacturing defects as described in the preceding paragraphs.

405.   Defendants' Cel MD's Microstem Shampoo and Conditioner were defective in design because they caused Plaintiff Brown to experience hair loss when she used them as Defendants directed and in a reasonably foreseeable way that she, as an ordinary consumer, would expect to perform safely.

406.   Cel MD's Microstem Shampoo and Conditioner were defective in warnings because Defendants failed to adequately warn Plaintiff Brown of risks Defendants knew or should have known at the time of sale based on available knowledge, including the risk of allergic reactions, skin peeling and stinging, and hair loss.

407.   The manufacturing, design, and warning defects to Cel MD's Microstem Shampoo and Conditioner were a substantial factor in causing Plaintiff Brown's injuries.

408.   Plaintiff Brown's harms are compensable under Washington law because she sustained physical injuries requiring medical treatment and suffered emotional distress as a result of using Defendants' defective products.

409.   Defendants' Advanced Hair Supplement was defective in design and warnings at the time Plaintiff Brown used them due to breach of express warranties made by Defendants that the product was effective, as alleged in Plaintiffs' First and Second Causes of Action.

410.    Defendants' Advanced Hair Supplement was defective in design and warnings at the time Plaintiff Brown used them due to misrepresentations of fact and the intentional concealment of information made by Defendants, as alleged in Plaintiffs' Fifth Cause of Action.

411.    Defendants' Microstem Deep Conditioning Hair Mask was defective in design and warnings at the time Plaintiff Brown used it due to breach of express warranties made by Defendants, as alleged in Plaintiffs' First and Second Causes of Action.

412.    Defendants' Microstem Deep Conditioning Hair Mask was defective in design and warnings due to misrepresentations of fact and the intentional concealment of information made by Defendants at the time Plaintiff Brown used the product, as alleged in the Fifth Cause of Action.

413.    Plaintiff Brown purchased Cel MD products on Amazon and suffered physical injuries after using them, experiencing stinging and burning on her scalp accompanied by skin peeling from her forehead. She suffered an allergic reaction that required medical treatment. Plaintiff Brown also experienced worsened hair loss after using Cel MD products, which caused her great embarrassment.

414.    Plaintiff Brown suffered emotional distress from these physical injuries after her use of Cel MD products. Her physical injuries lasted months, which caused her great embarrassment. Her emotional distress was amplified by not knowing whether her injuries were permanent or not. This emotional distress was severe enough that it affected her daily activities. She was forced to constantly wear a hat to hide the red, peeling skin on her head. She felt uncomfortable in business situations due to her appearance. On at least one occasion, she went on a business trip but felt she had to stay in her hotel room without going out because she feared drawing attention to her physical condition.

415.    Plaintiffs Widiantoro, Brown, Stefanacci, and Tishmen are entitled to damages under strict products liability for actual damages, emotional distress, medical monitoring, punitive damages, and any other appropriate relief in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

### Violation of State Consumer Protection Statutes

### New York's General Business Law, N.Y. Gen. Bus. Law §§ 349–350 (Plaintiffs

### Stefanacci and Tishman against Cel MD Defendants;

### Plaintiffs Hynes, Liotta, Lopez against the PetLab Defendants);

### Washington's Consumer Protection Act (CPA), Wash. Rev. Code Ann. §§ 19.86.010,

### *et. seq.* (Plaintiff Brown against Cel MD Defendants)

416.    Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

417.    Defendants have engaged in deceptive acts and unfair practices that have caused actual damages to Plaintiffs Brown, Stefanacci and Tishman, as described herein, including the misrepresentations and omissions described with respect to the marketing, advertising, promotion, packaging, and sale of the Cel MD products.

418.    Defendants violated state consumer protection laws as to Plaintiffs Brown, Stefanacci, and Tishman by falsely claiming that Cel MD products, formulas, and ingredients are safe when Defendants had actual knowledge of product returns that implicated the safety and compliance of batches of products, as described throughout this Complaint.

419.    Cel MD products returned by purchasers are considered "returned drug products" under federal law, which requires that: (1) returned drug products to be identified as such; (2) "if the condition of the drug product, its container, carton, or labeling, as a result of storage or shipping,

108

casts doubt on the safety, identity, strength, quality or purity of the drug product, the returned drug product shall be destroyed unless examination, testing, or other investigations prove the drug product meets appropriate standards of safety, identity, strength, quality, or purity"; (3) "[i]f the reason for a drug product being returned implicates associated batches, an appropriate investigation shall be conducted in accordance" with federal regulations; and (4) "[p]rocedures for the holding, testing, and reprocessing of returned drug products shall be in writing and shall be followed." 21 C.F.R. § 211.204.

420.    For Cel MD's Advanced Hair Supplement, as a returned supplement, federal law requires that "[i]f the reason for a dietary supplement being returned implicates other batches," the distributor "must conduct an investigation of [its] manufacturing processes and each of those other batches to determine compliance with specifications," and the distributor must comply with the recordkeeping and receiving requirements for returned supplements. 21 C.F.R. §§ 111.503–111.535.

421.    Defendants have engaged in deceptive acts and unfair practices that have caused actual damages to Plaintiffs Hynes, Liotta, and Lopez, as described herein, including the misrepresentations and omissions described with respect to the marketing, advertising, promotion, packaging, and sale of the PetLab Co. products.

422.    Defendants' deceptive and unfair trade practices have been carried out in the course of conducting Defendants' business, trade, and commerce.

423.    Defendants' acts—including their intentional efforts to mislead consumers regarding the benefits and effectiveness of Cel MD and PetLab Co. Products—are willful, unfair, unconscionable, deceptive, contrary to public policy and injurious to consumers.

424.    Defendants' false, deceptive and misleading statements and omissions would be material to any reasonable consumer's decision whether to buy a Cel MD or a PetLab Co. product.

425.    Any objectively reasonable consumer acting reasonably in the circumstances would have been deceived by the Cel MD and the PetLab acts and practices.

426.    Defendants' acts are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, are accompanied by a wanton and willful disregard for consumers' well-being, and are motivated solely by the desire for financial gain.

427.    As a direct and proximate result of the Cel MD and the PetLab Defendants' deceptive practices, Plaintiffs have sustained actual damages.

428.    Plaintiffs demand actual damages, attorneys' fees and costs, and any other relief to which they may be entitled, including the specific relief described in this Cause of Action.

## New York's General Business Law, N.Y. Gen. Bus. Law §§ 349–350

429.    New York's General Business Law states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). "This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state." *Id.* § 349(g).

430.    Plaintiffs Stefanacci and Tishman purchased Cel MD products from the Defendants in Internet transactions using the Cel MD website. Amplify Limited conducts business in the State of New York by using a New York address as its business address on the label of all Cel MD products and in other writings.

431.    Plaintiffs Hynes, Liotta, and Lopez purchased PetLab Co. products from the PetLab Co. Defendants in Internet transactions using the PetLab Co. website. Amplify Limited conducts

business in the State of New York by using a New York address as its business address on the label of all PetLab Co. products and in other writings.

432.     Plaintiff Lopez is a resident of the State of New York and was at all times relevant to the transactions at issue.

433.     General Business Law § 349 provides a cause of action for Plaintiffs to seek injunctive relief, monetary relief, reasonable attorneys' fees, statutory damages, and triple damages up to $1,000 for willful or knowing violations of this section. Id. § 349(h).

434.     General Business Law § 350 states: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." N.Y. Gen. Bus. Law § 350.

435.     The term "false advertising" means "advertising, including labeling, of a commodity" if "such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." N.Y. Gen. Bus. Law § 350-a(1).

436.     Defendants engaged in false advertising in the conduct of any business, trade or commerce in the State of New York, having operated, created, disseminated, or caused to be created or disseminated such advertisements from the State of New York.

437.    For violations of §§ 350–350-(a), Plaintiffs seek monetary relief, reasonable attorneys' fees, statutory damages, and triple damages up to $1,000 for willful or knowing violations of these sections. N.Y. Gen. Bus. Law § 350-e(3).

438.    Any person using the title "doctor" in "making representations for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of (a) drugs, devices or cosmetics," or "(b) other goods or services intended to diagnose, treat, mitigate, prevent or cure any human disease, pain, injury, deformity, nutritional deficiency or physical condition, or which are intended to appear to the purchaser of such goods or services to have done so, shall conspicuously disclose the profession in which he or she is licensed." N.Y. Gen. Bus. Law § 350-b(1). Such person is prohibited from using the title of doctor "unless the degree was conferred by an institution of higher education authorized by law to confer doctoral degrees in the state where it is located." Id. For the purposes of this section, "'conspicuously' shall mean equally in size, type or prominence and positioned adjacent to the title 'doctor.'" Id. For the purposes of this section, "drugs" mean articles "intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease" or "intended to affect the structure or any function of the body" in humans. N.Y. Educ. Law § 6802(7). For the purposes of this section, "cosmetics" means articles "intended to be rubbed, poured, sprinkled or sprayed on, introduced into or otherwise applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance." N.Y. Educ. Law § 6802(8).

439.    Defendants violated N.Y. Gen. Bus. Law § 350-b, prohibiting the use of the title doctor in ads for persons who do not hold a degree conferred by an institute of higher education authorized to confer doctoral degrees. Defendants made this false claim that doctors have developed, approved, or recommended Cel MD products as described in the section titled "Deceptive Brand

112

Name." Defendants' representations were likely to induce or were made with the purpose to induce purchases of Cel MD products by Plaintiffs Stefanacci and Tishman.

## Washington Consumer Protection Act, Wash. Rev. Code Ann. §§ 19.86.010, *et. seq.*

440.    Washington's Consumer Protection Act (CPA), Wash. Rev. Code Ann. §§ 19.86.010 et. seq., makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Id. § 19.86.020.

441.    Trade or commerce is as defined by statute as "any commerce directly or indirectly affecting the people of the state of Washington," id. § 19.86.010, which the Defendants engaged in by selling Cel MD products to Plaintiff Brown using Amazon, including as third-party sellers or as sellers using the Fulfilled by Amazon fulfillment program.

442.    Plaintiff Brown's claim satisfies the public interest element of a CPA claim by alleging an act or practice that violates a statute that incorporates the CPA, or that "[v]iolates a statute that contains a specific legislative declaration of public interest impact," or that "[i]njured other persons" or that "had" or "has the capacity to injure other persons." Wash. Rev. Code Ann. § 19.86.093.

443.    Defendants engaged in acts and practices that in fact injured Plaintiff Brown and that had and have the capacity to injure other persons by making false claims as alleged herein, including but not limited to: that Cel MD Products are FDA approved, that they comply with applicable regulations, that they contain magical stem cell technology, that they effectively regrow hair or stop hair loss, that they are hypoallergenic or free from allergens or other contaminants, that they do not contain harmful chemicals, that they are safe, that Defendants monitor adverse reaction reports for these products, that the products have thousands of highly rated customer reviews, and that the products have a money-back satisfaction guarantee.

444.    Defendants representations are likely to mislead consumers through their actual falsity of express or implied claims and their lack of a reasonable basis for asserting their representations were true.

445.    Defendants made actually false express claims and implied claims to Plaintiff Brown and to other consumers as alleged herein and in Plaintiffs' First, Second, Third, and Sixth Causes of Action.

446.    Defendants lack a reasonable basis for the claims in their advertisements that state or impliedly suggest that Cel MD products successfully perform the advertised functions or yield their advertised benefit as alleged herein. Defendants' claims have no reasonable basis and are per se deceptive as a matter of law because Defendants failed to substantiate their representations before placing them in advertisements, and they lack competent and reliable scientific evidence for their advertised claims.

447.    Chapter 69.04, Intrastate Commerce in Food, Drugs, and Cosmetics, of Title 69 is actionable under the CPA because it contains a legislative declaration of purpose to protect the public interest. Wash. Rev. Code Ann. § 69.04.001.

448.    Chapter 69.04 prohibits undertaking or causing the following acts:

  a.  the intrastate sale of a misbranded drug, Wash. Rev. Code Ann. § 69.04.040(1);

  b.  dissemination of any false advertisement by any manner or any means, *id.* § 69.04.040(5);

  c.  the giving of a guarantee that is false, *id.* § 69.04.040(9); and

  d.  in the labeling or advertisement of any drug, any representation or suggestion that the drug is complies with Section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355), *id.* § 69.04.040(11).

114

449.    Defendants' products, including Microstem Shampoo and Conditioner, the Hair Thickening Mask, and the Advanced Hair Supplement, are "drugs" because they are "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in" animals, and because they are "intended to affect the structure or any function of the body of" animals. *Id.* § 69.04.009.

450.    Defendants advertised Cel MD products by making false representations on Amazon, on their social media, on landing pages, and in advertisements, with the intent to induce or that are likely to induce purchase as described *supra*.

451.    Defendants disseminated false advertisements for Cel MD's Microstem Shampoo, Conditioner, and Hair Thickening Mask, and for the Advanced Hair Supplement on Defendants' Amazon product page, on their social media, on landing pages, and on advertisements styled to look like news articles, as described *supra*. Defendants' false claims and misrepresentations are likely to induce the purchase of the products. Defendants' make these false claims and misrepresentations with the intent to induce purchases from the public.

452.    The Cel MD Defendants gave guarantees for Cel MD products that are false as alleged in Plaintiffs' First, Second, and Sixth Causes of Action.

453.    The Cel MD Defendants advertised and represented on Amazon, on Facebook, and on landing pages that all Cel MD products had FDA approval as described *supra*, in violation of § 69.04.040(11) prohibiting representations that the products comply with Section 505 of the Federal Food, Drug, and Cosmetic Act.

454.    Plaintiff Brown seeks relief provided by the CPA including monetary relief for actual damages, treble damages, costs associated with bringing this action, and reasonable attorneys' fees. Wash. Rev. Code Ann. § 19.86.090.

455. In the alternative, should New York law apply to Plaintiff Brown's claims, Plaintiff incorporates the paragraphs in this section that allege a claim under the laws of New York and seeks relief under the GBL.

### SIXTH CAUSE OF ACTION

### Violation of California's State Consumer Laws

**(Plaintiff Widiantoro against the Cel MD Defendants; Plaintiff Carmichael against the PetLab Defendants)**

456. Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

457. At all times relevant to the events and transactions that give rise to this action, Plaintiff Widiantoro and Plaintiff Carmichael were residents of the State of California.

458. The Cel MD Defendants targeted their representations and claims to Plaintiff Widiantoro in the State of California, Plaintiff in fact received and viewed Defendants' claims in California, Defendants shipped Cel MD Products to Plaintiff's address in California, and Plaintiff used Defendants' products in California where they failed to perform as Defendants represented.

459. The PetLab Defendants made their representations and claims targeted at Plaintiff Carmichael in the State of California, Plaintiff in fact received and viewed Defendants' claims in California, Defendants shipped PetLab Co. Itch Relief Chews to Plaintiff's address in California, and Plaintiff used Defendants' products in California where they failed to perform as Defendants represented.

460. Defendants' claims that Cel MD products have FDA approval are false and misleading representations under the UCL as to Plaintiff Widiantoro.

116

461.    Defendants' claims that PetLab Co. products comply with federal and state regulations and standards are false and misleading representations under the UCL as to Plaintiff Carmichael.

462.    Defendants' claims that PetLab Co. products are made with all "natural" ingredients standards are false and misleading representations under the UCL as to Plaintiff Carmichael.

## Violation of the California False Advertising Law

## Cal. Bus. & Prof. Code §§ 17500, *et seq.*

463.    Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

464.     Pursuant to California Business and Professions Code §§ 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . [or] to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property . . . so advertised at the price stated therein, or as so advertised." Cal. Bus. & Prof. Code § 17500.

465.    Defendants advertised to Plaintiff Widiantoro that the Cel MD products would be of a particular nature and quality through written, visual, and audiovisual representations that contained false or misleading claims or that omitted material information, which were made by Defendants and their employees.

466.    Defendants advertised to Plaintiff Carmichael that PetLab Co. products would be of a particular nature and quality through written, visual, and audiovisual representations that contained false or misleading claims or that omitted material information, which were made by Defendants and their employees.

467.    The PetLab Co. Defendants have violated the False Advertising Law, § 17500, *et seq.*, in

117

particular as described herein in the sections "Misrepresentations and Omissions Itch Chews"; "Omissions Regarding Reviews and Endorsements"; "Deceptive advertising devices;" "Misrep PetLab Regulatory Compliance"; "Representations Regarding Limited Supply"; and "Omissions Regarding Deceptive Timers."

468.   Pursuant to § 17505, "No person shall state, in an advertisement of his goods, that he is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods, when such is not the fact, and no person shall in any other manner misrepresent the character, extent, volume, or type of his business."

469.   Defendants have violated § 17505, in particular by misrepresenting: that they develop Cel MD formulas and design and produce Cel MD products when in fact they distribute private label manufactured products and by misrepresenting the type and character of their business with respect to the use of "MD" in their brand name as described *supra*.

470.   Defendants have violated § 17505, in particular by misrepresenting: that they develop PetLab formulas and design and produce PetLab products when in fact they distribute private label manufactured products; and by misrepresenting the type and character of their business as described in the section on their brand name.

471.   Defendants misled consumers by omitting material information which they were under a duty to disclose as described herein in the section on failures to disclose safety issues with the PetLab productrs. Defendants were under a duty to disclose this material information to Plaintiffs.

472.   Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and they deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like

Plaintiff Widiantoro and Plaintiff Carmichael. In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described involving safety issues and fake review.

473.     Defendants' representations were material to the decision of Plaintiffs to purchase Cel MD and PetLab Co. products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendants in determining whether to purchase Defendants' products. With respect to the omissions by Defendants as described herein, those omissions were material and Plaintiffs would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, Plaintiffs would have been aware of it and would not have purchased the products from Defendant or would not have paid the same price for those products.

474.     In reasonable reliance on Defendants' false representations, Plaintiff Widiantoro purchased the Cel MD Microstem Shampoo and Conditioner and the Hair Stimulation Formula, and Plaintiff Carmichael purchased the PetLab Co. Itch Relief Chews. Plaintiffs paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiffs ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs have suffered injuries in fact.

475.     As a direct and proximate result of Defendants' misleading and false advertising, Plaintiffs have suffered injuries in fact and have lost money or property, time, and attention. Plaintiffs reasonably relied upon Defendants' representations regarding their products.

476.     The misleading and false advertising described herein presents a continuing threat to Plaintiffs in that Defendants persist and continue to engage in these practices, and they will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue

to cause irreparable injury to consumers as the general public unless Defendants are enjoined or restrained. Plaintiffs are entitled to restitution.

**Violation of the Unfair and Fraudulent Prongs**

**of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

477.   Plaintiffs incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

478.   As alleged herein, Plaintiffs have suffered injuries in fact and lost money or property as a result of Defendants' conduct. Plaintiffs suffered that injury at the time of purchase, at the time of billing, and at the time of use.

479.   The Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*, prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200.

480.   Defendants committed "unfair" business acts or practices by, among other things: (1) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiff; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs; and (3) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint.

481.   The utility of the conduct committed by Defendants and as described herein is nonexistent. There is no utility to falsely suggest to customers that an advertising agency is a medical practice, to pretend to be doctors or veterinarians, to misrepresent and omit crucial facts about how products

120

are to be consumed or applied by humans to Plaintiff Widiantoro, to misrepresent and omit crucial facts about how products are to be consumed by animals or applied to their bodies by Plaintiff Carmichael, to omit easily provided warnings about side effects, or to use fake customer reviews or photos. The harm to consumers caused by this conduct, by contrast, is significant. Defendants' conduct described herein not only deprived Plaintiffs of the value they were expecting to receive but also risked the health of Plaintiff Widiantoro and caused him to treat health conditions with ineffective products rather than alternative options.

482.    Defendants' conduct as described in this Complaint offends established public policies. The Defendants' conduct violates numerous statutes, as described further herein and in detail in the First, Second, Third, Fourth, and Seventh Causes of Action. Those statutes exist for a reason: to protect consumers from unfair marketing practices, and in many cases to protect consumers' health and property. It is a particularly important public policy issue to avoid these kinds of violations in products that relate to health care or that are applied to the human body or that are consumed by animals given the risks of such violations.

483.    Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiffs. In particular and *inter alia*, this is evidenced by the disregard for their customers' health and well-being.

484.     Defendants' conduct as described in this Complaint violates the letter, spirit, and intent of the consumer protection laws. Their products amount to snake oil, marketed dishonestly and in violation of various consumer protection laws, as described herein and in the Causes of Action of this Complaint. As detailed herein, Defendants' unfair and/or fraudulent practices include disseminating false and/or misleading representations through their marketing and advertising.

Defendants are aware that the claims or omissions they have made about the Products were and continue to be false and misleading.

485.    Defendants had an improper motive—profit before accurate marketing—in their practices related to their deceptive practices, as set forth herein.

486.    There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. For example, Defendants could have removed the false and misleading representations from their advertisements, provided omitted information to Plaintiffs to avoid any deception, and could have complied with the law rather than violating the statutes as described in Plaintiffs' First, Second, Third, Fourth, and Seventh Causes of Action.

487.    As a direct and proximate result of Defendants' unfair or fraudulent business acts and practices and misleading and false advertising, Plaintiffs have suffered injury in fact and have lost money or property, time, and attention. Plaintiffs reasonably relied upon Defendants' representations regarding Cel MD and PetLab Co. products. In reasonable reliance on Defendants' false representations, Plaintiffs purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiffs ended up with Cel MD and PetLab Co. products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs have suffered injury in fact.

488.    Defendants' representations were material to the decisions of Plaintiff Widiantoro and Plaintiff Carmichael to purchase Defendants' products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendants in determining whether to purchase Defendants' products, as described in detail herein. With respect to the omissions by the Defendants as described herein, those omissions were material and

Plaintiffs would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, Plaintiffs would have been aware of it and would not have purchased the products from Defendants or would not have paid the same price for those products. Similarly, had Defendants not engaged in the unfair and fraudulent business acts or practices described in this Complaint, Plaintiffs would not have purchased the products from the Defendants or would not have paid the same price for those products.

489.    As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiffs are entitled to restitution.

**Violation of the Unlawful Prong**

**of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

490.    Plaintiffs incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

491.    As alleged herein, Plaintiffs have suffered injury in fact and lost money or property as a result of Defendants' conduct. Plaintiffs suffered that injury at the time of purchase, at the time of billing, and at the time of use.

492.    The UCL, California Business & Professions Code §§ 17200, *et seq*., prohibits "unfair competition," which includes "any unlawful . . . business act or practice . . . any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200.

493.     As detailed above, the Defendants' acts and practices are unlawful because they violate the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*

494.     As detailed above, the Defendants' acts and practices are unlawful because they violate the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*

495.     As detailed above, the Defendants' acts and practices are unlawful because they violate the unfair and fraudulent prongs of California's UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any "unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."

496.     As detailed in the section of this Complaint titled "Deceptive Brand Name and Omissions Regarding the Cel MD Brand Name," the Defendants' acts and practices are unlawful because they violate Cal. Bus. & Prof. Code § 2054, which provides that "[a]ny person who uses in any sign, business card, or letterhead, or in an advertisement. . . the initials 'M.D.,' or any other terms or letters indicating or implying that he or she is a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law. . . is guilty of a misdemeanor."

**Unlawful Violations of Federal Trade Commission Regulations**

**Concerning Use of Endorsements and Testimonials in Advertising**

**16 C.F.R. pt. 255,** *et seq.*

497.     Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

498.     Defendants' acts and practices are unlawful under the California UCL because they violate federal regulations governing the use of endorsements and testimonials in advertising.

499.     Pursuant to 16 C.F.R. § 255.1(a), "an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser." Under § 255.1(c),

"[a]dvertisers are subject to liability for false or unsubstantiated statements made through endorsements . . . ."

500.    The term "endorsement" means "any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser." *Id.* § 255.0(b). "Endorsement" as used by the regulation means both endorsements and testimonials. *Id.* § 255.0(c).

501.    Endorsers include consumers who receive free products from advertisers through marketing programs. *Id.* § 255.0 ex. 8. Endorsers also include third party bloggers who are compensated in any way by advertisers, and advertisers are liable for misleading or unsubstantiated representations made by paid endorsers on their websites. 16 C.F.R. § 255.1 ex. 5.

502.    Under the regulations, advertisers have a duty to train endorsers and to monitor their statements, and to take necessary steps to halt continued publication of deceptive representations by endorsers. *Id.*

503.    Plaintiffs incorporates by reference the Factual Allegations section of this Complaint, and in particular refers to the section relating to "Omissions Regarding Reviews and Endorsements."

504.    Defendants violated these requirements by compensating certain unknown third-party endorsers for their reviews, testimonials, social media content, or appearances in Cel MD and PetLab videos or advertisements, whether via free products, discounts, or direct financial compensation. Neither the Defendants nor these endorsers disclosed this compensation in

proximity to their endorsements.  These individuals were endorsers under 16 C.F.R. pt. 255, *et seq.*, and Defendants are liable for these omissions.

505.    Defendants knew or should have known that those third-party endorsers had not disclosed such compensation in proximity to their reviews and endorsements.

506.    On information and belief, Defendants failed to provide training or guidance to these third-party endorsers to ensure that the endorsements did not include deceptive representations. On information and belief, Defendants failed to monitor these endorsements and took no steps to halt the continued publication of these deceptive representations.

507.    Under 16 C.F.R. § 255.5, certain material connections between sellers of an advertised product and endorsers must be fully disclosed.

508.    The requirement to disclose material connections between advertisers and endorsers particularly applies reviews posted on websites or blogs where there is no "inherently obvious" relationship between the advertiser and the endorser. 16 C.F.R. § 255.5 ex. 7. To comply with the regulations, advertisers must require clear and conspicuous disclosure of material connections to endorsers on such third-party websites, and they must have procedures in place to monitor compliance by the endorser. *Id.*

509.    As described further in the "Omissions Regarding Reviews and Endorsements" section of this Complaint, reviews and advertisements on the Cel MD website, on Amazon, on landing pages, on Facebook, on Instagram, and on YouTube contained or constituted third-party endorsements for the Cel MD products, or were written by or made by employees of the Defendants themselves.

510.    On information and belief, and as described in the factual background section of this Complaint, the Defendants had a connection to these third-party endorsers that might materially affect the credibility of their endorsements. The Cel MD website states as much, but it buries this

disclosure far away from the actual endorsements. Defendants similarly bury disclosures on the PetLab website. Defendants further have material connections to the employees of Altitude Ads, who posed as customers and who were being compensated as employees.

511.    These material connections were not disclosed in proximity to any of the endorsements, and on information and belief was not fully disclosed on the Cel MD website at the time Plaintiff Widiantoro saw their ads, social media posts, or purchased Cel MD products. In the time frame of Mr. Widiantoro's purchases, on information and belief based on a review of Cel MD's websites, all customers including Mr. Widiantoro were exposed to such false endorsements. Whether the customer reviews, photos, and endorsements on the website were real or fake was material to Mr. Widiantoro's purchasing decision because genuine reviews from third parties are an indicator of product quality.

512.    Similarly, the material connections were not disclosed in proximity to any of the endorsements, and on information and belief was not fully disclosed on the PetLab website at the time Plaintiff Carmichael saw their ads, social media posts, or purchased PetLab products. In the time from of Ms. Carmichael's purchases, on information and belief based on a review of PetLab's websites, all customers including Ms. Carmichael were exposed to such false endorsements. Whether the customer reviews, photos, and endorsements on the website were real or fake was material to Ms. Carmichael's purchasing decision because genuine reviews from third parties are an indicator of product quality.

513.    On information and belief, Defendants failed to require a clear and conspicuous disclosure of this material connection and had no procedures in place to monitor compliance by the third-party endorsers.

514.     Under 16 C.F.R. § 255.2(c), "[a]dvertisements presenting endorsements by what are represented, directly or by implication, to be 'actual consumers' should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product."

515.     Defendants presented endorsements appearing to be from actual consumers on their website, including photographs of those purported consumers. Similarly, Defendants included footage in video advertisements of endorsements from individuals who purported to be actual consumers of their products.

516.     In fact, the photographs of consumers on the Cel MD website and the PetLab website are stock photos of models, stolen photos, or in some instances are employees of Altitude Ads. And on information and belief, the individuals in many of their video advertisements are paid actors and actresses and not actual consumers.

517.     Defendants failed to clearly and conspicuously disclose that these photographs and videos were not actual consumers, as described in the "Omissions Regarding Reviews and Endorsements" section of this Complaint.

518.     Such failure to clearly and conspicuously disclose as required by 16 C.F.R. § 255.2(c) is deceptive because the individuals featured in those photographs and video advertisements had healthy hair and skin, which Cel MD customers would aspire to and which do not reflect the actual effects of Cel MD products.

519.     Failure clearly and conspicuously disclose as required by 16 C.F.R. § 255.2(c) is deceptive because the individuals featured in those photographs and video advertisements had healthy dogs without itching or skin conditions, which PetLab customers would aspire to achieve for their dogs and which do not reflect the actual effects of PetLab products.

128

520.     Defendants have an affirmative duty to substantiate consumer endorsements that relate to a central or key attribute of the product in ads. Failure to do so is a violation of 16 C.F.R. § 255.2(b).

521.     The regulations also require that an advertiser "must make clear the nature and limits of the endorser's expertise" if the endorser does not have "substantial experience" in the area. 16 C.F.R. § 255.3 ex. 2 (a Ph.D. or a physician without substantial experience in the area of hearing may not be referred to as a "doctor" without clarification in an endorsement of a hearing aid).

522.     As described in the "Deceptive Brand Name and Omissions Regarding the Cel MD Brand Name" section of this Complaint, the Cel MD Defendants portrayed themselves as doctors by using the "MD" designation without disclosing that they did not have such expertise.

523.     Plaintiffs Widiantoro and Carmichael were injured by this unlawful conduct and the violations of these regulations, as described in the "Omissions Regarding Reviews and Endorsements," "Deceptive Advertising Devices," and "Deceptive Brand Name and Omissions Regarding the Cel MD Brand Name" sections of this Complaint.

524.     Defendants' actions with respect to its endorsers as described above are in violation of 16 C.F.R. pt. 255, *et seq.*, and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of the

### Federal Food, Drug, and Cosmetic Act

### 21 U.S.C. §§ 301, *et seq.*

525.     Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

526.     Defendants' acts and practices are unlawful under the California UCL because they violate the Federal Food, Drug, and Cosmetic Act.

129

527.    Defendants' products constitute drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(g)(1), a "drug" includes "articles (other than food) intended to affect the structure or any function of the body of man or other animals . . . ."

528.    The Cel MD products are advertised as affecting the structure or function of the human body and are intended to affect the structure or function of the human body. Defendants advertise that their products "stimulate hair follicles" and "promote hair growth at a cellular level."[109] They claim the ginseng stem cells in their products "[b]oost cell regeneration & stimulate collagen growth."[110] They claim that plant stem cells "[n]ourish the scalp and stimulate dormant follicles for optimum growth."[111] As described herein, they have claimed among other things that their products can rewire human skin, that they can function as a second "super skin," that the plant stem cells in their products can communicate with human cells to alter their functionality to improve hair or skin, and that they can increase the lifespan of hair follicles and cause hair to stay in the anogen phase for longer than it otherwise would.

529.    The Cel MD products constitute new drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(p)(1), a "new drug" includes:

> Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a 'new drug' if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use . . . .

---

[109] Cel.md, https://promos.cel.md/dmxcspsub2/index.php (last visited Nov. 18, 2019).
[110] Cel.md, https://promos.cel.md/emailcesflow/index.php (last visited Nov. 18, 2019).
[111] Cel.md, https://promos.cel.md/emailchm/index.php (last visited Nov. 18, 2019).

530.    The Cel MD products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat. The effectiveness of the individual ingredients in the Cel MD products is not generally recognized. The FDA has previously made determinations that products constitute drugs when advertising biotin and arginine claiming the product can "prevent hair thinning and hair loss and promotes healthy hair."[112] Defendants have made the same claims about biotin and arginine in their products. The FDA has also previously made determinations that products claiming to include plant stem cells for improving skin constitute drugs.[113]

531.    The PetLab products are advertised as affecting, and are intended to affect, the structure or function of animal bodies. Defendants advertise that their products treat, relieve, and mitigate the symptoms of allergies, gingivitis, and aging joints. They advertise that PetLab Co. Itch Relief Chews purchased by Ms. Carmichael "reduce inflammation," "soothe irritated or inflamed skin," and that they maintain healthy skin and coats. They advertise that the Itch Relief Chews work as an antihistamine, that they are "packed with antiviral, antibacterial, antioxidant, and anti-inflammatory" ingredients, and that they affect a dog's immune system to "combat infection and disease" and support muscle and circulation health.

532.    Defendants' products are new animal drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(v)(1), a "new animal drug" includes:

---

[112] Warning Letter to Orgen Nutraceuticals, Oct. 28, 2015, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/orgen-nutraceuticals-10282015 (last visited Mar. 12, 2020).
[113] Warning Letter to Sircuit Skin, July 19, 2016, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/sircuit-skin-07192016 (last visited Mar. 12, 2020); Warning Letter to Annemarie Gianni Skin Care LLC, July 15, 2016, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/annemarie-gianni-skin-care-llc-07152016 (last visited Mar. 12, 2020).

[A]ny drug intended for use for animals other than man, including any drug intended for use in animal feed . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof; except that such a drug not so recognized shall not be deemed to be a "new animal drug" if at any time prior to June 25, 1938, it was subject to the Food and Drug Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use . . . .

533.   The PetLab Co. products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat. The effectiveness of the individual ingredients in the PetLab Co. products is not generally recognized. The FDA has previously made determinations that products constitute drugs when advertising that they are natural arthritis therapies that "reduces pain and inflammation," that natural antioxidants "attack free radicals," and that turmeric can prevent or reduce inflammation or reduce pain from arthritis.[114] The PetLab Defendants make substantially the same claims about PetLab Itch Relief Chews and use of turmeric as an ingredient. The FDA has also found that products advertised as natural pain relief and anti-inflammatory are drugs, and that website claims, testimonials, blog posts, and labeling that makes these and similar representations render the products mislabeled and misbranded drugs and unlawful to sell in interstate commerce.[115]

534.   Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug."

---

[114] Warning Letter to Natural Wonder Products Corp, Sept. 23, 2019, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/natural-wonder-products-corp-592699-09232019 (last visited May 24, 2021).

[115] Warning Letter to Vireo Resources, Aug. 24, 2018, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/vireo-resources-541391-08242018 (last visited May 24, 2021).

535.     On information and belief, the Defendants have not filed a new drug application or obtained approval of any of their products with the Food and Drug Administration. As such, it was unlawful for them to introduce or deliver their products into interstate commerce, and **all** sales of their products in the United States were unlawful.

536.     In addition to the various forms of harm alleged throughout this complaint, which Plaintiffs incorporates here by reference, these particular violations specifically harmed Plaintiffs Widiantoro and Carmichael by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

537.     The Defendants' actions with respect to their products as described above are in violation of 21 U.S.C. §§ 301, *et seq*., and thus constitute unlawful business acts or practices under the UCL.

### Injury from Defendants' Unlawful Actions

538.     To the extent that the unlawful conduct described above is based on misrepresentations, deception, or omission, Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and they deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiffs Widiantoro and Carmichael.

539.     As a direct and proximate result of Defendants' unlawful conduct and unfair competition, Plaintiffs have suffered injury in fact and has lost money or property, time, and attention. Plaintiffs Carmichael and Widiantoro reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, and as a result of Defendants' unlawful conduct and unfair competition, they purchased the products at issue and

paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful and unfair conduct described herein. Plaintiffs ended up with Products that were overpriced, inaccurately marketed, and that did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiffs have suffered injury in fact.

## SEVENTH CAUSE OF ACTION

### Common Law Fraud

540.    Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

541.    The elements for fraudulent concealment are: (1) the defendant must have concealed or suppressed a material fact; (2) the defendant must have had a duty to disclose the fact to the plaintiff; (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff was unaware of the fact and would not have acted as they did if they had known of the concealed or suppressed fact; and (5) the plaintiff was damaged as a result of the concealment  or suppression of the fact.

542.    A duty to disclose arises when a defendant possesses or exerts control over material facts not readily available to the plaintiff. Absent a fiduciary duty, defendants still owe a duty when they have exclusive knowledge of material facts not unknown to the plaintiff, when they actively conceal a material fact from the plaintiff, or when they make partial representations but also suppresses some material facts.

543.    Defendants have concealed and suppressed material facts.

544.    Defendants had a duty to disclose because they had exclusive knowledge of material facts, they actively concealed material facts. They made partial representations as described in the

FACTUAL ALLEGATIONS within the Complaint, and in Plaintiffs' Fifth, Sixth, and Seventh Causes of Action, and the particular acts of fraud and particular omissions committed by Defendants against each Plaintiff are alleged therein.

545.    Defendants' acts were made with intent to defraud as alleged in Plaintiffs' Seventh Cause of Action.

546.    Plaintiffs did not know of the material facts that Defendants concealed and would not have purchased Defendants' Products if those facts had been known.

547.    Plaintiffs sustained damages as a proximate cause of Defendants fraudulent acts as described in Plaintiffs' Fifth and Sixth Causes of Action, because had the fraud not occurred, they would not have purchased the products at issue.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs demand judgment as follows:

A.  For judgment for all Plaintiffs on their claims including actual damages, incidental damages, consequential damages for all Plaintiffs;

B.  Medical monitoring costs for Plaintiffs Brown, Stefanacci, and Tishman;

C.  Emotional distress damages and any other damages for personal injury in an amount to be proven at trial for Plaintiffs Brown, Stefanacci, and Tishman;

D.  Punitive damages for all Plaintiffs;

E.  For all Plaintiffs, restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendants obtained from Plaintiffs as a result of the unlawful, unfair, and deceptive business practices described herein;

F.  An award of attorneys' fees and costs for all Plaintiffs;

G.  Statutory damages to the extent appropriate for any Plaintiff;

H.  For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and such other and further relief as is necessary and appropriate for all Plaintiffs;

I.  For any and all relief listed specifically in any Cause of Action above as to that Cause of Action.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 17, 2021                **LAW OFFICE OF DAYTON P.  HAIGNEY**

Dayton P. Haigney III. (DH-3455)
233 Broadway, Suite 2348
New York, NY 10279
(212) 557-5590
dphlaw@msn.com

**KNEUPPER & COVEY, PC**

*/s/ Kevin M. Kneupper*
Kevin M. Kneupper
*(pro hac vice application forthcoming)*
(CA SBN 325413; TX SBN 24050885)
17011 Beach Blvd., Suite 900
Huntington Beach, CA 92647
Tel: (512) 420-8407
kevin@kneuppercovey.com

*Attorneys for Plaintiffs Yonatan Widiantoro, Heather Brown, Colleen Carmichael, Joseph Liotta, Sabrina Lopez, Alissa Stefanacci, Cheryl Tishman, and Jolene Hynes*

137